## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OYOMA ASINOR
1500 Massachussetts Avenue N.W., Apt. 763
Washington, D.C. 20005

BRYAN DOZIER
1754 S Street N.W., Apt. 10
Washington, D.C. 20009,

                          Plaintiffs,

v.

DISTRICT OF COLUMBIA,
c/o Mayor and Office of the Attorney
General for the District of Columbia
400 6th Street, N.W.
Washington, D.C. 20001

JOHN DOES 1–7,

JANE DOE,

                        Defendants.

No. 1:21-cv-_____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES
(Violation of constitutional and D.C.-law rights of journalists covering racial justice protests)

### INTRODUCTION

1.  On August 29, 2020 and August 31, 2020, people gathered near Black Lives Matter Plaza, near the White House, to protest racism and brutality in policing. On both nights, the District of Columbia's Metropolitan Police Department (MPD) responded to these demonstrations with the very sorts of tactics people were protesting. MPD officers, some clad in riot gear and wielding batons, deployed chemical irritants and stun grenades against demonstrators, even though, just

weeks earlier, the D.C. Council had unanimously banned officers from using these weapons to disperse demonstrations. Plaintiffs Oyoma Asinor and Bryan Dozier, independent photojournalists seeking to document demonstrations in D.C., were victims of the attack on August 29, and Mr. Asinor was similarly attacked on August 31. Both endured searing pain and emotional distress as a result.

2.   Following the attack on August 31, MPD officers carried out a mass arrest of people near the Plaza, including Mr. Asinor. The officers did not have probable cause to arrest Mr. Asinor: Mr. Asinor was not involved in any conduct that was unlawful or that could reasonably have been viewed as unlawful. Nonetheless, officers detained Mr. Asinor overnight. The next day, when Mr. Asinor was released without charges, MPD refused to return his cell phone, camera, and goggles— items officers had seized upon his arrest. MPD did not return these items for almost a full year, even though he requested them multiple times, and MPD had no lawful basis to keep them.

3.   MPD's use of chemical irritants and less-lethal projectiles on August 29 and 31 violated the D.C. First Amendment Assemblies Act and D.C. common law. Additionally, MPD's baseless arrest of Mr. Asinor and unreasonable retention of his property were also unlawful. Both Plaintiffs now seek compensation for the injuries they sustained due to the officers' illegal conduct.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to redress the deprivation of rights under the Fourth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

5.   Plaintiffs' claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.   Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to this action occurred in this District.

## PARTIES

7.   Plaintiff Oyoma Asinor is a resident of the District of Columbia. He attended a protest at or around Black Lives Matter Plaza during the late-night hours of August 29, 2020 and into the early morning of August 30, 2020 to photograph the demonstrations as an independent photojournalist. Once again acting in his role as a photojournalist, he attended another protest at that location that extended from the late-night hours of August 30, 2020 into the early morning hours of August 31, 2020.

8.   Plaintiff Bryan Dozier is a resident of the District of Columbia. He attended a protest at or around Black Lives Matter Plaza during the late-night hours of August 29, 2020 and into the early morning of August 30, 2020 to photograph the demonstration as an independent photojournalist.

9.   Defendants John Does 1–7 and Defendant Jane Doe are officers of the Metropolitan Police Department. At the time of the events at issue, these defendants were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

10. Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the District of Columbia Metropolitan Police Department (MPD) pursuant to the laws of the District of Columbia. In this case, the District acted through its agents, employees, and servants, including Defendants John Does 1–7 and Jane Doe.

**FACTUAL ALLEGATIONS**

**The District of Columbia Bans MPD Use of Chemical Irritants and Less-Lethal Projectiles**

11. In the wake of police killings of George Floyd and Breonna Taylor, mass protests against police brutality occurred throughout the District of Columbia in the summer of 2020.

12. These demonstrations were often themselves met with police brutality. Throughout the summer, MPD officers used a wide range of weapons—from chemical irritants to stun grenades—to disperse crowds of demonstrators. MPD's tactics prompted the D.C. Council to unanimously pass emergency legislation in July 2020 banning the use of chemical irritants and less-lethal projectiles at First Amendment assemblies.

13. Specifically, the legislation stated that "chemical irritants" and "less-lethal projectiles" "shall not be used by MPD to disperse a First Amendment assembly." Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 § 121(b) (July 22, 2020). It was signed by the Mayor on July 22 and became effective on that date. *See* 67 D.C. Register 9148 (July 31, 2020).

14. The statute defines "chemical irritant" as "tear gas or any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure, or any substance prohibited by the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, effective April 29, 1997." *Id.* § 121(a)(2).

