## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OYOMA ASINOR
1500 Massachussetts Avenue N.W., Apt. 763
Washington, D.C. 20005

BRYAN DOZIER
1754 S Street N.W., Apt. 10
Washington, D.C. 20009,

                        Plaintiffs,

v.

DISTRICT OF COLUMBIA,
c/o Mayor and Office of the Attorney
General for the District of Columbia
400 6th Street, N.W.
Washington, D.C. 20001,

COMMANDER ROBERT GLOVER,
c/o District of Columbia Metropolitan Police
Department
2850 New York Avenue, N.E.
Washington, D.C. 20002,

OFFICER SHAWN CALDWELL
c/o District of Columbia Metropolitan Police
Department
2850 New York Avenue, N.E.
Washington, D.C. 20002,

JOHN DOES 1–3,

                        Defendants.

No. 1:21-cv-02158-APM

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT FOR DAMAGES
(Violation of constitutional and D.C.-law rights of journalists covering racial justice protests)

## INTRODUCTION

1.   This case arises from two forms of abuse that the District of Columbia's Metropolitan Police Department (MPD) regularly inflicts on the people it polices. The first is the use of chemical irritants and stun grenades to disperse demonstrations. On July 22, 2020, the D.C. Council banned MPD from deploying these tactics, but just over one month later, on August 29, 2020, MPD officers used them anyway. That night, people gathered near Black Lives Matter Plaza, near the White House, to protest racism and brutality in policing. MPD officers, some clad in riot gear and wielding batons, unjustifiably deployed chemical irritants and stun grenades against demonstrators and journalists, including Plaintiffs Oyoma Asinor and Bryan Dozier, photojournalists who were seeking to document the demonstration. Both endured searing pain and emotional distress as a result.

2.   The second form of misconduct at issue in this case is the District's practice of retaining arrestees' cell phones for months after any conceivable governmental justification has expired. Seizures of property, including those lawful at their inception, become unreasonable, and therefore unconstitutional under the Fourth Amendment, when the seizure lasts beyond the point of law enforcement need. The District, through MPD, has defied this constitutional mandate hundreds of times in the past several years, retaining arrestees' phones for protracted time periods even when the phones are not physical evidence, and when search warrants for their contents are not obtained or have long since been executed. One application of the District's custom of prolonged cell phone retentions occurred on August 31, 2020, when MPD officers arrested Mr. Asinor at another demonstration near Black Lives Matter Plaza (even though he violated no law), seized his cell phone, camera, and goggles, and retained those items for over eleven months, notwithstanding the lack of criminal charges against Mr. Asinor and his repeated request for their return.

3.  Plaintiffs now seek a declaration that the conduct of the District and its officers was unlawful and compensation for the injuries they sustained due to the Defendants' illegal acts.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions. The Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to redress the deprivation of rights under the Fourth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

5.  Plaintiffs' claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.  Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to this action occurred in this District.

## PARTIES

7.  Plaintiff Oyoma Asinor is a resident of the District of Columbia. He attended a protest at or around Black Lives Matter Plaza during the late-night hours of August 29, 2020 and into the early morning of August 30, 2020 to photograph the demonstrations as an independent photojournalist. Once again acting in his role as a photojournalist, he attended another protest at that location that extended from the late-night hours of August 30, 2020 into the early morning hours of August 31, 2020.

8.  Plaintiff Bryan Dozier is a resident of the District of Columbia. He attended a protest at or around Black Lives Matter Plaza during the late-night hours of August 29, 2020 and into the early morning of August 30, 2020 to photograph the demonstration as an independent photojournalist.

9.  Defendants Robert Glover, Shawn Caldwell, and John Does 1–3 are officers of the Metropolitan Police Department. At the time of the events at issue, these defendants were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

10. Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the District of Columbia Metropolitan Police Department (MPD) pursuant to the laws of the District of Columbia. In this case, the District acted through its agents, employees, and servants, including Defendants Robert Glover, Shawn Caldwell, and John Does 1–3.

## FACTUAL ALLEGATIONS

### The District of Columbia Bans MPD Use of Chemical Irritants and Less-Lethal Projectiles

11. In the wake of police killings of George Floyd and Breonna Taylor, mass protests against police brutality occurred throughout the District of Columbia in the summer of 2020.