15. The statute defines "less-lethal projectiles" as "any munition that may cause bodily injury or death through the transfer of kinetic energy and blunt force trauma," including "rubber or foam-covered bullets and stun grenades." *Id.* § 121(a)(3).

4

16. A stun grenade is an explosive device that causes people to experience disorientation by producing, among other effects, loud noise. Stun grenades are occasionally referred to as "flash-bangs." *See id.*

17. The legislation inserted the new weapons prohibitions into the First Amendment Assemblies Act, D.C. Code § 5-331.01 *et seq*., which is intended to "protect persons who are exercising First Amendment rights in the District of Columbia," D.C. Code § 5-331.17, and which sets forth the District's policy that "persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways," D.C. Code § 5-331.03. The D.C. Council passed the First Amendment Assemblies Act following a Council investigation of MPD's unlawful handling of prior demonstrations; it was "a response to . . . law enforcement based on the past record" as well as an "affirm[ation of] the importance of the exercise of First Amendment rights." D.C. Council Comm. on the Judiciary, Report on Bill No. 15- 968 at 1 (Dec. 1, 2004) (referencing prior demonstrations including "anti-globalization demonstrations . . . in 2002," and noting that the Council was enacting safeguards that were "first proposed in litigation following the 1971 'May Day' demonstrations against the Vietnam War").

**The August 29, 2020 Attack**

18. Plaintiffs Oyoma Asinor and Bryan Dozier are independent photojournalists who have previously photographed demonstrations in the District. Starting in June 2020, Plaintiffs documented demonstrations against police brutality through the District on a near-daily basis.

19. Mr. Dozier's work has been published by the Wall Street Journal, Time Magazine, Financial Times, and The Guardian.

20. Mr. Asinor's work has been published by the Washington Post.

21. On August 29, 2020, at around 7:00 p.m., Plaintiffs covered a group of demonstrators who marched through the District of Columbia to protest police brutality.

22. Plaintiffs took photographs of the protest to document what occurred. Mr. Asinor brought his camera and wore it strapped across his body. Mr. Dozier brought his camera, a backpack, a separate shoulder bag with camera gear, and a belt gear pack with him.

23. The protesters marched through various neighborhoods in the District before arriving at the intersection of 16th Street NW and H Street NW, near Black Lives Matter Plaza ("BLM Plaza").

24. Plaintiffs arrived at this intersection at or around 11:00 p.m.

25. That night, there was a large police presence at BLM Plaza and on surrounding streets. MPD officers stood behind concrete barricades erected in front of St. John's Church. There were two barricades—one that stretched north on 16th Street NW ("16th Street Barricade") and one that stretched east on H Street NW ("H Street Barricade"). MPD officers were stationed in front of the church and behind these barricades.

26. Several other MPD officers with bicycles ("bike officers") stood further east on H Street, between the H Street Barricade and Vermont Avenue NW.

27. At the H Street and Vermont Avenue intersection, another line of MPD officers stood across Vermont Avenue.

28. The annotated map below shows the officers' positions at around 11:00 p.m. on August 29.



29. A large group of protestors stood near the 16th and H Street Barricades. They held signs, shouted slogans, and chanted to express their outrage with the state of policing in America.

30. Both Mr. Asinor and Mr. Dozier walked around the areas of the 16th Street Barricade and H Street Barricade to film and photograph the protest.

31. At or around 11:30 p.m., several MPD officers surrounded a demonstrator at the H Street Barricade and appeared to arrest that individual. The demonstration otherwise continued.

*Officers' Unlawful Use of Chemical Irritants Injures Mr. Dozier*

32. As he was filming, Mr. Dozier followed a group of protesters east on H Street, toward its intersection with Vermont Avenue.

33. He paused near the line of bike officers stationed on H Street and continued to film officers and protesters.

34. Protestors stood a few feet in front of the officers, holding signs and verbally demonstrating against officers, expressing frustration with their practices.

35. Moments after Mr. Dozier arrived, he saw one of the bike officers closest to the H Street Barricade shove a demonstrator. The protesters near the individual yelled at the officer. Mr. Dozier moved closer to film the officers.

36. Mr. Dozier did not see any demonstrator touch the officers, throw objects at the officers, or do anything other than continue to verbally protest.

37. Nonetheless, as the protestors expressed their objections, Officer John Doe 1, who was standing farther west on H Street, by or behind the H Street Barricade, released a munition into H Street. Mr. Dozier heard a hissing sound, like pressure being released, and then saw some form of gas or smoke with chemical irritants ascend rapidly.

38. The smoke prompted Mr. Dozier to back farther away from the barricade.

39. Many protesters also backed away from the barricade.

40. As protesters were moving back, Officer John Doe 2 released another munition from behind the H Street Barricade, causing more smoke or gas with chemical irritants to fill the air.