12. These demonstrations were often themselves met with police brutality. Throughout the summer, MPD officers used a wide range of weapons—from chemical irritants to stun grenades—to disperse crowds of demonstrators. MPD's tactics prompted the D.C. Council to unanimously pass emergency legislation in July 2020 banning the use of chemical irritants and less-lethal projectiles at demonstrations (in the language of the D.C. Code, "First Amendment assemblies").

13. Specifically, the legislation stated that "chemical irritants" and "less-lethal projectiles" "shall not be used by MPD to disperse a First Amendment assembly." Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 § 121(b) (July 22, 2020). It was signed by the Mayor on July 22 and became effective on that date. *See* 67 D.C. Register 9148 (July 31, 2020).

14. The statute defines "chemical irritant" as "tear gas or any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure, or any substance prohibited by the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, effective April 29, 1997." *Id.* § 121(a)(2).

15. The statute defines "less-lethal projectiles" as "any munition that may cause bodily injury or death through the transfer of kinetic energy and blunt force trauma," including "rubber or foam-covered bullets and stun grenades." *Id.* § 121(a)(3).

16. A stun grenade is an explosive device that causes people to experience disorientation by producing, among other effects, loud noise. Stun grenades are occasionally referred to as "flash-bangs." *See id.*

17. The legislation inserted the new weapons prohibitions into the First Amendment Assemblies Act, D.C. Code § 5-331.01 *et seq.*, which is intended to "protect persons who are exercising First Amendment rights in the District of Columbia," D.C. Code § 5-331.17, and which sets forth the District's policy that "persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways," D.C. Code § 5-331.03. The D.C. Council passed the First Amendment Assemblies Act following a Council investigation of MPD's unlawful handling of prior demonstrations; it was "a response to . . . law enforcement based on the past record" as well as an "affirm[ation of] the importance of the exercise of First Amendment rights." D.C. Council Comm. on the Judiciary, Report on Bill No. 15-968 at 1 (Dec. 1, 2004) (referencing prior demonstrations including "anti-globalization demonstrations . . . in 2002," and noting that the Council was enacting safeguards that were "first proposed in litigation following the 1971 'May Day' demonstrations against the Vietnam War").

**The August 29, 2020 Attack**

18. Plaintiffs Oyoma Asinor and Bryan Dozier are photojournalists who have previously photographed demonstrations in the District. Starting in June 2020, Plaintiffs documented demonstrations against police brutality through the District on a near-daily basis.

19. Mr. Dozier's work has been published by the Wall Street Journal, Time Magazine, Financial Times, and The Guardian.

20. Mr. Asinor's work has been published by the Washington Post.

21. On August 29, 2020, at around 7:00 p.m., Plaintiffs covered a group of demonstrators who marched through the District of Columbia to protest police brutality.

22. Plaintiffs took photographs of the protest to document what occurred. Mr. Asinor brought his camera and wore it strapped across his body. Mr. Dozier brought his camera, a backpack, a separate shoulder bag with camera gear, and a belt gear pack with him.

23. The protesters marched through various neighborhoods in the District before arriving at the intersection of 16th Street NW and H Street NW, near Black Lives Matter Plaza ("BLM Plaza").

24. Plaintiffs arrived at this intersection at around 11:00 p.m.

25. That night, there was a large police presence at BLM Plaza and on surrounding streets. MPD officers stood behind concrete barricades erected in front of St. John's Church. There were two barricades—one that stretched north on 16th Street NW ("16th Street Barricade") and one that stretched east on H Street NW ("H Street Barricade"). MPD officers were stationed in front of the church and behind these barricades.

26. Several other MPD officers with bicycles ("bike officers") stood further east on H Street, between the H Street Barricade and Vermont Avenue NW.

27. At the H Street and Vermont Avenue intersection, another line of MPD officers stood across Vermont Avenue.

28. The annotated map below shows the officers' positions at around 11:00 p.m. on August 29.



29. A large group of protestors stood near the 16th and H Street Barricades. They held signs, shouted slogans, and chanted to express their outrage with the state of policing in America.

30. Both Mr. Asinor and Mr. Dozier walked around the areas of the 16th Street Barricade and H Street Barricade to film and photograph the protest.