41. This irritant from John Doe 2's munition combined with the irritant produced by John Doe 1's munition to create clouds of smoke that lingered in the air.

42. Despite Mr. Dozier's attempt to retreat, the irritants made contact with him and caused him to cough.

43. Mr. Dozier ran east on H Street toward its intersection with Vermont Avenue to escape. Many demonstrators started running in that direction too.

44. At or near the intersection, Mr. Dozier saw officers wearing riot gear with helmets and batons ("riot officers"), marching toward him from further east on H Street. The officers marched in a line that spanned the width of H Street, heading west. As Mr. Dozier was looking for an exit, the riot officers marched through the intersection and past Mr. Dozier.

45. Suddenly, Officer John Doe 3 grabbed Mr. Dozier, lifted him, and pushed him west on H Street, through the line of riot officers that had just passed by him, and back near the clouds of chemical irritants produced by the two munitions Mr. Dozier had been running from. Officer John Doe 3's placement of Mr. Dozier left him with no exit available, except to continue west on H Street, through the clouds of irritants.

46. Mr. Dozier struggled to breathe as he moved through the chemical irritants. He continued to cough, his nose ran, and he felt burning across his face. He continued west on H Street, then turned north onto 16th Street.

*Officer's Unlawful Use of Chemical Irritants Injures Mr. Asinor*

47. Mr. Asinor had been photographing near the H Street Barricade when he heard the sound of Officers John Doe 1 and 2 releasing munitions.

48. He moved closer to the intersection of H Street and Vermont Avenue to take photos of the scene and the smoke or gas produced.

49. Shortly thereafter, Mr. Asinor saw riot officers advancing toward him on H Street, ordering people to move back and marching in a line that spanned the width of the street so people could not move east on H Street.

50. Faced with this line of riot officers, Mr. Asinor, along with several journalists and demonstrators standing near him, started moving west on H Street toward 16th Street, keeping about five feet ahead of the riot officers.

51. Many people around Mr. Asinor continued to engage in First Amendment activities. Some people held out their phones to film the officers and narrated what the officers were doing. Others raised signs with statements critical of policing.

9

52. Mr. Asinor himself walked backwards to continue capturing pictures of the riot officers and demonstrators near or in front of him.

53.  Mr. Asinor and the demonstrators and journalists near him reached the intersection of 16th and H Streets and turned onto 16th Street, shortening the distance between one of the demonstrators on the inside of the turn and the riot officers.

54. Neither this demonstrator nor any of the other people around him touched the officers or made any threatening movements or statements.

55. But several riot officers, apparently frustrated that the demonstrator was now closer to them, grabbed the demonstrator and pushed him to the ground, wielding batons against him.

56. The demonstrator attempted to get up and move away from the officers.

57. As the demonstrator moved away, Officer John Doe 4, who was holding a gun-shaped weapon attached to a small tank, unleashed liquid containing chemical irritant toward the demonstrator and the people near him, hitting Mr. Asinor.

58. Mr. Asinor felt a burning sensation on his neck and experienced trouble breathing from the chemical irritant spray. He was coughing, his eyes watered, and he experienced disorientation.

*Officer's Unlawful Use of Less-lethal Projectiles Against Plaintiffs*

59. Around the time Mr. Asinor was hit with chemical irritant, Officer John Doe 5 began deploying a series of at least six stun grenades in close succession, near the intersection of 16th and H Streets.

60. The stun grenades produced smoke and loud noises that terrified and disoriented Mr. Asinor, who was still near the intersection of 16th and H Streets, and Mr. Dozier, who was further north on 16th Street.

61. At the time Officer John Doe 5 deployed the stun grenades, neither Mr. Asinor nor Mr. Dozier saw any protestors make contact with officers, throw objects at them, or engage in any violent behavior.

62. Instead, Mr. Asinor and Mr. Dozier saw the protestors engaged in First Amendment activity, such as chanting slogans and waving signs.

63. Some protestors asked officers why munitions were being used when the tactic had been banned.

64. The stun grenades placed Mr. Asinor and Mr. Dozier in fear that either the officers or explosive devices deployed by the officers would imminently make contact with their bodies.

65. The riot officers continued to march, pushing protestors and Plaintiffs north on 16th Street.

66. Mr. Asinor and Mr. Dozier fled the scene and returned to their respective apartments.

### The August 31, 2020 Attack and Mr. Asinor's Arrest

67. On the night of August 30, 2020, a group of demonstrators gathered at or near Black Lives Matter Plaza for another demonstration against police brutality. Plaintiff Oyoma Asinor again attended the protest as an independent photojournalist and brought his camera and cellphone to document it.