31. At around 11:20 p.m., several MPD officers surrounded a demonstrator at the H Street Barricade and appeared to arrest that individual. The demonstration otherwise continued.

*Officers' Unlawful Use of Chemical Irritants Injures Mr. Dozier*

32. As he was filming, Mr. Dozier followed a group of protesters east on H Street, toward its intersection with Vermont Avenue.

33. He paused near the line of bike officers stationed on H Street and continued to film officers and protesters.

34. Protestors stood a few feet in front of the officers, holding signs and verbally demonstrating against officers, expressing frustration with their practices.

35. Moments after Mr. Dozier arrived, he saw a protestor shoved near the bike officers stationed between the H Street Barricade and Vermont Avenue. Mr. Dozier moved closer to film what was occurring.

36. Mr. Dozier did not see any demonstrator touch the officers, throw objects at the officers, or do anything other than continue to verbally protest.

37. Nonetheless, as the protestors expressed their frustrations with MPD officers' actions that night and more generally, Officer John Doe 1 released a munition onto H Street not far from where Mr. Dozier was standing. Mr. Dozier heard a hissing sound, like pressure being released, and then saw the spread of some form of gas or smoke which contained chemical irritant (a fact that became clear when it made contact with him).

38. The smoke prompted Mr. Dozier to back farther away from the bike officers.

39. Many protesters also backed away from the bike officers.

40. As protesters were moving back, Officer John Doe 2 released another munition, causing more smoke or gas with chemical irritants to fill the air.

41. This irritant from John Doe 2's munition combined with the irritant produced by John Doe 1's munition to create clouds of smoke that lingered in the air.

42. Despite Mr. Dozier's attempt to retreat, the irritants made contact with him and caused him to cough.

43. Mr. Dozier ran east on H Street toward its intersection with Vermont Avenue to escape the chemical smoke. Many demonstrators started running in that direction too.

44. Mr. Dozier turned north on Vermont, and, just as he passed its intersection with H Street, he saw officers wearing riot gear with helmets and batons ("riot officers"), marching from further east on H Street toward the intersection between H Street and Vermont. The officers marched in a line that spanned the width of H Street, heading west. Another line of riot officers marched past Mr. Dozier down Vermont.

45. Defendant Commander Robert Glover grabbed Mr. Dozier, lifted him, and pushed him through the line of riot officers that had just passed by him. Defendant Glover's placement of Mr. Dozier forced him to go west on H Street, through the clouds of irritants produced by the two munitions.

46. Mr. Dozier struggled to breathe as he moved through the chemical irritants. His nose ran, and he felt burning across his face. He continued west on H Street, then turned north onto 16th Street.

*Officer's Unlawful Use of Chemical Irritants Injures Mr. Asinor*

47. Mr. Asinor had been photographing near the H Street Barricade when he heard the sound of Officers John Doe 1 and 2 releasing munitions.

48. He moved closer to the intersection of H Street and Vermont Avenue to take photos of the scene and the smoke or gas produced.

49. Shortly thereafter, Mr. Asinor saw riot officers advancing toward him on H Street, ordering people to move back and marching in a line that spanned the width of the street so people could not move east on H Street.

50. Faced with this line of riot officers, Mr. Asinor, along with several journalists and demonstrators standing near him, started moving west on H Street toward 16th Street, keeping about five feet ahead of the riot officers.

51. Many people around Mr. Asinor continued to engage in First Amendment activities. Some people held out their phones to film the officers and narrated what the officers were doing. Others raised signs with statements critical of policing.

52. Mr. Asinor himself walked backwards to continue capturing pictures of the riot officers and demonstrators near or in front of him.

53. Mr. Asinor and the demonstrators and journalists near him reached the intersection of 16th and H Streets and turned onto 16th Street, shortening the distance between one of the demonstrators on the inside of the turn and the riot officers.

54. Neither this demonstrator nor any of the other people around him touched the officers or made any threatening movements or statements.

55. But several riot officers, apparently frustrated that the demonstrator was now closer to them, grabbed the demonstrator and pushed him to the ground, wielding batons against him.

56. The demonstrator attempted to get up and move away from the officers.

57. As the demonstrator moved away, Defendant Officer Shawn Caldwell, who was holding a gun-shaped weapon attached to a small tank, unleashed liquid containing chemical irritant toward the demonstrator and the people near him, hitting Mr. Asinor.