68. At or around 12:00 a.m. on August 31, 2020, Mr. Asinor arrived at BLM Plaza.

69. Just as on the night before, MPD officers stood in front of St. John's Church behind the 16th Street Barricade and the H Street Barricade. This time, the officers standing behind the barricades had large shields and helmets.

70. Protesters stood directly in front of the barricades, chanting and voicing their frustration with policing. Mr. Asinor moved around the intersection of 16th and H Streets, taking photographs of demonstrators and officers.

71. MPD officers yelled at protesters to move away from the intersection, indicating that they should move further north up 16th Street. The protesters complied, moving away from the H Street Barricade.

72. A separate group of officers formed a line in the intersection of 16th and H Street, across H Street, blocking people from moving east of the intersection. These officers wore helmets, and several were equipped with gun-shaped weapons attached to small tanks.

73. Mr. Asinor continued photographing the officers, standing with another photojournalist at the northwest corner of the intersection of 16th and H Streets.

74. Mr. Asinor was facing the 16th Street Barricade. Several demonstrators were in front of Mr. Asinor, standing closer to the barricade than he was. A smaller group of demonstrators stood about three to five feet behind him, further back on H Street.

75. As Mr. Asinor continued photographing, he saw a small item—what appeared to be a water bottle—thrown from behind him toward the MPD officers at the barricades. Mr. Asinor believed that the water bottle came from the group standing behind him.

76. Several demonstrators asked who had thrown the bottle and shouted that others should not do anything like that or provoke officers.

77. Moments after the water bottle was thrown, an officer behind the 16th Street Barricade walked up to the barricade and rolled a smoke munition onto 16th Street. The munition produced a large cloud of smoke on 16th Street.

78. Around the same time, Officer John Doe 6 deployed at least one stun grenade about near where Mr. Asinor was standing.

79. The stun grenade produced smoke and a loud noise that Mr. Asinor found terrifying and disorienting.

80. The stun grenade placed Mr. Asinor in fear that either the officer or explosive device deployed by the officer would imminently make contact with his body.

81. MPD officers then walked out from behind the barricade and began to march toward demonstrators by the 16th Street Barricade, causing them to move farther north. Mr. Asinor and a few other journalists remained in the intersection to take photos of officers, but several officers told them to move away.

82. Mr. Asinor walked north on 16th Street. Several small concrete blocks, separated by several feet, stood across 16th Street about halfway between H and I Streets. Mr. Asinor walked between and past these blocks, continuing north.

83. He then noticed that several officers had stopped immediately south of the blocks. The officers stood in a line for several minutes, facing north, and pointing, but not firing, cannon-shaped weapons at Mr. Asinor and the others near him.

84. Mr. Asinor and a few other journalists and demonstrators stopped as well, on the north side of the blocks around ten feet away from the blocks. A larger group of demonstrators had continued farther north of Mr. Asinor and the few others near him. Mr. Asinor began taking more pictures.

85. Some of the people on the north side of the blocks with Mr. Asinor filmed the officers, narrating what was happening. Other people chanted slogans and others called out to the officers, asking why they were pointing weapons at the demonstrators.

86. Demonstrators standing around five to seven feet behind Mr. Asinor threw two water bottles at the officers, which either missed them or landed near them harmlessly.

87. The officers responded by shooting rubber bullets at the demonstrators. After that, Mr. Asinor did not see the demonstrators throw anything else or attack or threaten the officers in any way.

88. Nonetheless, the officers ran between the blocks, charging at Mr. Asinor and others who had stopped on the north side of the blocks. Mr. Asinor had been facing the officers and taking photos, but he turned around to run north on 16th Street as soon as he saw them charge.

89. Officer John Doe 7 sprayed liquid chemical irritants at Mr. Asinor and others running away.

90. The spray hit Mr. Asinor, causing him to feel a burning sensation on his skin as he was running. He additionally felt a burning sensation in his nose, his eyes watered, and he had trouble breathing. Mr. Asinor had goggles with him, but he was not wearing them so that he could better use his camera.

91. As Mr. Asinor was running up 16th Street, officers on bicycles quickly emerged from both east and west sides and formed a line to block off 16th Street at I Street. Some of these officers got off the bicycles and began to run south on 16th Street, resulting in Mr. Asinor and others being boxed in between the officers chasing them north on 16th and these bike officers moving south.

92. Mr. Asinor attempted to move around individual bike officers to leave the area, but Officer Jane Doe, one of the bike officers, struck him in the chest with her arm and stopped him. Officer Jane Doe forced Mr. Asinor onto the ground and handcuffed him.

93. Mr. Asinor informed Officer Jane Doe that he was a member of the press multiple times, repeatedly telling her that he was carrying a camera for journalistic purposes; however, she did not allow him to leave.