58. Mr. Asinor felt a burning sensation on his neck and experienced trouble breathing from the chemical irritant spray. He was coughing, his eyes watered, and he experienced disorientation.

*Officer's Unlawful Use of Less-lethal Projectiles Against Plaintiffs*

59. Around the time Mr. Asinor was hit with chemical irritant, at least one officer, Officer John Doe 3, began deploying a series of stun grenades near the intersection of 16th and H Streets.

60. The stun grenades produced smoke and loud noises that terrified and disoriented Mr. Asinor, who was still near the intersection of 16th and H Streets, and Mr. Dozier, who was further north on 16th Street.

61. At the time Officer John Doe 3 deployed the stun grenades, neither Mr. Asinor nor Mr. Dozier saw any protestors make contact with officers, throw objects at them, or engage in any violent behavior.

62. Instead, Mr. Asinor and Mr. Dozier saw the protestors engaged in First Amendment activity, such as chanting slogans and waving signs.

63. Some protestors asked officers why munitions were being used when the tactic had been banned.

64. The stun grenades placed Mr. Asinor and Mr. Dozier in fear that either the officers or explosive devices deployed by the officers would imminently make contact with their bodies.

65. The riot officers continued to march, pushing protestors and Plaintiffs north on 16th Street.

66. Mr. Asinor and Mr. Dozier fled the scene and returned to their respective apartments.

### The District's Custom of Unlawfully Retaining Arrestees' Cell Phones and Its Application to Mr. Asinor

*The District Seizes Mr. Asinor's Property and Unlawfully Retains It*

67. On the night of August 30, 2020, a group of demonstrators gathered at or near Black Lives Matter Plaza for another demonstration against police brutality. Plaintiff Oyoma Asinor again attended the protest as a photojournalist and brought his camera and cellphone to document it.

68. A few minutes after midnight on August 31, 2020, when the demonstrators, along with Mr. Asinor and other journalists, were near BLM Plaza, Defendant Glover ordered officers to encircle the protestors and demonstrators on the scene and arrest them.

69. MPD officers arrested Mr. Asinor, even though he was not violating any laws.

70. An MPD officer removed Mr. Asinor's property, including his camera, cellphone, and goggles. Mr. Asinor was then transported to the Second Police District where he remained overnight.

71. Mr. Asinor was released on August 31, 2020, and informed that he would not face any charges (i.e., that his case would be "no papered").

72. Upon release, Mr. Asinor was transported to the Second Police District to recover his property. However, at the precinct, his camera, cellphone, and goggles were not returned to him. Mr. Asinor asked an officer where his camera and cellphone were, and the officer informed him they were being kept as evidence, despite his release without charges.

73. Over the past year, Mr. Asinor contacted several different MPD officers, including the Second District Station Sergeant, to obtain his property. None of them returned the missing items.

74. Mr. Asinor also contacted the United States Attorney's Office for the District of Columbia multiple times on his own and through retained counsel, David Benowitz, but never received his property back.

75. On August 3, 2021, in response to a request from Mr. Asinor's attorneys at the American Civil Liberties Union of the District of Columbia, MPD allowed Mr. Asinor to collect his property—nearly a year after Mr. Asinor's arrest.

76. MPD Special Order 15-08 provides that "when [MPD] members recover cell phones from arrestees, and there is no reason to believe the phone has any evidentiary value or is stolen, members shall handle the cell phones as 'Prisoner's Property' in accordance with GO-SPT-601.1." MPD Special Order 15-08: Cell Phone Recovery § III(B) (April 14, 2015).[1]

---

[1] https://go.mpdconline.com/GO/SO_15_08.pdf

77.  In turn, MPD General Order 601.1 requires officers to return Prisoner's Property to arrestees after they are released. MPD General Order 601.1 § III(A)(4)–(6) (April 30, 1992).[2]

78.  MPD had no basis to believe that Mr. Asinor's goggles, phone, or camera were stolen.

79.  Nor did MPD have any basis to conclude that Mr. Asinor's goggles, phone, or camera were contraband or evidence of a crime. Mr. Asinor did not use his goggles, cell phone, or camera to advance unlawful action; nor could an officer have thought he used those objects for such purposes given that, for his entire time he was at BLM Plaza and the surrounding area during the early morning of August 31, he wore his goggles on top of his head and used his camera and cell phone solely to take or upload pictures and videos.