94. Another officer later told Mr. Asinor that he was being arrested for "felony rioting."

95. The D.C. Code defines a riot as "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a). The statute makes it unlawful

to "willfully engage[] in a riot in the District of Columbia" or "willfully incite[] or urge other persons to engage in a riot." *Id.* § 22-1322(b) & (c).

96. Mr. Asinor did not engage in a "riot" on August 30 or 31.  He did not incite or urge others to do so. Nor did he commit any other unlawful act.

97. Nothing Mr. Asinor did on August 30 or 31, 2020 provided probable cause to believe that he violated D.C. Code § 22-1322 or any other law.

98. In the moments before his arrest, Mr. Asinor had been taking pictures, and then attempting to flee from officers who, without provocation, had fired chemical irritants at him and chased him up 16th Street. He was not encouraging individuals to engage in unlawful, riotous acts. Nor was he near people engaged in riotous or otherwise unlawful acts when the officers began to charge.

99. Indeed, aside from witnessing the water bottles thrown from several feet behind him, Mr. Asinor did not see any actions by demonstrators at the protests that could in any way be construed as tumultuous, violent, or threatening injury to persons or property.

100.     After the arrest, an MPD officer removed Mr. Asinor's property, including his camera, cellphone, and goggles. Mr. Asinor was then transported to the Second Police District.

101.     He remained in police custody overnight. He continued to feel the effects of the chemical irritants with which he had been hit. While in custody, he asked for a new COVID-19 face mask because irritant had gotten on his previous face covering and produced a burning sensation on his skin.

102.     Mr. Asinor was ultimately released on August 31, 2020, after about 17 hours in custody, at which point Mr. Asinor was informed that he would not face any charges (i.e., that his case would be "no papered").

**The Unlawful Retention of Mr. Asinor's Property**

103. Upon release, Mr. Asinor was transported to the Second Police District to recover his property. However, at the precinct, his camera, cellphone, and goggles were not returned to him. Mr. Asinor asked an officer where his camera and cellphone were, and the officer informed him they were being kept as evidence, despite his release without charges.

104. Over the past year, Mr. Asinor contacted several different MPD officers, including the Second District Property Clerk and the Second District Station Sergeant, to obtain his property. None of them returned the missing items.

105. Mr. Asinor also contacted the United States Attorney's Office for the District of Columbia multiple times on his own and through retained counsel, David Benowitz, but never received his property back.

106. On August 3, 2021, in response to a request from Mr. Asinor's attorneys at the American Civil Liberties Union of the District of Columbia, MPD allowed Mr. Asinor to collect his property—nearly a year after Mr. Asinor's arrest.

107. MPD Special Order 15-08 provides that "when [MPD] members recover cell phones from arrestees, and there is no reason to believe the phone has any evidentiary value or is stolen, members shall handle the cell phones as 'Prisoner's Property' in accordance with GO-SPT-601.1." MPD Special Order 15-08: Cell Phone Recovery § III(B) (April 14, 2015).[1]

108. In turn, MPD General Order 601.1 requires officers to return Prisoner's Property to arrestees after they are released. MPD General Order 601.1 § III(A)(4)–(6) (April 30, 1992).[2]

109. MPD had no basis to believe that Mr. Asinor's goggles, phone, or camera were stolen.

---

[1] https://go.mpdconline.com/GO/SO_15_08.pdf
[2] https://go.mpdconline.com/GO/GO_601_01.pdf

110. Nor did MPD have any basis to conclude that Mr. Asinor's goggles, phone, or camera were contraband or evidence of a crime. Mr. Asinor did not use his goggles, cell phone, or camera to advance unlawful action; nor could an officer have thought he used those objects for such purposes given that, for his entire time he was at BLM Plaza and the surrounding area during the early morning of August 31, he wore his goggles on top of his head and used his camera and cell phone solely to take or upload pictures and videos.

111. Even if MPD officers believed that Mr. Asinor's phone and camera contained images of unlawful activity, they had no basis to retain his goggles and could easily have investigated any suspicions about his phone and camera in far less time than the eleven months MPD held them.

112. Special Order 15-08 provides that officers must "[e]nsure an application for a search warrant or court order is presented for [a seized] cell phone as soon as possible but no later than 48 hours after the recovery." Special Order 15-08 § III(C)(4)(c).

113. Once officers obtain a warrant, they have access to Cellebrite Kiosk technologies, which can extract files from most cell phones without damaging the phones and without requiring ongoing retention of the devices to authenticate the data. MPD's Cellebrite Kiosk technology can generally extract material from cellular devices in about 30 minutes.