80.  Even if MPD officers believed that Mr. Asinor's phone and camera contained images of unlawful activity, they had no basis to retain his goggles and could easily have investigated any suspicions about his phone and camera in far less time than the eleven months MPD held them.

81.  Special Order 15-08 provides that officers must "[e]nsure an application for a search warrant or court order is presented for [a seized] cell phone as soon as possible but no later than 48 hours after the recovery." Special Order 15-08 § III(C)(4)(c).

82.  Once officers obtain a warrant, they have access to Cellebrite Kiosk technologies, which can extract files from most cell phones without damaging the phones and without requiring ongoing retention of the devices to authenticate the data. MPD's Cellebrite Kiosk technology can generally extract material from cellular devices in about 30 minutes.

*The District's Custom of Unlawfully Retaining Arrestees' Cell Phones*

83.  As a matter of custom and practice, the District regularly retains arrestees' cell phones for months beyond the point reasonably necessary to serve any law enforcement interest.

---

[2] https://go.mpdconline.com/GO/GO_601_01.pdf

84.   Prolonged retentions of cell phones occur even where charges are dropped or not pursued against the owner of the cell phone, where the cell phone is not physical evidence of a crime, and where *either* no search warrant is issued for the contents of the cell phone *or* where such a warrant has been issued but the time reasonably needed for MPD to execute the warrant and obtain the specified contents has long passed.

85.   Examples of prolonged retentions pursuant to the District's custom include:

    a.   The prolonged retention of Mr. Asinor's cell phone that is challenged in this case.

    b.   The prolonged retention of the cell phones seized from approximately 40 individuals—protesters, medics and journalists—arrested at a civil rights protest the night of August 13, 2020 in the Adams Morgan neighborhood of D.C.; even though all but one of the arrestees were "no papered" the next day, the District retained all the arrestees' phones well into 2021, returning only three of them in the spring or summer of 2021 and keeping the rest despite repeated requests for their return.

    c.   The District's prolonged retention of a cell phone (as well as clothing) seized from a robbery suspect in February 2020; although the cell phone had no evidentiary value and the defendant pleaded guilty within a month, the cell phone and clothing were retained, in spite of requests for their return, for an additional 15 months (as reported to undersigned counsel by the owner's criminal defense counsel).

    d.   The District's prolonged retention of a cell phone seized from a robbery suspect in June 2020; the cell phone was retained, in spite of requests for its return, even after a trial, at which the cell phone was not introduced as evidence, and the cell phone

remains in the District's custody (as reported to undersigned counsel by the owner's criminal defense counsel).

e.  The District's prolonged retention of two cell phones seized from a theft suspect in November 2019; the cell phones were retained for approximately 8 months, in spite of requests for their return and in spite of the fact that the cell phones were unrelated to the theft charge (as reported to undersigned counsel by the owner's criminal defense counsel).

f.  The District's prolonged retention of a cell phone belonging to a suspect charged in November 2020 with unauthorized use of a vehicle; the government has agreed that the cell phone should be released but has nonetheless refused to do so (as reported to undersigned counsel by the owner's criminal defense counsel).

g.  The District's prolonged retention of two cell phones seized in May 2021 from an individual who was "no papered"; the owner has requested their return but the cell phones have not been returned over three months after the owner was released with no charges (as reported to undersigned counsel by the owner's criminal defense counsel)

h.  The District's prolonged retention of a cell phone seized in October 2015; even after the charges against the owner were dismissed in March 2018 and the owner requested the cell phone back, the District did not return it until October 2019— four years after the cell phone was originally seized and over a year and a half after the charges were dismissed (as reported to undersigned counsel by the owner's criminal defense counsel).

i. The District's prolonged retention of the cell phones seized from all or nearly all of the individuals, numbering more than 200, arrested in downtown Washington during the January 20, 2017 protests against the inauguration of President Donald Trump; even though many of the arrested individuals demanded the return of their phones and even though any material relevant to the criminal charges arising out of that protest (most of which were ultimately dropped) could have been downloaded by the government expeditiously as alleged above, the government did not return the phones for at least eight months (and in some cases much longer) after their seizure.