### Plaintiffs' Injuries

114. When Mr. Dozier arrived home after the August 29 attack, about 30 minutes after he had been attacked by MPD with chemical irritants and stun grenades, he felt intense burning in his eyes and could feel the sting of the irritants in his nose and throat. He took a shower to wash off the irritants but continued to feel a burning sensation on his skin. After the shower, he dry heaved for approximately half an hour.

115. The August 29 attack caused Mr. Dozier significant psychological distress, the effects of which continue to this day. Mr. Dozier met with a psychologist after the incident, who noted that he had several symptoms consistent with Post-Traumatic Stress Disorder.

116. Mr. Dozier continues to experience some of the PTSD symptoms to this day, including heightened sensitivity to loud noises, sudden, unexpected anxiety attacks, and a fear of being trapped with no ability to exit. He additionally continues bi-weekly therapy sessions, which help him deal with his PTSD symptoms.

117. When Mr. Asinor arrived home after the August 29 attack, around 30 to 60 minutes after he had been exposed to the chemical irritants, he took a shower and used dish soap to scrub the chemical irritants off. He continued to cough and experience trouble breathing.

118. Furthermore, as a result of MPD's retention of his property following his August 31 arrest, Mr. Asinor was forced to purchase new equipment, including a new camera, cellphone, SIM card, and other cellphone accessories. He also lost access to old text messages and old photographs and records, including call logs and notes.

119. MPD's attacks against Mr. Asinor on August 29 and 31 as well as the August 31 arrest caused Mr. Asinor significant psychological distress, including difficulty sleeping for weeks.

120. In the ensuing months, he has frequently felt afraid that officers are surveilling him or planning to raid his apartment and has experienced significant anxiety at this thought. Mr. Asinor did not suffer from these fears before his August 31, 2020 arrest.

121. To this day, Mr. Asinor continues to feel jittery and anxious around loud noises such as fireworks, because they remind him of the munitions officers used against him in August 2020. He additionally feels an aversion to Black Lives Matter Plaza and the nearby streets. The lingering

trauma from the events of August 2020 contributed to his decision to stop attending and covering protests a few months later. Mr. Asinor does not currently attend or cover protests.

## Compliance with D.C. Code § 12-309

122. Plaintiffs have satisfied the requirements of D.C. Code § 12-309.

123. On February 25, 2021, counsel for Plaintiffs mailed to the District's Office of Risk Management notice of claim letters informing the District of the approximate time, place, cause, and circumstances of the injuries and damages that each Plaintiff suffered.

124. On February 26, 2021, counsel additionally filed similarly detailed notices of claims for each Plaintiff through the District's online portal.

125. The District confirmed receipt of the notice of claim letters on February 26, 2021 and March 1, 2021. Mr. Asinor's claims were assigned No. GL-21-000807 and No. GL-21-000792. Mr. Dozier's claim was assigned No. GL-21-000791.

## CLAIMS FOR RELIEF

### Claim 1: Negligence per se / First Amendment Assemblies Act – unlawful use of chemical irritants; unlawful use of less-lethal projectiles
### (Plaintiffs Asinor and Dozier against Defendants District of Columbia and Officers John Doe 1–7)

126. The First Amendment Assemblies Act, as amended by Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, imposes two specific duties of care on MPD and its officers toward individuals present at demonstrations: "Chemical irritants shall not be used by MPD to disperse a First Amendment Assembly," D.C. Code § 5-331.16(b)(1), and "Less-lethal projectiles shall not be used by MPD to disperse a First Amendment assembly," D.C. Code § 5-331.16(c)(1).

127. A First Amendment Assembly is a "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views." D.C. Code § 5-331.02(2).

128. Plaintiffs Dozier and Asinor were present at a First Amendment assembly near BLM Plaza around 11:00 p.m. on August 29, 2020; Plaintiff Asinor was also present at a First Amendment assembly near BLM Plaza around 12:00 a.m. on August 31, 2020.

129. The First Amendment Assemblies Act exists to promote safety. As journalists exercising their First Amendment rights to cover demonstrations, Plaintiffs are among the class of individuals the statute is designed to protect, and the prohibitions on the use of chemical irritants and less-lethal munitions to disperse assemblies are duties imposed on MPD officers, including Officers John Does 1–7.

130. Defendants John Doe 1 through 3 are jointly and severally liable to Plaintiff Dozier under the doctrine of negligence per se because they breached their statutory duty of care by causing Plaintiff Dozier to be exposed to chemical irritants as part of their effort to disperse people engaged in a First Amendment Assembly on August 29, 2020 and, in so doing, caused harm to Plaintiff by causing him to experience, among other things, pain, difficulty breathing, and emotional distress.