86. In addition to the specific examples described, numerous defense attorneys from the D.C. Public Defender Service and from the panel of attorneys maintained under the Criminal Justice Act in this District for appointment as defense counsel have reported to undersigned counsel that prolonged retentions of the type complained of in this case and described above occur regularly.

87. As reflected by the widespread and longstanding nature of the practice, the District has knowingly failed to take any meaningful actions to prevent the unlawful retention of arrestees' cell phones.

88. The prolonged cell phone retentions that have occurred pursuant to this custom and practice have caused owners a range of hardships, including but not limited to financial harm (from having to replace their cell phones), loss of data or access to data including contact information for friends and business associates, and collateral consequences such as being unable to contact pretrial services officers and being subject to additional court proceedings as a result.

**Plaintiffs' Injuries**

89.  When Mr. Dozier arrived home after the August 29 attack, about 30 minutes after he had been attacked by MPD with chemical irritants and stun grenades, he felt intense burning in his eyes and could feel the sting of the irritants in his nose and throat. He took a shower to wash off the irritants but continued to feel a burning sensation on his skin. After the shower, he dry heaved for approximately half an hour.

90.  The August 29 attack caused Mr. Dozier significant psychological distress, the effects of which continue to this day. Mr. Dozier met with a psychologist after the incident, who noted that he had several symptoms consistent with Post-Traumatic Stress Disorder.

91.  Mr. Dozier continues to experience some of the PTSD symptoms to this day, including heightened sensitivity to loud noises, sudden, unexpected anxiety attacks, and a fear of being trapped with no ability to exit. He additionally continues bi-weekly therapy sessions, which help him deal with his PTSD symptoms.

92.  When Mr. Asinor arrived home after the August 29 attack, around 30 to 60 minutes after he had been exposed to the chemical irritants, he took a shower and used dish soap to scrub the chemical irritants off. He continued to cough and experience trouble breathing.

93.  MPD's attacks against Mr. Asinor on August 29 caused Mr. Asinor significant psychological distress, including difficulty sleeping for weeks.

94.  To this day, Mr. Asinor continues to feel jittery and anxious around loud noises such as fireworks, because they remind him of the munitions officers used against him on August 29, 2020. He additionally feels an aversion to Black Lives Matter Plaza and the nearby streets. The lingering trauma from the events of August 29, 2020 contributed to his decision to stop attending and covering protests a few months later. Mr. Asinor does not currently attend or cover protests.

95.  As a result of MPD's retention of his property following his August 31 arrest, Mr. Asinor was forced to purchase new equipment, including a new camera, cellphone, SIM card, and other cellphone accessories. He also lost access to old text messages and old photographs and records, including call logs and notes.

### Compliance with D.C. Code § 12-309

96.  Plaintiffs have satisfied the requirements of D.C. Code § 12-309.

97.  On February 25, 2021, counsel for Plaintiffs mailed to the District's Office of Risk Management notice of claim letters informing the District of the approximate time, place, cause, and circumstances of the injuries and damages that each Plaintiff suffered.

98.  On February 26, 2021, counsel additionally filed similarly detailed notices of claims for each Plaintiff through the District's online portal.

99.  The District confirmed receipt of the notice of claim letters on February 26, 2021 and March 1, 2021. Mr. Asinor's claims were assigned No. GL-21-000807 and No. GL-21-000792. Mr. Dozier's claim was assigned No. GL-21-000791.

### CLAIMS FOR RELIEF

### Claim 1: Negligence per se / First Amendment Assemblies Act – unlawful use of chemical irritants; unlawful use of less-lethal projectiles (Plaintiffs Asinor and Dozier against Defendants District of Columbia, Glover, Caldwell, and Officers John Doe 1–3)

100. The First Amendment Assemblies Act, as amended by Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, 67 D.C. Register 9148 (July 31, 2020), imposes two specific duties of care on MPD and its officers toward individuals present at demonstrations: "Chemical irritants shall not be used by MPD to disperse a First Amendment Assembly," *id.* § 121(b) (amending D.C. Code § 5-331.16(b)(1)), and "Less-lethal projectiles shall

not be used by MPD to disperse a First Amendment assembly," *id.* (adding D.C. Code § 5-331.16(c)(1)).