131. Defendant John Doe 4 is liable to Plaintiff Asinor under the doctrine of negligence per se because he breached his statutory duty of care by using chemical irritants to disperse people engaged in a First Amendment Assembly on August 29, 2020 and caused harm to Plaintiff Asinor by causing him to experience, among other things, pain, difficulty breathing, and emotional distress.

132. Defendant John Doe 5 is liable to Plaintiffs Asinor and Dozier under the doctrine of negligence per se because he breached his statutory duty of care by using less-lethal projectiles,

specifically stun grenades, to disperse people engaged in a First Amendment Assembly on August 29, 2020, and caused harm to Plaintiffs by causing them to experience terrifying and disorienting noise as well as psychological distress.

133. Defendant John Doe 6 is liable to Plaintiff Asinor under the doctrine of negligence per se because he breached his statutory duty of care by using at least one less-lethal projectile, specifically a stun grenade, to disperse people engaged in a First Amendment Assembly on August 31, 2020 and caused harm to Plaintiff by causing him to experience terrifying and disorienting noise as well as psychological distress.

134. Defendant John Doe 7 is liable to Plaintiff Asinor under the doctrine of negligence per se because Defendant John Doe 7 breached his statutory duty of care by using a chemical irritant to disperse people engaged in a First Amendment Assembly on August 31, 2020 and caused harm to Plaintiff Asinor by causing him to experience, among other things, pain, difficulty breathing, and emotional distress.

135. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the negligence of its agents Defendants John Doe 1–7 who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 2: First Amendment Assemblies Act – unlawful use of chemical irritants; unlawful use of less-lethal projectiles
### (Plaintiffs Asinor and Dozier against Defendants District of Columbia and Officers John Doe 1–7)

136. Defendants' use of chemical irritants and less-lethal projectiles to disperse First Amendment assemblies on August 29, 2020 and August 31, 2020 in violation of the First Amendment Assemblies Act violated Plaintiffs' rights directly under the Act, which contains an implied private cause of action.

137. The D.C. Council intended for the Act to be privately enforceable, explicitly stating that its provisions set forth "standards for police conduct" that "may be relied upon by such persons in any action alleging violation of statutory or common law rights." D.C. Code § 5-331.17.

138. Plaintiffs fall within the group for whose special benefit the statute was enacted, as the Act is "intended to protect persons," like Plaintiffs, "who are exercising First Amendment rights in the District of Columbia." *Id.*

139. The Act's purpose is consistent with a private cause of action as it provides that "the declared public policy of the District of Columbia [is] that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia." D.C. Code § 5-331.03.

140. Defendants John Doe 1 through 3 are jointly and severally liable to Plaintiff Dozier for their August 29, 2020 violation of his rights under the First Amendment Assemblies Act to be free from the use of chemical irritants.

141. Defendant John Doe 4 is liable to Plaintiff Asinor for the August 29, 2020 violation of his rights under the First Amendment Assemblies Act to be free from the use of chemical irritants.

142. Defendant John Doe 5 is liable to Plaintiffs Asinor and Dozier for the August 29, 2020 violation of their rights under the First Amendment Assemblies Act to be free from the use of less-lethal projectiles.

143. Defendant John Doe 6 is liable to Plaintiff Asinor for the August 31, 2020 violation of his rights under the First Amendment Assemblies Act to be free from the use of less-lethal projectiles.

144. Defendant John Doe 7 is liable to Plaintiff Asinor for the August 31, 2020 violation of his rights under the First Amendment Assemblies Act to be free from chemical irritants.

145. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents Officers John Doe 1–7, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 3: Assault and battery
### (Plaintiffs Asinor and Dozier against Defendants District of Columbia and Officers John Doe 1–7)

146. District of Columbia law proscribes assault, defined as an act that is intended to cause harmful or offensive contact or place the plaintiff in imminent apprehension of a harmful or offensive contact, and, in fact, causes the plaintiff to experience imminent apprehension of such contact.

147. District of Columbia law proscribes battery, defined as an intentional act that causes a harmful or offensive bodily contact.

148. Defendants John Doe 1 and 2 are jointly and severally liable to Plaintiff Dozier for committing assault and battery because, on August 29, 2020, they intentionally caused demonstrators and journalists, including Plaintiff Dozier, to be exposed to chemical irritants, with the intent and effect of placing those individuals, including Plaintiff Dozier, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Dozier.

149. Defendant John Doe 3 is liable to Plaintiff Dozier for committing assault and battery because, on August 29, 2020, he physically grabbed and then intentionally placed Plaintiff Dozier near chemical irritants with no option but to run through them, with the intent and effect of placing him in imminent apprehension of harmful or offensive contact, and causing such contact.