101. A First Amendment Assembly is a "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views." D.C. Code § 5-331.02(2).

102. Plaintiffs Dozier and Asinor were present at a First Amendment assembly near BLM Plaza around 11:00 p.m. on August 29, 2020.

103. The First Amendment Assemblies Act exists to promote safety. As journalists exercising their First Amendment rights to cover demonstrations, Plaintiffs are among the class of individuals the statute is designed to protect, and the prohibitions on the use of chemical irritants and less-lethal munitions to disperse assemblies are duties imposed on MPD officers, including Defendants Glover, Caldwell, and John Does 1–3.

104. Defendant Glover and Defendants John Doe 1 and 2 are jointly and severally liable to Plaintiff Dozier under the doctrine of negligence per se because they breached their statutory duty of care by causing Plaintiff Dozier to be exposed to chemical irritants as part of their effort to disperse people engaged in a First Amendment Assembly on August 29, 2020 and, in so doing, caused harm to Plaintiff Dozier by causing him to experience, among other things, pain, difficulty breathing, and emotional distress.

105. Defendant Caldwell is liable to Plaintiff Asinor under the doctrine of negligence per se because he breached his statutory duty of care by using chemical irritants to disperse people engaged in a First Amendment Assembly on August 29, 2020 and caused harm to Plaintiff Asinor by causing him to experience, among other things, pain, difficulty breathing, and emotional distress.

106. Defendant John Doe 3 is liable to Plaintiffs Asinor and Dozier under the doctrine of negligence per se because he breached his statutory duty of care by using less-lethal projectiles, specifically stun grenades, to disperse people engaged in a First Amendment Assembly on August 29, 2020, and caused harm to Plaintiffs by causing them to experience terrifying and disorienting noise as well as psychological distress.

107. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the negligence of its agents Defendants Glover, Caldwell, and John Doe 1–3 who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 2: First Amendment Assemblies Act – unlawful use of chemical irritants; unlawful use of less-lethal projectiles
### (Plaintiffs Asinor and Dozier against Defendants District of Columbia, Glover, Caldwell, and Officers John Doe 1–3)

108. Defendants' use of chemical irritants and less-lethal projectiles to disperse First Amendment assemblies on August 29, 2020 in violation of the First Amendment Assemblies Act violated Plaintiffs' rights directly under the Act, which contains an implied private cause of action.

109. The D.C. Council intended for the Act to be privately enforceable, explicitly stating that its provisions set forth "standards for police conduct" that "may be relied upon by such persons in any action alleging violation of statutory or common law rights." D.C. Code § 5-331.17.

110. Plaintiffs fall within the group for whose special benefit the statute was enacted, as the Act is "intended to protect persons," like Plaintiffs, "who are exercising First Amendment rights in the District of Columbia." *Id.*

111. The Act's purpose is consistent with a private cause of action as it provides that "the declared public policy of the District of Columbia [is] that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia." D.C. Code § 5-331.03.

112. Defendants Glover and John Doe 1 and 2 are jointly and severally liable to Plaintiff Dozier for their August 29, 2020 violation of his rights under the First Amendment Assemblies Act to be free from the use of chemical irritants.

113. Defendant Caldwell is liable to Plaintiff Asinor for the August 29, 2020 violation of his rights under the First Amendment Assemblies Act to be free from the use of chemical irritants.

114. Defendant John Doe 3 is liable to Plaintiffs Asinor and Dozier for the August 29, 2020 violation of their rights under the First Amendment Assemblies Act to be free from the use of less-lethal projectiles.

115. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the actions of its agents Defendants Glover, Caldwell, and John Doe 1–3, who acted within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 3: Assault and battery
### (Plaintiffs Asinor and Dozier against Defendants District of Columbia, Glover, and Caldwell)

116. District of Columbia law proscribes assault, defined as an act that is intended to cause harmful or offensive contact or place the plaintiff in imminent apprehension of a harmful or offensive contact, and, in fact, causes the plaintiff to experience imminent apprehension of such contact.

117. District of Columbia law proscribes battery, defined as an intentional act that causes a harmful or offensive bodily contact.