150. Defendant John Doe 4 is liable to Plaintiff Asinor for committing assault and battery because, on August 29, 2020, he intentionally used chemical irritants against demonstrators and journalists, including Plaintiff Asinor, with the intent and effect of placing those individuals,

23

including Plaintiff Asinor, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Asinor.

151. Defendant John Doe 5 is liable to Plaintiffs Asinor and Dozier for committing assault and battery because, on August 29, 2020, Defendant John Doe 5 intentionally used less-lethal projectiles, specifically stun grenades, against demonstrators and journalists including Plaintiffs, with the intent and effect of placing those individuals, including Plaintiffs, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiffs.

152. Defendant John Doe 6 is liable to Plaintiff Asinor for committing assault and battery because, on August 31, 2020, Defendant John Doe 6 intentionally used at least one less-lethal projectile, specifically at least one stun grenade, against demonstrators and journalists including Plaintiff Asinor, with the intent and effect of placing those individuals, including Plaintiff Asinor, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Asinor.

153. Defendant John Doe 7 is liable to Plaintiff Asinor for committing assault and battery because, on August 31, 2020, Defendant John Doe 7 intentionally used chemical irritants against demonstrators and journalists, including Plaintiff Asinor, with the intent and effect of placing those individuals, including Plaintiff Asinor, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Asinor.

154. Defendants John Does 1–7 acted with intent to injure, or in willful disregard for the rights of Plaintiffs, and their conduct was outrageous or reckless toward the safety of Plaintiffs.

155. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents, who were acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 4: Fourth Amendment / 42 U.S.C. § 1983 – arrest without probable cause
### (Plaintiff Asinor against Defendant Officer Jane Doe)

156. The Fourth Amendment protects Plaintiff Asinor's right to be free from arrests made without probable cause.

157. On August 31, 2020, Defendant Jane Doe violated this right when she arrested Plaintiff Asinor even though he was not engaged in illegal activity, took no actions that a reasonable officer could have believed were unlawful, and was in no way participating in, and could not have been perceived as participating in, a crowd of people engaging in unlawful riotous activity.

158. Defendant Jane Doe acted with reckless or callous disregard for Plaintiff's rights as well as in intentional violation of federal law.

### Claim 5: False arrest / false imprisonment
### (Plaintiff Asinor and against Defendants District of Columbia and Officer Jane Doe)

159. District of Columbia law proscribes false arrest or false imprisonment, defined as unlawful detention or restraint of an individual against the individual's will.

160. Defendant Jane Doe committed false arrest or false imprisonment when she restrained and detained Plaintiff Asinor without a warrant or probable cause on August 31, 2020. Mr. Asinor was not engaged in illegal activity, took no actions that a reasonable officer could have believed were unlawful, and was in no way participating in, and could not have been perceived as participating in, a crowd of people engaging in unlawful riotous activity.

161. Defendant Jane Doe acted with intent to injure, or in willful disregard for the rights of Plaintiff Asinor, and her conduct was outrageous or reckless toward the safety of Plaintiff.

162. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agent Jane Doe, who was acting within the scope of her employment as an MPD officer and on behalf of and in the interests of her employer.

### Claim 6: Conversion
### (Plaintiff Asinor against Defendant District of Columbia)

163. District of Columbia law proscribes conversion, defined as unlawful exercise of ownership, dominion, and control over the personal property of another in denial or repudiation of their right to such property. A conversion claim will lie against the District when "the police, after lawfully coming into possession of plaintiff's property, thereafter wrongfully refused to surrender it." *O'Callaghan v. District of Columbia*, 741 F. Supp. 273, 280 (D.D.C. 1990); *see also Savoy Const. Co. v. Atchison & Keller, Inc.*, 388 A.2d 1221, 1223 (D.C. 1978). By retaining Plaintiff Asinor's property after the justification for holding it expired, and refusing to return it in response to Plaintiff Asinor's requests, MPD officers exercised unlawful dominion and control over Plaintiff Asinor's property for over eleven months, thereby depriving him of his right to his property and causing him financial damage consisting of the costs of replacement. He additionally lost access to data, including text messages, photographs, and records including call logs and notes.

164. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents, who were acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

    (a) ENTER JUDGMENT declaring that the actions of all Defendants violated D.C. law and that the actions of Defendant Jane Doe also violated the Fourth Amendment;

    (b) ENTER JUDGMENT awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

    (c) ENTER JUDGMENT awarding Plaintiffs punitive damages against all individual Defendants in an amount appropriate to the evidence adduced at trial;

(d) ENTER JUDGMENT awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(e) GRANT Plaintiffs such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)
Megan Yan (D.C. Bar No. 1735334)
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
202-457-0800
mperloff@acludc.org

August 12, 2021                                    Counsel for Plaintiffs[*]

---

[*] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this filing.