118. Defendant Glover is liable to Plaintiff Dozier for committing assault and battery because, on August 29, 2020, he physically grabbed and then intentionally placed Plaintiff Dozier in a position where he had no option but to run through chemical irritants, with the intent and effect of placing him in imminent apprehension of harmful or offensive contact, and causing such contact.

119. Defendant Caldwell is liable to Plaintiff Asinor for committing assault and battery because, on August 29, 2020, he intentionally used chemical irritants against demonstrators and journalists, including Plaintiff Asinor, with the intent and effect of placing those individuals, including Plaintiff Asinor, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Asinor.

120. Defendants John Doe 1 and 2 committed assault and battery on Plaintiff Dozier when, on August 29, 2020, they intentionally caused demonstrators and journalists, including Plaintiff Dozier, to be exposed to chemical irritants, with the intent and effect of placing those individuals, including Plaintiff Dozier, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiff Dozier.

121. Defendant John Doe 3 committed assault and battery against Plaintiffs Asinor and Dozier when, on August 29, 2020, Defendant John Doe 3 intentionally used less-lethal projectiles, specifically stun grenades, against demonstrators and journalists including Plaintiffs, with the intent and effect of placing those individuals, including Plaintiffs, in imminent apprehension of harmful or offensive contact, and causing such contact to Plaintiffs.

122. Defendants Glover and Caldwell acted with intent to injure, or in willful disregard for the rights of Plaintiffs, and their conduct was outrageous or reckless toward the safety of Plaintiffs.

123. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents Defendant Glover, Caldwell, and John Doe 1–3, who were acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 4: Fourth Amendment / 42 U.S.C. § 1983 – unreasonable seizure
### (Plaintiff Asinor against Defendant District of Columbia)

124. "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 124 & n.25 (1984) (citing *United States v. Place*, 462 U.S. 696, 707–10 (1983)). Accordingly, "the Fourth Amendment permits seizures only for as long as necessary. Once a justification loses force, the government must cease the seizure or come up with a new justification." *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 25 (D.D.C. 2019).

125. Retaining Mr. Asinor's cell phone, camera, and goggles for over eleven months was unreasonable because any plausible governmental interest in the property expired long before the District surrendered the items. The prolonged retention seriously interfered with Mr. Asinor's property interest in the seized items, depriving him use of his property, causing him financial damage consisting of the costs of replacement, and causing him to lose access to data, including text messages, photographs, call logs, and notes.

126. Defendant District of Columbia is liable under the Fourth Amendment for these injuries because it has knowingly failed to take meaningful action to prevent officers from unreasonably retaining arrestees' cell phones, thereby adopting the policy, custom, or practice from which the prolonged seizure of Mr. Asinor's property arose.

### Claim 5: Conversion
### (Plaintiff Asinor against Defendant District of Columbia)

127. District of Columbia law proscribes conversion, defined as unlawful exercise of ownership, dominion, and control over the personal property of another in denial or repudiation of their right to such property. A conversion claim will lie against the District when "the police, after lawfully coming into possession of plaintiff's property, thereafter wrongfully refused to surrender it." *O'Callaghan v. District of Columbia*, 741 F. Supp. 273, 280 (D.D.C. 1990); *see also Savoy Const. Co. v. Atchison & Keller, Inc.*, 388 A.2d 1221, 1223 (D.C. 1978). By retaining Plaintiff Asinor's

property after the justification for holding it expired, and refusing to return it in response to Plaintiff Asinor's requests, MPD officers exercised unlawful dominion and control over Plaintiff Asinor's property for over eleven months, thereby depriving him of his right to his property and causing him financial damage consisting of the costs of replacement. He additionally lost access to data, including text messages, photographs, and records including call logs and notes.

128. Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents, who were acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a) ENTER JUDGMENT declaring that the actions of all Defendants violated D.C. law and that the actions of Defendant District of Columbia also violated the Fourth Amendment;

(b) ENTER JUDGMENT awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

(c) ENTER JUDGMENT awarding Plaintiffs punitive damages against all individual Defendants in an amount appropriate to the evidence adduced at trial;

(d) ENTER JUDGMENT awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(e) GRANT Plaintiffs such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
202-457-0800
mperloff@acludc.org

August 28, 2021                                    Counsel for Plaintiffs[*]

---

[*] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this filing.