# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OYOMA ASINOR, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*<br><br>Defendants. | 1:21-cv-02158 (APM) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...............................................................................1

SUMMARY OF ARGUMENT ...............................................................2

FACTS ...........................................................................................3

    I.      MPD Attacks Plaintiffs While Dispersing a First Amendment Assembly ...................3

    II.     The District Unreasonably Retains Mr. Asinor's Cell Phone ........................................5

LEGAL STANDARD ..........................................................................8

ARGUMENT ....................................................................................9

    I.      Plaintiffs Have Stated Claims for Violations of the FAAA and for Negligence Per Se Based on Defendants' Use of Chemical Irritants and Stun Grenades ...............9

          A.  Plaintiffs Have Plausibly Alleged That Defendants' Use of Chemical Irritants and Stun Grenades To Disperse a First Amendment Assembly, in Violation of FAAA Amendment Act § 121(b), Constitutes Negligence Per Se. .................10

          B.  Alternatively, Plaintiffs Have an Implied Right of Action Under the FAAA. 17

    II.     Mr. Asinor Plausibly Alleged a Fourth Amendment Claim Against the District ..19

          A.  The Fourth Amendment Requires That Seizures of Property Be Reasonable Not Only at Their Inception but Also in Their Duration .................................19

          B.  The District Bears Responsibility for Its Prolonged Retention of Mr. Asinor's Phone.....................................................................................27

    III.    Mr. Asinor Has Stated a Procedural Due Process Claim Under the Fifth Amendment...........................................................................33

          A.  Superior Court Rule of Criminal Procedure 41(g) Does Not Provide a Meaningful Way For Individuals to Contest Prolonged Seizures of Their Cell Phones When No Charges Were Filed Against Them and When There Is No Criminal Case in Which The Phones Could Serve as Evidence. ....................34

          B.  The District is Constitutionally Liable for Depriving Mr. Asinor of His Cell Phone Without Due Process.........................................................39

CONCLUSION ................................................................................44

# TABLE OF AUTHORITIES

*Authorities on which we chiefly rely are marked with an asterisk.*

## Cases

*Albright v. Oliver*, 510 U.S. 266 (1994) ...............................................................21, 22

*Alexander v. Government of the District of Columbia*, 2020 WL 3573462 (D.D.C. July 1, 2020) ....................................................................................................................33

*Alleyne v. United States*, 455 A.2d 887 (D.C. 1983) ...................................................36

*Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672 (D.C. Cir. 2009).......................33, 34

*Avila v. Dailey*, 246 F. Supp. 3d 347 (D.D.C. 2017) ................................24, 35, 36, 38

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003).......................19, 27, 39

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................8

*Bennett v. Dutchess Cty.*, 832 F. App'x 58 (2d Cir. 2020) ........................................25

*Brewster v. Beck*, 859 F.3d 1194 (9th Cir. 2017) ...................................22, 23, 25, 26

*Brown v. District of Columbia*, 115 F. Supp. 3d 56 (D.D.C. 2015) ................40, 43, 44

*California v. Hodari D.*, 499 U.S. 621 (1991)................................................................22

*Ciambriello v. Cty. of Nassau*, 292 F.3d 307 (2d Cir. 2002)........................................39

*Carter v. District of Columbia*, 795 F.2d 116 (D.C. Cir. 1986) ...................................32

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).............................................27, 38

*Chavis v. Garrett*, 419 F. Supp. 3d 24 (D.D.C. 2019) .................................................38

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .......................................44

*Coleman v. Watt*, 40 F.3d 255 (8th Cir. 1994).............................................................38

*Coley v. Bowser*, 2021 WL 1578295 (D.D.C. Apr. 22, 2021)...........................36, 37, 38

*Cousart v. Metro Transit Police Chief*, 101 F. Supp. 3d 27 (D.D.C. 2015) ................36

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ...........................................39

*District of Columbia v. Dunmore*, 749 A.2d 740 (D.C. 2000) ...............................34, 35

*Dukore v. District of Columbia*, 970 F. Supp. 2d 23 (D.D.C. 2013), *aff'd*, 799 F.3d 1137 (D.C. Cir. 2015) .................................................................................................................................38

*Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014)..............................................29

*Evangelou v. District of Columbia*, 901 F. Supp. 2d 159 (D.D.C. 2012) ......................................8

*Fuentes v. Shevin*, 407 U.S. 67 (1972).........................................................................................39

*Gerstein v. Pugh*, 420 U.S. 103 (1975).........................................................................................21

*Goodwin v. District of Columbia*, 2022 WL 123894 (D.D.C. Jan. 13, 2022) ........................15, 16

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) .........................................................32

*Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006) ...........................................................28, 29

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)....................................................................33

*Holt v. Walsh Grp.*, 316 F. Supp. 3d 274 (D.D.C. 2018)................................................................8

*H.R.H. Constr. Co. v. Conroy*, 411 F.2d 722 (D.C. Cir. 1969) ..............................................11, 14

*Hudson v. Palmer*, 468 U.S. 517 (1984).......................................................................................38

*Hunter v. District of Columbia*, 824 F. Supp. 2d 125 (D.D.C. 2011)...........................................29

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017)........................................................8

*Illinois v. Caballes*, 543 U.S. 405 (2005) ....................................................................................22

*Illinois v. Lafayette*, 462 U.S. 640 (1983).....................................................................................40

*In re Grand Jury Proc.*, 115 F.3d 1240 (5th Cir. 1997) ...............................................................37

*In re Singh*, 892 F. Supp. 1 (D.D.C. 1995) ......................................................................26, 27, 37

*In re Smith*, 888 F.2d 167 (D.C. Cir. 1989) .................................................................................43

*Jarrett v. Woodward Bros.*, 751 A.2d 972 (D.C. 2000)................................................................13

*Jones v. District of Columbia*, 2019 WL 5690341 (D.D.C. June 13, 2019)..................................24

*Kaley v. United States*, 571 U.S. 320 (2014) ................................................................................40

*Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322 (D.D.C. 2017) .....................................33

*Kelly v. Parents United for D.C. Pub. Schs.*, 641 A.2d 159 (D.C. 1994), *amended in part on reh'g,* 648 A.2d 675 (D.C. 1994)..................................................................................................17

*King v. Holder*, 950 F. Supp. 2d 164 (D.D.C. 2013) .................................................................32

*Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) ................................................................43, 44

*Krimstock v. Kelly*, 464 F.3d 246 (2d Cir. 2006) ............................................................25, 26

*LaChance v. Erickson*, 522 U.S. 262 (1998) ..............................................................................39

*Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003) ................................................21, 25

*Leiken v. Wilson*, 445 A.2d 993 (D.C. 1982) ..........................................................................11, 14

*Leyland v. Edwards*, 797 F. Supp. 2d 7 (D.D.C. 2011) ......................................................36

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ........................................................36, 38

*Mahoney v. District of Columbia*, 662 F. Supp. 2d 74 (D.D.C. 2009), *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) ................................................................................................18

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ................................................................21, 22

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..........................................................38, 40, 41, 42

*Medina v. California*, 505 U.S. 437 (1992) ..............................................................................40

*Medina v. Dist. of Columbia*, 517 F. Supp. 2d 272 (D.D.C. 2007) ..............................37, 38

*Mom's Inc. v. Willman*, 109 F. App'x 629 (4th Cir. 2004)............................................9, 14, 23, 26

*Moya v. United States*, 761 F.2d 322 (7th Cir. 1984) ..............................................23, 25

*Nelson v. Colorado*, 137 S. Ct. 1249 (2017)............................................................................40

*Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033 (D.C. 2014)................................................10

*Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014) ..........................29, 33

*Parratt v. Taylor*, 451 U.S. 527 (1981).......................................................................................38

*Powe v. City of Chicago*, 664 F.2d 639 (7th Cir. 1981) ................................................28, 32

*Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993)...................................................................37

*Riley v. California*, 573 U.S. 373 (2014) ....................................................................................41

*Robert Siegel, Inc. v. District of Columbia*, 892 A.2d 387 (D.C. 2006).......................................17

*Robinson v. District of Columbia*, 130 F. Supp. 3d 180 (D.D.C. 2015)..........................28, 32, 33

*Rodriguez v. United States*, 575 U.S. 348 (2015) ..............................................................21, 22, 26

*Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268 (D.C. 1987) ........................13

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018)..................................................................8

*Sandoval v. Cty. of Sonoma*, 72 F. Supp. 3d 997 (N.D. Cal. 2014), *aff'd*, 912 F.3d 509 (9th Cir. 2018) ...................................................................................................................................26

*Segura v. United States*, 468 U.S. 796 (1984) ...................................................... *passim*

*Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177 (2d Cir. 2004).....................25

*Sibert-Dean v. Wash. Metro. Area Transit Auth.*, 721 F.3d 699 (D.C. Cir. 2013) ......................12

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012).................................40, 43, 44

*Singh v. District of Columbia*, 881 F. Supp. 2d 76 (D.D.C. 2012) ..............................................28

*Smith v. City of Chicago,* 524 F.3d 834 (7th Cir. 2008)*, vacated and remanded as moot sub nom., Alvarez v. Smith,* 558 U.S. 87 (2009) ..........................................................39, 43, 44

*Smith v. District of Columbia*, 387 F. Supp. 3d 8 (D.D.C. 2019) ............................24, 26, 30, 41

*Soldal v. Cook Cty.*, 506 U.S. 56 (1992)......................................................................................26

*Stevens v. United States,* 462 A.2d 1137 (D.C. 1983) ................................................................35

*Sunrise Acad. v. United States*, 791 F. Supp. 2d 200 (D.D.C. 2011)...........................................42

*Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010) .......................................................22

*United States v. Bumphus*, 227 A.3d 559 (D.C. 2020) ................................................................23

*United States v. Burgard*, 675 F.3d 1029 (7th Cir. 2012)......................................................31, 32

*United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013) ..............................................23, 24, 26

*United States v. Howard*, 991 F.2d 195 (5th Cir. 1993) ..............................................................23

*United States v. Jacobsen*, 466 U.S. 109 (1984)................................................................ *passim*

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ...................................26, 27

*United States v. Jones*, 565 U.S. 400 (2012) ..............................................................................26

*United States v. Martin*, 157 F.3d 46 (2d Cir. 1998) .............................................................25, 26

*United States v. Mays*, 993 F.3d 607 (8th Cir. 2021)...................................................................23

*United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009)......................................................23, 24

*\*United States v. Place*, 462 U.S. 696 (1983) ...................................................................... *passim*

*United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019) .................................................................31

*United States v. Respress*, 9 F.3d 483 (6th Cir. 1993) ..............................................................23

*United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) .......................................................22, 25, 31

*United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011) ..........................................................22, 23

*United States v. Veillette*, 778 F.2d 899 (1st Cir. 1985) ........................................................22, 32

*United States v. Wilkins*, 538 F. Supp. 3d 49 (D.D.C. 2021).......................................................24

*Walters v. Wolf*, 660 F.3d 307 (8th Cir. 2011)...........................................................................38

*Wilson v. United States*, 424 A.2d 130 (D.C. 1980) ..................................................................36

*Zinermon v. Burch*, 494 U.S. 113 (1990)..................................................................................38

**Statutes, Regulations, Rules and Legislative Materials**

D.C. Code § 5-331.01, *et seq.* .....................................................................................................1

D.C. Code § 5-331.02 ...............................................................................................................12

D.C. Code § 5-331.03 ...............................................................................................................17

D.C. Code § 5-331.07 ...............................................................................................................15

D.C. Code § 5-331.08 ...............................................................................................................14

D.C. Code § 5-331.16 ............................................................................................................9, 15

*D.C. Code § 5-331.17 .....................................................................................................16, 17, 18

67 D.C. Reg. 005837 (Jun. 4, 2021) ...........................................................................................9

42 U.S.C. § 1983...................................................................................................................18, 27

Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, D.C. Act 23-336, 67 D.C. Reg. 09148 (Jul. 31, 2020) ("FAAA Amendment Act") .................... *passim*

D.C. Superior Court Rule of Criminal Procedure 41(g) ........................................................ *passim*

Fed. R. Civ. P. 8(a) ....................................................................................................8, 30

Fed. R. Crim. P. 41(g) (previously Fed. R. Crim. P. 41(e))...........................................3, 34, 37, 43

MPD Special Order 15-08, *Cell Phone Recovery Process* § III.C.4.c (Apr. 14, 2015)......... *passim*

## Other Authorities

Gov't of Dist. of Columbia, Off. Of Police Complaints, *PCB Policy Report # 19-4: Handling Property* (Sept. 30, 2019)....................................................................................8, 28, 29

D.C. Council Comm. on the Judiciary, Report on Bill No. 15-968 25 (Dec. 1, 2004)) ("Comm. Report on the FAAA"), Pl.'s Ex. A..............................................................................9, 16

Tr. Status Conf., *Horse v. District of Columbia*, No. 17-cv-1216 (D.D.C. Sept. 27, 2019), Def.' Ex. 1, ECF 29-1 ("Horse") ................................................................................14, 16, 18

Tr. Status Conf., *Schultz v. District of Columbia*, No. 18-cv-0120 (D.D.C. Sept. 27, 2019), Def.'s Ex. 1 ("Horse")....................................................................................................14

## INTRODUCTION

This case involves specific instances of two abusive practices regularly perpetrated by the District of Columbia's Metropolitan Police Department (MPD). The first is the use of excessive force against demonstrators. Multiple examples of this conduct led the D.C. Council to amend the First Amendment Assemblies Act, D.C. Code § 5-331.01, *et seq*. (FAAA) to ban the use of chemical irritants and less-lethal weapons, such as stun grenades, to disperse demonstrations (which the statute calls "First Amendment assemblies"). On the night of August 29, 2020, and into the morning of August 30, MPD violated these commands by indiscriminately deploying chemical irritants and stun grenades to disperse non-violent protestors. The stun grenades terrified and traumatized Plaintiffs Bryan Dozier and Oyoma Asinor, independent photojournalists covering the event, and the irritants hit them, causing significant pain.

The second practice at issue in this case is MPD's custom or policy of seizing cell phones from arrestees and refusing, without justification, to return them for months or longer. Pursuant this custom or policy, on August 30, at another demonstration, MPD officers arrested Mr. Asinor, seized his cell phone (along with his camera and other property), and, despite releasing him without charges, retained the cell phone and other items for nearly a year.

Regarding the August 29-30 attack, Mr. Asinor and Mr. Dozier assert claims against individual MPD officers and the District of Columbia for violating the FAAA (on a negligence per se theory or in the alternative via an implied right of action), and for assault and battery. For the unreasonably prolonged retention of his property, Mr. Asinor asserts claims against the District under the Fourth and Fifth Amendments and for conversion.

Defendants now move to dismiss all claims for violations of the FAAA and the Fourth and Fifth Amendment claims. They have not moved to dismiss the claims for assault, battery, or conversion. *See* Defs.' Partial Mot. To Dismiss the 2d Am. Compl., ECF 29 at 2 ("MTD").

## SUMMARY OF ARGUMENT

The FAAA's prohibitions on chemical irritants and less-lethal weapons are enforceable via either negligence per se or an implied right of action. Defendants contend that FAAA provisions that apply when a "First Amendment assembly" is ongoing require too much discretion to be enforced via negligence per se; however, this Court has held that FAAA provisions subject to that very condition can serve as predicates for negligence per se liability, and the D.C. Court of Appeals has reached the same conclusion regarding similar regulatory language in other statutes. Moreover, because most of the FAAA's provisions apply only during First Amendment assemblies, if Defendants' theory were correct, it would bar negligence per se enforcement of almost all of the statute's provisions. That argument, combined with Defendants' contention that the statute cannot be enforced via an implied right of action, would make it virtually impossible to directly enforce many of the FAAA's unique safeguards—a result that diverges from the Council's intent and express rules of construction for the statute. Defendants' FAAA arguments cannot both be correct: The provisions at issue must be enforceable via negligence per se or the statute itself.

Regarding the cell phone claims, Defendants do not argue that their prolonged seizure of Mr. Asinor's phone was reasonable under the Fourth Amendment; instead, they contend that the Fourth Amendment does not apply at all because Mr. Asinor challenges the duration of the seizure, not the initial decision to take the phone. Yet the Supreme Court has held that seizures lawful at their inception can violate the Fourth Amendment due to their duration. Although the D.C. Circuit has not addressed this issue, this Court and every other circuit has recognized as much. Defendants

attempt to refute this principle by relying on outlier decisions from other circuits. However, those decisions, which fail to follow Supreme Court precedent and conflict with other decisions in their own circuits, are not persuasive. Defendants are equally wrong to assert that the District cannot be held liable for the prolonged seizures in this case. A municipality can face liability if it acts pursuant to a custom, and here Mr. Asinor has plausibly alleged a custom, pointing to hundreds of instances where officers retained arrestees' cell phones for an unreasonably long time.

As for the Fifth Amendment, Defendants err in asserting that Superior Court Rule of Criminal Procedure 41(g) provided Mr. Asinor with all the process he was due. Rule 41(g) allows claimants to seek their property in a related criminal case. Where, as here, charges have never been filed against the property's owners, and the property could not serve as evidence in a pending criminal case, the Superior Court has no jurisdiction to hear motions under the rule. The cases Defendants cite do not hold otherwise.

Because Plaintiffs have plausibly alleged sufficient facts to proceed on each of their claims, Defendants' partial motion to dismiss should be denied.

## FACTS

### I.    MPD Attacks Plaintiffs While Dispersing a First Amendment Assembly.

Mr. Asinor and Mr. Dozier are independent photojournalists whose photographs have been published in newspapers such as The Washington Post and The Wall Street Journal, respectively, and who have regularly documented protests against unjust policing in the District. ECF 24 (2d Am. Compl.; hereinafter "Compl.") ¶¶ 18–20. On August 29, 2020, Plaintiffs covered such a protest. *Id.* ¶¶ 7, 8, 21, 22. Late that night, the protestors and Plaintiffs reached Black Lives Matter Plaza ("BLM Plaza"), near the intersection of 16th Street NW and H Street NW. *Id.* ¶¶ 23, 24. MPD officers were standing in lines along the streets and behind concrete barricades. *Id.* ¶¶ 25,

27. Mr. Dozier attempted to take pictures of officers standing on H Street NW between Vermont Avenue NW and 16th Street NW. *Id.* ¶¶ 28, 33. He paused to photograph bicycle officers on H Street with demonstrators in front of them. *Id.* ¶ 33. The demonstrators were verbally protesting but not engaging in any form of violence or misconduct. *Id.* ¶ 36. Nonetheless, Defendant Officer John Doe 1 threw a munition, which released gas or smoke filled with chemical irritant. *Id.* ¶ 37. As Mr. Dozier and the protestors backed away, Defendant Officer John Doe 2 deployed a second munition nearby, releasing more irritant-filled smoke or gas, which combined with the smoke from the first munition to create a cloud of irritant that lingered in the air and caused Mr. Dozier to cough as he attempted to retreat. *Id.* ¶¶ 38–42.

Demonstrators started to run away from the gas; Mr. Dozier did too. *Id.* ¶ 43. After Mr. Dozier turned onto Vermont Avenue from H Street, Defendant Commander Robert Glover lifted him up and pushed him through a line of riot officers marching down Vermont, which had just passed by, and continued to push Mr. Dozier until he was back on H Street. *Id.* ¶¶ 44, 45. With another line of riot officers marching toward Mr. Dozier from the east on H Street, that placement left Mr. Dozier with no option but to head west through the cloud of irritant, which he did, struggling to breathe and feeling a burning sensation on his face as he did so. *Id.* ¶¶ 45, 46.

When Defendants John Doe 1 and 2 released the munitions, Mr. Asinor was on H Street, attempting to take pictures of the gas the munitions produced. *Id.* ¶¶ 47, 48. Mr. Asinor subsequently saw riot officers marching toward him from the east, ordering people to move back. *Id.* ¶ 49. He complied, walking backwards west on H Street to continue capturing pictures of the scene. *Id.* ¶¶ 50, 52. Demonstrators and journalists standing near Mr. Asinor started moving west on H Street as well, with several of the demonstrators continuing to protest as they walked. *Id.* ¶¶ 50, 51. As Mr. Asinor and the demonstrators and other journalists reached the intersection of 16th

4

and H Streets, the distance between one of the demonstrators and the riot officers shortened as the demonstrator began turning onto 16th. *Id.* ¶ 53. Officers pushed the demonstrator to the ground, even though no one had touched or threatened the officers in any way. *Id.* ¶¶ 54, 55. When the demonstrator got up and moved away, Defendant Officer Shawn Caldwell fired a gun-shaped weapon that dispersed liquid chemical irritant and hit Mr. Asinor and others who had been near the demonstrator. *Id.* ¶¶ 56, 57. The irritant burned Mr. Asinor's neck, made it hard for him to breathe, and caused him to cough, tear up, and feel disoriented. *Id.* ¶ 58.

Around this time, Defendant Officer John Doe 3 deployed a series of stun grenades near the intersection of 16th and H Streets. *Id.* ¶ 59. They gave off smoke and loud noises, terrifying Mr. Asinor and Mr. Dozier. *Id.* ¶ 60. Neither Mr. Asinor nor Mr. Dozier saw any protestors engaged in violent behavior at the time the stun grenades went off; instead, the protestors were chanting slogans and waving signs. *Id.* ¶¶ 61, 62.

Eventually, Mr. Dozier and Mr. Asinor escaped north up 16th Street. *Id.* ¶¶ 65, 66. Mr. Dozier arrived home approximately 30 minutes after being attacked by the irritants. *Id.* ¶ 93. He continued to feel burning on his body even after showering and he dry-heaved for half an hour. *Id.* The incident caused Mr. Dozier to experience symptoms that a psychologist diagnosed as consistent with Post-Traumatic Stress Disorder. *Id.* ¶¶ 94, 95. Similarly, Mr. Asinor continued to experience difficulty breathing when he arrived home after the demonstration. *Id.* ¶ 96. The officers' actions caused him to have trouble sleeping for weeks, to suffer anxiety around loud noises, and to decide to stop covering protests a few months later. *Id.* ¶¶ 97, 98.

## II.   The District Unreasonably Retains Mr. Asinor's Cell Phone.

On August 30, 2020, Mr. Asinor covered another police-related protest that culminated at BLM Plaza. *Id.* ¶ 67. Shortly after midnight on August 31, MPD officers encircled a group of

protestors and Mr. Asinor and arrested them, even though Mr. Asinor was not violating any laws. *Id.* ¶¶ 68, 69. Officers confiscated the property Mr. Asinor had on his person, including his cell phone, detained him overnight, and, upon his release the next day, informed him that he would not face any charges. *Id.* ¶¶ 70, 71. When Mr. Asinor attempted to retrieve his property from the Second District MPD station, an officer said that his cell phone and several other items would be held as evidence. *Id.* ¶ 72.  Mr. Asinor contacted multiple officers to regain his property, including the Second District Property Clerk; he also made several requests for the United States Attorney's Office for the District of Columbia to order the property's release. *Id.* ¶¶ 73, 74. Nonetheless, MPD did not return the property until August 3, 2021, over eleven months after it was confiscated, in response to a request from undersigned counsel. *Id.* ¶ 75.

Even if MPD had a valid basis for concluding that Mr. Asinor's cell phone contained evidence of a crime, its officers could easily have investigated their suspicions far more quickly than the time it took them to return Mr. Asinor's phone. MPD policy states that officers intending to apply for a warrant to search a cell phone must do so within 48 hours of the phone's seizure. *Id.* ¶ 79 (citing MPD Special Order 15-08, *Cell Phone Recovery Process* § III.C.4.c (Apr. 14, 2015), https://go.mpdconline.com/GO/SO_15_08.pdf) (hereinafter "MPD Special Order 15-08"). And once MPD obtains a warrant, it has access to "Cellebrite Kiosks" technologies, which can extract files from most cell phones without in about 30 minutes without damaging the phone or requiring the cell phone's continued retention for authentication purposes. *Id.* ¶ 80. Nonetheless, MPD did not return the property for nearly a year. As a result, Mr. Asinor had to purchase a new cell phone, SIM card, and other cell phone accessories. *Id.* ¶ 99. He also permanently lost access to old text messages, photographs, call logs, and notes. *Id.*

The District's prolonged retention of Mr. Asinor's phone arose from its custom of "retaining cell phones seized from arrestees, where officers have no basis to believe the cell phone constitutes physical evidence of a crime or contains contraband, for longer than is reasonably necessary for any legitimate law enforcement purpose." *Id.* ¶ 81. As alleged in Plaintiffs' Complaint, in addition to the prolonged seizure in this case, there have been over 240 other instances in which MPD has retained cell phones seized from arrestees for at least three months (and in many cases far longer). *Id.* ¶ 83. In each case, MPD retained the phone even though it had no basis for believing that the phone was stolen or contained contraband, and even though MPD requires officers who believe a phone may contain evidence to apply for a warrant *no later than* 48 hours after its seizure, MPD Special Order 15-08 § III.C.4.c, and has technology that can extract relevant data from cell phones within about 30 minutes, *see* Compl. ¶¶ 79, 80, 83.

For example, MPD seized an individual's phone in 2015, dismissed charges against the individual in March 2018, and despite the individual's request for the phone's return, kept the phone until October 2019, nineteen months after the case was dismissed and four years after the initial seizure. *Id.* ¶ 83(h). In February 2020, MPD seized a phone from a robbery suspect, and although the owner pleaded guilty within a month, and the phone lacked evidentiary value, MPD did not return it for an additional fifteen months. *Id.* ¶ 83(c).  And in January 2017, MPD seized phones from at least 200 people arrested during protests against the inauguration of Donald Trump and retained the phones for at least eight months "even though any material relevant to the [resulting] criminal charges . . . (most of which were ultimately dropped) could have been downloaded by the government expeditiously" as discussed above. *Id.* ¶ 83(i). Reflecting the persistence of this practice, MPD's Evidence Control Branch has a "large bin" holding phones that MPD seized but never returned. *Id.* ¶ 83(i)(i)-(ii).

The District's policymakers had ample basis to know of this custom. In addition to the custom's pervasiveness, *The Atlantic* ran an article in 2016 in which multiple legal practitioners complained that MPD routinely retains arrestees' cell phones for protracted periods in what one attorney described as "legal robbery, like a shakedown." *Id.* ¶ 85. Additionally, in 2019, the Police Complaints Board issued a report "outlining MPD's failures to return property," and indicating that officers were not complying with MPD's written policies. *Id.* (citing Gov't of Dist. of Columbia, Off. of Police Complaints, *PCB Policy Report # 19-4: Handling Property* (Sept. 30, 2019) (hereinafter "PCB Report"[1])). In the face of this widespread practice, the District "failed to take any meaningful actions to prevent the unlawful retention of arrestees' cell phones." *Id.* ¶ 86.

## LEGAL STANDARD

A complaint need only provide "a short and plain statement … showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). "Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To the extent inferences must be drawn to show that the defendant is liable, they must merely be reasonable, *Hurd*, 864 F.3d at 678, and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). The standard for plausibly pleading a claim is a "low bar." *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018).

---

[1]https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/HandlingProperty.FINAL_.pdf

**ARGUMENT**

**I.      Plaintiffs Have Stated Claims for Violations of the FAAA and for Negligence Per Se Based on Defendants' Use of Chemical Irritants and Stun Grenades.**

The D.C. Council enacted the FAAA "as a response to . . . the past record" of MPD officers using excessive force to disperse protests in the District. Pl.'s Ex. A (D.C. Council Comm. on the Judiciary, *Report on Bill No. 15-968* 25 (Dec. 1, 2004)) at 1 (hereinafter "Comm. Report on the FAAA"). In the wake of the police treatment of demonstrators protesting the murders of George Floyd and Breonna Taylor, the Council amended the statute on an emergency basis to provide that "[c]hemical irritants shall not be used by MPD to disperse a First Amendment assembly," and that "[l]ess-lethal projectiles shall not be used by MPD to disperse a First Amendment assembly." Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020, D.C. Act 23-336 (hereinafter "FAAA Amendment Act") § 121(b).[2] The Council added these amendments, which became effective on July 22, 2020, *see* 67 D.C. Reg. 09148, 09162, 09169 (Jul. 31, 2020), on an emergency basis, and have extended them several times since, *see, e.g.*, 67 D.C. Reg. 005837, 05851, 05852 (Jun. 4, 2021) (extending FAAA § 121(b) for up to 225 days pending the expiration of the congressional review period); *see also* Council of the District of Columbia, D.C. Code § 5-331.16, https://code.dccouncil.us/us/dc/council/code/sections/5-331.16 (scroll to bottom for full history of extensions) (last accessed February 25, 2022).

There is no dispute that Plaintiffs have plausibly alleged that by causing Plaintiffs to be exposed to chemical irritants, Defendants Caldwell, Glover, and John Does 1 and 2 violated the prohibition on using such weapons to disperse a First Amendment assembly. *See* MTD 3, 5–11.

---

[2] The statute is available at https://code.dccouncil.us/us/dc/council/acts/23-336#%C2%A7121(b). Section 121(b) also contains a restriction on the use of officers in riot gear that Plaintiffs have not invoked.

Nor is there a dispute that Defendant John Doe 3 violated the bar on dispersing First Amendment assemblies by deploying less-lethal projectiles in the form of stun grenades that terrified and traumatized Plaintiffs. *See id*; *see also* FAAA Amendment Act § 121(a) (defining "[l]ess-lethal projectiles" to include "stun grenades"). Defendants instead assert that Plaintiffs cannot hold them accountable for their violations of these statutory commands through a private statutory right of action or through a claim for negligence *per se*. Yet basic principles of negligence per se law, this Court's prior interpretations of the FAAA, and the Council's intent, make plain that the provisions at issue here are enforceable via negligence per se. Moreover, the text and history of the FAAA show that if Defendants prevail on their negligence per se argument, the only way to give effect to the Council's intent that the statute be enforceable is to recognize an implied right of action. The FAAA must be enforceable one way or the other.

### A. Plaintiffs Have Plausibly Alleged That Defendants' Use of Chemical Irritants and Stun Grenades To Disperse a First Amendment Assembly, in Violation of FAAA Amendment Act § 121(b), Constitutes Negligence Per Se.

An unexcused violation of a statute that proximately causes the plaintiff's injuries constitutes negligence per se if the statute "[1] is meant to promote safety, . . . [2] the plaintiff is a member of the class to be protected by the statute, and . . . [3] the defendant is a person upon whom the statute imposes specific duties." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014). Defendants do not contend that their conduct was excused or that proximate cause is lacking; nor do they dispute that the FAAA provisions at issue are meant to promote public safety and that Plaintiffs—on the facts alleged in the Complaint—fall within the class of people protected by the statute. Instead, Defendants contest only the final requirement, asserting two arguments that conflict with authoritative interpretations of D.C. law.

First, Defendants' argument that that FAAA Amendment Act § 121(b) does not impose duties on individual defendants because they place requirements on "MPD" rather than "MPD officers," MTD 9–10, is formalistic in the extreme, as a police force can act only through its officers. None of Defendants' cases discuss, much less rely on, the distinction between an employee and the entity for which that person works. Moreover, the D.C. Court of Appeals has applied negligence per se when the applicable statutory or regulatory standard does not name the person or even the entity to which it applies. *See Leiken v. Wilson*, 445 A.2d 993, 1002 & n.16 (D.C. 1982) (applying negligence per se based on violation of traffic regulations stated in the passive voice: vehicles "shall be equipped with service brakes" meeting certain requirements and the brakes "shall be maintained in good working order"); *H.R.H. Constr. Co. v. Conroy*, 411 F.2d 722, 722–23 & n.3 (D.C. Cir. 1969) (applying negligence per se based on violation of building code provisions stated in the passive voice: "structures … shall be securely and safely supported" and "floors shall be … laid tight and securely fastened in place").

Second, Defendants contend, incorrectly, that the requirements established by FAAA Amendment Act § 121(b) cannot serve as predicates for negligence per se because they apply only when a "First Amendment assembly" is ongoing, and applying that standard "provides actors with discretion." MTD 6–7.  The statute, though, provides officers no discretion on whether to comply with its commands, as it states that "[c]hemical irritants *shall* not be used by MPD to disperse a First Amendment assembly" and that "[l]ess-lethal projectiles *shall* not be used by MPD to disperse a First Amendment assembly." FAAA Amendment Act § 121(b) (emphasis added). Defendants do not appear to dispute this point; their concern, it seems, is that determining whether a gathering is a "First Amendment assembly" requires some level of judgment.

11

But the enforceability of a statute via negligence per se does not depend on whether the statute eliminates all possible gray area in application. Rather, "the key question is . . . whether [the statute] allows a factfinder to determine whether it has been violated without resorting to a common law reasonable care analysis." *Sibert-Dean v. Wash. Metro. Area Transit Auth.*, 721 F.3d 699, 704 (D.C. Cir. 2013) (cleaned up). "If the regulation provides specific directions that go beyond a mere admonition of reasonable care, the negligence per se instruction should be given." *Id.* at 704.

The provisions invoked here meet these requirements. Determining whether FAAA Amendment Act § 121(b) has been violated turns on assessing, first, whether officers used chemical irritants or less-lethal projectiles, and second, whether they did so to disperse a First Amendment assembly. Answering the first of these questions obviously does not revert to a reasonable care analysis: either officers used the prohibited weapons, or they did not. The second question likewise has nothing to do with whether the officers took reasonable care. The FAAA contains a specific definition of a "First Amendment assembly" that has nothing to do with discretion or reasonable care: a First Amendment assembly is "a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views." D.C. Code § 5-331.02(1). Although applying this statutory definition requires analysis, that does not turn the FAAA's statutory bar on these weapons into a rule of reasonableness: what officers must assess is whether the people they are policing are engaged in a "First Amendment assembly" under the specific statutory definition, not whether using the banned weapons is reasonable. The fact that the statutory command applies if particular circumstances exist does not make the statutory duty one of reasonableness or due care.

That principle is reflected in *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1271–72 (D.C. 1987), which held that a negligence per se claim could be stated under a statute that barred serving liquor to "any intoxicated person or any person of notoriously intemperate habits, or any person who appears to be intoxicated." Just like the FAAA provisions at issue here, the statute in *Rong* announced a prohibition (there, against serving liquor) and then defined the circumstances in which that prohibition applied using specific criteria (there, where the person served is "intoxicated" or "of notoriously intemperate habits" or "appears to be intoxicated") rather than a requirement of reasonableness (which would have been the case if the statute had, for instance, banned *unreasonably* serving liquor to a person who appears to be intoxicated or something similar). In applying negligence per se, *Rong* nowhere suggested that the duty not to serve liquor was insufficiently specific because the innkeeper needed to assess whether the patron was or appeared to be intoxicated or otherwise fell within the prohibition.

The Court of Appeals applied *Rong* in *Jarrett v. Woodward Bros.*, 751 A.2d 972 (D.C. 2000), to permit another application of negligence per se under the same statute, and in so doing made clear that determining whether a tavern "violated the statute by serving a patron who, according to the testimony of his companions, appears to have been visibly intoxicated" was a "factual issue[] subject to proof at trial," not a basis to reject a negligence per se claim as a matter of law. *Id.* at 987 n. 25. Likewise, here, the Defendants are free to contest as a factual matter that a First Amendment assembly was occurring when they deployed the weapons barred by the FAAA; as in *Jarrett*, however, their ability to raise that question does not preclude Plaintiffs from raising a negligence per se claim.

More broadly, the D.C. Court of Appeals and the D.C. Circuit have held that statutes with standards of conduct far less specific than the FAAA's are enforceable via negligence per se. *See*

*Leiken*, 445 A.2d at 1002 n.16 (holding regulation could serve as predicate for negligence per se when it required that vehicle brakes be "adequate to control the movement of and to stop and hold such vehicle under all conditions of loadings, and on any grade incident to its operation" and "maintained in good working order"); *H.R.H. Constr.*, 411 F.2d at 723 & n.3 (holding that safety code provision could serve as basis for negligence per se when it required that "temporary structures" be "securely and safely supported to insure safety of persons working thereon" and that "[t]emporary working floors shall be … laid tight and securely fastened in place" meaning able to "withstand such weight or shock as is reasonably expected").

Defendants' attempts to convert the FAAA's specific definition of First Amendment assembly into a general rule of reasonableness fail. They contend that courts applying the definition would need to assess whether officers had probable cause to believe a First Amendment assembly was ongoing. MTD 7–8. Yet the relevant question in a negligence per se case is whether the defendant breached the statutory standard, and answering that question here depends on whether a factfinder determines that a First Amendment assembly, as clearly defined by the statute, was *actually* ongoing, not on what an officer might have had probable cause to believe. Defendants' urge a contrary result based on *Horse v. District of Columbia* (and its companion case, *Schultz v. District of Columbia*), MTD 8–9, but the statutory standard at issue in the portion of the decision they cite applied only when offices lacked "probable cause to believe" certain facts, *see* Defs.' Ex. 1 (Tr. Status Conf., *Horse*, No. 17-cv-1216 (ABJ) and *Schultz*, No. 18-cv-120 (ABJ) (D.D.C. Sept. 27, 2019)) 31:22–32:25, 85:8–86:2, ECF 29-1 (discussing D.C. Code § 5-331.08) (hereinafter "*Horse*"). Here, however, the statutory provisions do not call for such analysis and therefore *Horse* and *Schultz* are inapposite.

14

Defendants also argue that applying FAAA Amendment Act § 121(b) requires assessing whether an assembly is peaceful. *See* MTD 7. To be sure, the FAAA does not protect riots. But determining whether an assembly is or is not protected by the FAAA is no different from determining whether a tavern patron is inebriated, or whether a temporary floor at a construction site is laid tight and securely fastened, or whether a vehicle's brakes are adequate to stop its operation. If anything, the task here is easier because the FAAA provides a clear and specific definition of "First Amendment assembly." Requiring officers to apply that definition to objective facts is not at all similar to mandating that officers comply with a vague standard of due care. Accordingly, there is no impediment to enforcing this aspect of the FAAA through an action for negligence per se.

Moreover, recognizing a negligence per se claim based on FAAA Amendment Act § 121(b) comports with this Court's case law. In *Goodwin v. District of Columbia*, 2022 WL 123894 (D.D.C. Jan. 13, 2022), the Court held that negligence per se liability could arise from the violation of two FAAA subsections, both of which—like the subsections invoked here—apply only when First Amendment assemblies are ongoing. *See id.* at *12–*13 (discussing D.C. Code §§ 5-331.07(e)(1)–(2) and 5-331.16(b)(2)). Indeed, one of the provisions in that case was an earlier version of the prohibition on chemical irritants, which not only required officers to discern that a First Amendment assembly was ongoing but also to conclude that the participants were not "committing acts of public disobedience endangering public safety and security," *id.* at *13 (quoting D.C. Code § 5-331.16(b)(2))—an additional determination that officers had to make on top of assessing whether a First Amendment assembly is occurring. Defendants' theory that duties contingent on the existence of a First Amendment assembly cannot serve as the predicate for negligence per se claims is thus squarely refuted by *Goodwin*.

Although *Horse* held that several provisions of the FAAA not at issue here could not support a negligence per se theory because they relied on a requirement of reasonableness, the Court recognized that a provision in the original FAAA requiring MPD commanders to approve the use of "large scale canisters of chemical irritant . . . at *First Amendment assemblies*" would have been "sufficiently precise" if the plaintiffs had alleged a breach of that duty. *See Horse*, 33:19–25; 34:9–11 (emphasis added). Thus, *Horse* suggested in dicta what *Goodwin* would later hold: that specific FAAA duties that depend on the existence of an ongoing First Amendment assembly can be enforced through negligence per se.

That result accords with the statute's explicit directives. In a section titled "Construction," the FAAA provides that "[t]he provisions of this subchapter are intended to protect persons who are exercising First Amendment rights in the District of Columbia, and the standards for police conduct set forth in this subchapter may be relied upon by such persons in any action alleging violations of statutory or common law rights." D.C. Code § 5-331.17. The Council added this provision in lieu of an express right of action after a senior District official testified that an express right was unnecessary because the "common law would dictate that if the statute was violated, it would constitute negligence per se." Comm. Report on the FAAA 25. The theory of negligence per se liability that the District presented to the Council—and which undergirds § 5-331.17— conflicts with the one the District advances in this case. Under the latter approach, it is unclear how the FAAA's provisions could ever be enforced through negligence per se, since most of its provisions apply only in the context of a First Amendment assembly and the others are likely unenforceable under that doctrine because they are unrelated to public safety. Defendants' arguments thus betray not only settled principles of negligence per se law and this Court's prior

interpretations of the FAAA, but also the District's own testimony to the Council, and the statutory provision the Council enacted in reliance on it.

**B. Alternatively, Plaintiffs Have an Implied Right of Action Under the FAAA.**

If Plaintiffs cannot vindicate their FAAA rights through negligence per se, then they must be able to do so through an implied statutory cause of action. When a statute enacted by the D.C. Council does not expressly provide a private cause of action, courts determine whether one is implied by analyzing (1) whether the plaintiff is part of the group for whose special benefit the statute was enacted, (2) the Council's intent, and (3) the underlying purposes of the statute. *See Robert Siegel, Inc. v. District of Columbia*, 892 A.2d 387, 392 n.8 (D.C. 2006); *Kelly v. Parents United for D.C. Pub. Schs.*, 641 A.2d 159, 163–65 (D.C. 1994), *amended in part on reh'g*, 648 A.2d 675 (D.C. 1994).

These factors all favor inferring a cause of action in the FAAA. First, the FAAA's section on "construction" states that the statute is "intended to protect persons who are exercising First Amendment rights in the District of Columbia," D.C. Code § 5-331.17, a class that includes Mr. Asinor and Mr. Dozier, both of whom were exercising their First Amendment rights as journalists at the time MPD attacked them.

Second, the same section also provides that the FAAA's "standards for police conduct . . . may be relied upon by such persons in any action alleging violations of statutory or common law rights." *Id.* This language clearly demonstrates the Council's intent that the statute's provisions be enforceable.

Third, inferring a private right of action plainly advances the statute's purpose, which is to ensure that "persons and groups have a right to organize and participate in peaceful First Amendment assemblies." D.C. Code § 5-331.03. A private right of action promotes this goal

because the threat of liability for damages will deter MPD officers from violating the statute's mandates.

Although this Court has twice read the FAAA not to include a private right of action, those decisions should not dictate the result here. In *Mahoney v. District of Columbia*, the Court declined to infer a right of action to enforce the FAAA's rules governing denials of assembly plan permits— rules that are not at issue here and which, unlike the provisions that are at issue, are enforceable through an administrative process. 662 F. Supp. 2d 74, 94 n.11 (D.D.C. 2009), *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011). And in *Horse*, the Court rejected a private right of action because it incorrectly reasoned that the ability to file claims under 42 U.S.C. § 1983 and the common law meant that the Council did not intend for the FAAA specifically to be enforceable. *Horse*, 26:24–28:5. But the Council enacted the FAAA because it wanted demonstrators to be safeguarded by provisions that are more specific and protective than those under the Constitution and D.C. common law; that is why it provided that "*the standards for police conduct set forth in this subchapter* may be relied upon by such persons." D.C. Code § 5-331.17 (emphasis added).

The Council omitted an express right of action from the FAAA only after a senior District official testified that such a clause was "not needed because any time the District enacts a statute, it can be enforced without such an explicit right being created" and that "if the statute was violated, it would constitute negligence per se." Comm. Report on the FAAA 25. The Council thus anticipated that the statute's commands would be directly enforceable. Absent an express right of action, the only way that can only happen if the statute contains an implied right of action or if it can be vindicated via negligence per se. The District now seeks to foreclose both those options, despite the contrary testimony at the FAAA's hearing. This bait and switch should not be

18

countenanced. To vindicate the Council's intent, the FAAA must be enforceable, if not via negligence per se, then under statute itself.

**II.   Mr. Asinor Plausibly Alleged a Fourth Amendment Claim Against the District.**

Stating a constitutional claim against the District requires showing, first, "a predicate constitutional violation," and second, "that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). With respect to the predicate Fourth Amendment claim, Defendants do not contend that the District acted reasonably by retaining Mr. Asinor's phone for eleven months despite an MPD policy requiring officers to secure search warrants for seized cell phones they wish to search no later than 48 hours after seizure, and despite MPD's possession of technology that extracts relevant data from cell phones in about 30 minutes. Instead, Defendants argue only that a seizure lawful at its inception can never violate the Fourth Amendment, no matter its duration. MTD 12–13. As for the policy/custom requirement, Defendants contend that the hundreds of examples of prior instances of unreasonably prolonged seizures of cell phones documented in the Complaint do not establish a custom capable of giving rise to municipal liability. *Id.* 20–24. Defendants are wrong on both points.

**A.  The Fourth Amendment Requires That Seizures of Property Be Reasonable Not Only at Their Inception but Also in Their Duration.**

Almost forty years of Supreme Court jurisprudence affirms that a lawfully initiated seizure can become unreasonable, and thereby violate the Fourth Amendment, due to its duration. In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court held that officers who properly seized luggage based on reasonable suspicion that it contained contraband violated the Fourth Amendment by retaining it for too long. *Id.* at 709–10. As the Court later described its own holding, "[i]n *Place,* the Court held that while the initial seizure of luggage . . . was reasonable, the seizure

became unreasonable because its length unduly intruded upon constitutionally protected interests." *United States v. Jacobsen*, 466 U.S. 109, 124 n.25 (1984). Likewise, in *Segura v. United States*, 468 U.S. 796 (1984), six justices agreed that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons." *Id.* at 812 (opinion of Burger, C.J., joined by O'Connor, J.); *see also id.* at 823 (Stevens, J., dissenting, joined by Brennan, Marshall, and Blackmun, JJ.) ("Even a seizure reasonable at its inception can become unreasonable because of its duration.").

And in *Jacobsen*, the Court held that officers who lawfully seized a bag of white powder on probable cause needed further justification to destroy a portion of the powder as part of a field test to assess if it was an illegal drug, because the destruction "converted what had been only a temporary deprivation of possessory interests into a permanent one." 466 U.S. 124–25. Thus, *Place, Segura, and Jacobsen* establish that the Fourth Amendment regulates not only the initiation of a seizure of property, but also how long it lasts.

Defendants assert that *Place* applies only to seizures based on reasonable suspicion, not those grounded in probable cause, and that *Jacobsen* concerns only the destruction of seized property, not its unlawful retention, MTD 12–13. But the Supreme Court reads its own precedent differently. *Segura*, a case Defendants do not discuss, expressly cited *Place* for the proposition that "a seizure reasonable at its inception because based upon *probable cause* may become unreasonable as a result of its duration or for other reasons." 468 U.S. at 812 (opinion of Burger, C.J., joined by O'Connor, J.) (emphasis added); *see also id.* at 823 (Stevens, J., dissenting, joined by Brennan, Marshall, and Blackmun, JJ.) (citing *Place* for a similar proposition). Similarly, in *Jacobsen*, the Court relied on *Place* to subject the field test to additional constitutional scrutiny even though probable cause justified the initial seizure. 466 U.S. at 124. Moreover, *Jacobsen*

concluded that the field test had to be assessed for reasonableness not merely because the test destroyed the owner's property, but rather because, as in *Place*, it "affect[ed] respondents' possessory interests" in the property. *See id.* Thus, *Jacobsen* teaches that any meaningful interference with an individual's possessory interests in lawfully seized items must be reasonable—regardless of whether the property is destroyed or retained for an unreasonably long period, *see id.* at 124 n.25, and regardless of whether the property is seized on reasonable suspicion (as in *Place*) or on probable cause (as in *Jacobsen* and *Segura*). This conclusion accords with *Jacobsen*'s definition of a seizure of property as "some meaningful interference with an individual's possessory interests in that property." *Id.* at 113. Defendants rely on the Seventh Circuit's decision in *Lee v. City of Chicago*, 330 F.3d 456, 464 (7th Cir. 2003) for their interpretation of *Place*, MTD 13, but that decision fails to cite *Segura* and cites *Jacobsen* without discussing or analyzing it, *see id.* at 460, 461. In any event, the Seventh Circuit's reading of *Place* must give way to the Supreme Court's authoritative construction of its own case law.

The Supreme Court has reaffirmed in recent years that the Fourth Amendment guards against unreasonably prolonged seizures. In *Rodriguez v. United States*, the Court held that a lawfully initiated traffic stop that extended seven or eight minutes beyond the time needed to complete its purpose violated the Fourth Amendment, because a seizure "become[s] unlawful if it is prolonged beyond the time reasonably required to complete the [traffic-related] mission." 575 U.S. 348, 350–51 (2015).  And *Manuel v. City of Joliet* held that the Fourth Amendment regulates seizures of persons past the initial arrest and during the entire period of "detention . . . pending trial."  137 S. Ct. 911, 919 n.8 (2017) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975)). In this way, *Manuel* comports with Justice Ginsburg's conclusion, in *Albright v. Oliver*, that the Fourth Amendment remained applicable after an initial arrest because "[a]t common law, an

arrested person's seizure was deemed to continue even after release from official custody." 510 U.S. 266, 277–78 (1994) (Ginsburg, J., concurring).

Although *Manuel* and *Rodriguez* addressed seizures of persons, the Court has relied on principles governing arrests and stops of people in evaluating seizures of property and vice versa. *See Jacobsen*, 466 U.S. 109, 112 n.5 (deriving definition of a seizure of property from cases on seizures of persons); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *Jacobsen*, a seizure of property case, for proposition that lawfully initiated traffic stops violate the Fourth Amendment if unreasonably prolonged). Accordingly, the Ninth Circuit cited *Manuel* to support its holding that an initially lawful seizure of a vehicle violated the Fourth Amendment because it lasted too long. *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017). These rulings refute Defendants' assertion that the Fourth Amendment term "seizure" extends only to the initial act of taking custody.[3]

That proposition also conflicts with decisions issued by other appellate courts. While the D.C. Circuit has not addressed this issue, every other geographic circuit, as well as the D.C. Court of Appeals, has recognized that seizures lawful at their inception can violate the Fourth Amendment if unreasonably prolonged. *See United States v. Veillette*, 778 F.2d 899, 903 & n.3 (1st Cir. 1985) (evaluating whether lawfully initiated seizure violated the Fourth Amendment based on its duration); *United States v. Smith*, 967 F.3d 198, 205, 213 (2d Cir. 2020) (holding police violated the Fourth Amendment by retaining seized tablet for 31 days before seeking a warrant and affirming that "even a seizure based on probable cause is unconstitutional if police act

---

[3] *Manuel* in particular refutes prior D.C. Circuit dicta stating that a seizure exclusively entails "a 'taking possession.'" *Tate v. District of Columbia*, 627 F.3d 904, 912 (D.C. Cir. 2010) (quoting *California v. Hodari D*., 499 U.S. 621, 624 (1991)). Defendants wisely did not cite *Tate*, which held only that a sale of a vehicle is not a seizure, and did not address any of the cases discussed above or otherwise consider whether an unreasonably prolonged seizure offends the Fourth Amendment. *See Tate*, 627 F.3d at 912.

with unreasonable delay in securing a warrant" (cleaned up)); *United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011) (assessing whether an initially lawful seizure violated the Fourth Amendment based on its duration); *Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (holding that officers' theft of property seized under a warrant violated the Fourth Amendment because the thievery prolonged the "seizure beyond its lawful duration"); *United States v. Howard*, 991 F.2d 195, 202 (5th Cir. 1993) (analyzing whether a lawfully initiated seizure violated the Fourth Amendment based on its duration); *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993) ("[E]ven with the existence of probable cause to effect a seizure, the duration of the seizure pending the issuance of a search warrant must still be reasonable."); *Moya v. United States*, 761 F.2d 322, 325 n.1 (7th Cir. 1984) (same); *United States v. Mays*, 993 F.3d 607, 616 (8th Cir. 2021) (same); *Brewster v. Beck*, 859 F.3d 1194, 1196, 1197 (9th Cir. 2017) (holding initially lawful seizure of vehicle violated the Fourth Amendment when it lasted 30 days); *United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (Gorsuch, J.) (assessing whether search of computer was the fruit of an unlawfully prolonged seizure arising from an extended delay in securing a warrant); *United States v. Mitchell*, 565 F.3d 1347, 1349, 1353 (11th Cir. 2009) (holding 21-day delay between lawfully initiated seizure and acquisition of warrant was unreasonable under the Fourth Amendment); *United States v. Bumphus*, 227 A.3d 559, 564, 568 (D.C. 2020) (holding that a police officer, who, acting on probable cause, seized a car and a cell phone left inside it, violated the Fourth Amendment by waiting four days to return the vehicle and affirming that "seizures that are reasonable at their inception may become unreasonable over time").

Writing for the Tenth Circuit, then-Judge Gorsuch framed the issue this way:

What, after all, is "reasonable" about police seizing an individual's property on the ground that it potentially contains relevant evidence and then simply neglecting for months or years to search that property to determine whether it really does hold

relevant evidence needed for trial or is totally irrelevant to the investigation and should be returned to its rightful owner?

*United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013); *see also United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009) (providing similar rationale). The scenario described by Justice Gorsuch is precisely what is at issue here. While the District may have had a legitimate basis for its original seizure of Mr. Asinor's phone, its own policies demand that detectives who intend to search a cell phone apply for a search warrant within 48 hours of recovery. MPD Special Order 15-08 § III.C.4.c. Instead, the District retained Mr. Asinor's phone for over eleven months.

This Court's case law confirms that such conduct falls within the Fourth Amendment's ambit. Following the Supreme Court, this Court has recognized that a "seizure that is reasonable at the outset can become unreasonable because of duration," *Avila v. Dailey*, 246 F. Supp. 3d 347, 355 (D.D.C. 2017) (citing *Segura*, 468 U.S. at 812–13). The Court has repeatedly affirmed this rule. For example, *Smith v. District of Columbia* interpreted *Place* and *Jacobsen* as establishing that "the Fourth Amendment permits seizures only for as long as necessary. Once a justification loses force, the government must cease the seizure or come up with a new justification." 387 F. Supp. 3d 8, 25 (D.D.C. 2019). Applying this rule, the Court held that the plaintiffs stated a Fourth Amendment claim for the District's prolonged retention of their seized property. *Id.*; *see also Jones v. District of Columbia*, 2019 WL 5690341, at *2 (D.D.C. June 13, 2019) ("[A] seizure must not only be reasonable in the first instance but must also remain reasonable over time and in light of new facts and circumstances." (citing *Segura*, 468 U.S. at 812)). Indeed, the Court has even specifically applied that rule to hold unconstitutional a lawfully initiated, but unreasonably prolonged, seizure of a cell phone. *United States v. Wilkins*, 538 F. Supp. 3d 49, 90-96 (D.D.C. 2021) (holding that, under *Place*, a 15-month delay between the seizure of the defendant's phone

incident to arrest and an application for a search warrant required suppression of the evidence obtained from the phone).

Despite the broad consensus on this issue, Defendants argue that the Fourth Amendment does not govern the prolonged retention of lawfully seized items based on a handful of out-of-circuit cases that are not only incompatible with Supreme Court decisions, but that also conflict with other opinions within their respective circuits. Defendants rely on the Seventh Circuit's decision in *Lee*, but that decision, as discussed previously, rests on a reading of *Place* that conflicts with subsequent Supreme Court decisions as well as the Supreme Court's interpretation of *Place* itself. *See Brewster*, 859 F.3d at 1197 (rejecting *Lee*'s conclusion). It also conflicts with an earlier Seventh Circuit decision that *Lee* did not address. *See Moya v. United States*, 761 F.2d 322, 325 n.1 (7th Cir. 1984) ("Even if the officers had probable cause to believe Moya's bag contained contraband, there would be a question whether the three-hour detention of the bag before seeking a search warrant was reasonable.").

The Second Circuit decisions on which Defendants rely suffer from similar flaws. Each fails even to cite *Jacobsen* or *Segura* or *Place* and contains only cursory analysis of the relevant constitutional question. *See Bennett v. Dutchess Cty.*, 832 F. App'x 58, 60 (2d Cir. 2020); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004). Moreover, Second Circuit decisions that properly engaged with Supreme Court precedent (and which the District's cases ignored) reached different conclusions. *See, e.g., United States v. Smith*, 967 F.3d 198, 202, 205 (2d Cir. 2020) (holding that lawful seizure became unreasonable under the Fourth Amendment due to its 31-day duration and citing *Place*, 462 U.S. at 701); *Krimstock v. Kelly*, 464 F.3d 246, 250, 252 (2d Cir. 2006) (scrutinizing prolonged retention of lawfully seized vehicles under the Fourth Amendment); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) ("[E]ven a seizure

based on probable cause is unconstitutional if police act with unreasonable delay in securing a

warrant." (citing *Jacobsen*, 466 U.S. at 121)).[4]

Defendants' two remaining arguments are equally uncompelling. They assert that the

prolonged retention of Mr. Asinor's phone did not offend the Fourth Amendment because it did

not invade his privacy. MTD 12. But the Supreme Court has rejected "the view that the Fourth

Amendment protects against unreasonable seizures of property only where privacy or liberty is

also implicated." *Soldal v. Cook Cty.*, 506 U.S. 56, 65 (1992); *accord United States v. Jones*, 565

U.S. 400, 406 (2012). Supreme Court precedent also debunks the government's suggestion that

the applicability of the Fifth Amendment precludes a claim under the Fourth Amendment. *See*

MTD 12. "Certain wrongs . . . can implicate more than one of the Constitution's commands. . . ."

*Soldal*, 506 U.S. at 70. When "the seizure of property implicates two explicit textual sources of

---

[4] In its briefing on the same issue in the related case, *Cameron v. District of Columbia*, the District
argued that many of the authorities cited by the plaintiffs in that case, which are also invoked by
Mr. Asinor here, do not suggest that the Fourth Amendment prohibits all unreasonable delays in
returning seized property but only those arising from *a dilatory warrant application*. *See* Def.'s
Mot. to Dismiss at 9–10 n.5, *Cameron v. District of Columbia*, 1:21-cv-2908 (D.D.C. Dec. 17,
2021), ECF 19-1. Defendants do not advance that argument in this case, *see* MTD 12–13, but for
the sake of completeness Mr. Asinor notes that such a contention is meritless. At least one court
has expressly rejected this type of distinction. *See Sandoval v. Cty. of Sonoma*, 72 F. Supp. 3d 997,
1004 (N.D. Cal. 2014), *aff'd*, 912 F.3d 509 (9th Cir. 2018) (concluding that cases holding seizures
unreasonable because of delays in obtaining a warrant governed a case involving a seizure
prolonged for a different reason and explaining that "[t]he Fourth Amendment protects an
individual's interest in possessing his property, and that interest is implicated by a delay in
returning the property"). More generally, courts have held seizures unconstitutional under the
Fourth Amendment due to their duration when the delay arose from reasons other than the need to
secure a warrant, *see Rodriguez*, 575 U.S. at 351, 355–57 (holding seizure of person unreasonably
extended for dog sniff violated the Fourth Amendment), and have imposed civil liability under
such circumstances, *see Smith*, 387 F. Supp. 3d at 25; *Brewster*, 859 F.3d at 1197; *Mom's Inc.*,
109 F. App'x at 63; *see also Krimstock*, 464 F.3d at 252 (reviewing civil unreasonable delay claim
under the Fourth Amendment). As then-Judge Gorsuch explained, the Fourth Amendment bars
unreasonable delays in obtaining a warrant to prevent police from unreasonably prolonging
owners' separation from their property. *See Christie*, 717 F.3d at 1162. The same interest is at
issue if property is unreasonably withheld for other reasons or for no reason at all.

constitutional protection, the Fourth Amendment and the Fifth[,]. . . [t]he proper question is not which Amendment controls but whether either Amendment is violated." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50 (1993).

The Supreme Court's decisions in *Place*, *Segura*, *Jacobsen, Caballes*, *Rodriguez*, and *Manuel*, and the decisions from this Court, the D.C. Court of Appeals, and every federal appellate court to consider the issue, make plain that a seizure valid at its inception can violate the Fourth Amendment due to its duration. Defendants' outlier cases do not shake this broad consensus. Plaintiffs have thus adequately pled a constitutional violation under the Fourth Amendment.

### B.  The District Bears Responsibility for Its Prolonged Retention of Mr. Asinor's Phone.

The District is liable for constitutional torts when a municipal "policy or custom" is the "moving force behind the constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (cleaned up). "There are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under [42 U.S.C.] § 1983. . . ." *Id.* One way is through "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (cleaned up).

Here, Mr. Asinor has plausibly alleged an MPD custom of retaining "cell phones seized from arrestees, where officers have no basis to believe the cell phones constitute physical evidence of a crime or contain contraband, for longer than is reasonably necessary for any legitimate law enforcement purpose." Compl. ¶ 81. Mr. Asinor has pointed to over 240 instances of unreasonably

protracted seizures of cell phones (and in one case, an iPad) between 2018 and 2021.[5] *Id.* ¶ 83. This does not include the countless others strongly suggested by the existence of a "large bin" in MPD's Evidence Control Branch used to store previously seized cell phones. *Id.* ¶ 83(i)(i), (ii).

The large number of past incidents of unreasonably retained phones, on its own, gave the District constructive knowledge of the custom. *See, e.g.*, *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 196–97 (D.D.C. 2015) (denying summary judgment on municipal liability claim based on 22 examples of a practice); *Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir. 1981) (holding that plaintiff adequately alleged municipal custom arising from four arrests "based upon the same, allegedly invalid, warrant" which "was prepared, promulgated, and executed by various employees"); *see also Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (holding allegations of five similar incidents without accompanying policy changes stated claim for municipal liability).

Further evidence of the District's constructive knowledge is a 2016 article in *The Atlantic* in which multiple attorneys complained that MPD unlawfully retained property seized from arrestees, Compl. ¶ 85, and a 2019 Police Complaints Board (PCB) Report raising concerns about similar conduct, *id.* Defendants do not discuss the article from *The Atlantic*.[6] And though Defendants emphasize that the PCB Report contained statements of praise for certain formal MPD policies on property retention, MTD 23–24, those statements are immaterial because Mr. Asinor alleges that MPD has a "practice, as opposed to [a] formal policy" of violating the Constitution.

---

[5] One seizure began in 2015, but charges against the owner were not dismissed until 2018, and the seizure lasted more than a year after that.

[6] At this stage, Plaintiffs are entitled to the reasonable inference that an article in a major national magazine about an MPD practice would have been brought to the attention of the Chief of Police. Discovery may later confirm or rebut that inference.

*Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006). The PCB report is relevant to this point because it shows that officers did not consistently follow their written policies. PCB Report at 3.

Pursuant to the District's pervasive practice, the officers who handled Mr. Asinor's property rejected his repeated demands for its return and held it for nearly a year. Compl. ¶ 75. Thus, the District's custom was the moving force behind Mr. Asinor's injuries.

Defendants' motion relies on a distortion of the legal standard for reviewing a custom claim on a motion to dismiss. Defendants contend that the examples underlying Mr. Asinor's custom theory are insufficiently detailed, MTD 22, but to plausibly allege a municipal liability claim, "the recitation of facts need not be particularly detailed." *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014). Defendants also wrongly assert that "the past events purportedly establishing a custom must be *identical* to the alleged wrongdoing underlying [P]laintiffs' claim." MTD 21 (emphasis added). This language is Defendants' own—not any court's—and the cases they cite do not support their purported rule. *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), held that a plaintiff could not establish a custom of arrests in violation of the First and Fourth Amendments based on a report documenting racial disparities in arrests, as racial discrimination was "an issue not raised in the complaint." *Id.* at 42. Likewise, *Hunter v. District of Columbia*, 824 F. Supp. 2d 125 (D.D.C. 2011), held that a plaintiff alleging that MPD had a custom "of making arrests for misdemeanors" without probable cause could not rely on a report that discussed "higher than average arrests" for only one type of misdemeanor offense, because the report did not speak to the offense for which the plaintiff was arrested, or even misdemeanors generally. *Id.* at 133–34. These cases teach that litigants cannot establish a municipal custom based on conduct unrelated to their claims, but that is not what Mr. Asinor seeks to do.

To the contrary, Mr. Asinor has easily cleared Fed. R. Civ. P. 8(a)'s low bar by plausibly alleging many past incidents of conduct that are very similar to what he experienced. Mr. Asinor's examples of the custom all involve cell phones seized by MPD and retained for three months or longer, *see* Compl. ¶ 83, just as in this case. Moreover, for each example, Mr. Asinor pled sufficient facts to show why governmental interests did not support extending the seizures for as long as MPD extended them—and therefore why the duration was unreasonable. *See Smith v. District of Columbia*, 387 F. Supp. 3d 8, 25 (D.D.C. 2019) ("Once a justification loses force, the government must cease the seizure or come up with a new justification.").

First, each example contains allegations about the charges (if any) that resulted from the arrest. *See* 2d. Am. Compl. ¶ 83. That none involved theft of a cell phone, *see id.*, makes plausible the inference that none of the cell phones was legitimately retained as stolen property. Second, Mr. Asinor has plausibly alleged that each seizure extended far longer than needed to search the phones for evidence for the same reasons as exist here: MPD generally has the administrative capacity to apply for warrants to search a cell phone within 48 hours of a seizure, *see id.* ¶ 79, and (with search warrant in hand) has the technological capacity to "extract data from a cell phone in about 30 minutes without damaging the phone," *id.* ¶ 80. Third, Mr. Asinor plausibly alleged that the government did not need to retain the phones for use at trial. The Complaint alleges that MPD's Cellebrite Kiosk technology can extract phone data without "requiring the cell phone's continued retention for authentication purposes." *Id.* ¶ 80. This allegation, which Defendants do not dispute is well-pled, supports the reasonable inference that prosecutors did not need the phones for trial— only the phones' data (if that), something MPD could extract and then return the phone. Indeed, for each example, Mr. Asinor has identified additional reasons why prosecutors would not need phones for trial as well. *See id.* ¶ 83(a)–(j) (phones retained when they were immaterial to the

30

underlying charges, after charges were dropped or not filed, after the trial ended, or after prosecutors agreed the phone should be returned). Thus, Mr. Asinor has shown that MPD repeatedly seizes cell phones in contexts like the one at issue here, and retains them for similar periods, despite similar factors making that retention unreasonable.

Although Defendants argue otherwise, the unreasonably prolonged cell phone seizures arising from MPD's response to the 2017 inauguration protest are part and parcel of this custom. The material facts are the same: the seizures lasted for months, there was no basis for considering the phones stolen property, and MPD's technological and administrative capacities permitted the extraction of any relevant evidence in far less time than it took for MPD to return the phones. The fact that some inauguration protestors faced charges while Mr. Asinor did not, *see* MTD 23, is immaterial given the key similarities between those seizures and these: the length of time and the absence of justification. Nor are Defendants correct that the 2017 inauguration protest was too unique to be relevant. MTD 23. MPD expects its officers to obtain warrants within 48 hours of a seizure, no exceptions. *See* MPD Special Order 15-08 § III.C.4.c. Even assuming that the sheer quantity of phones seized on a particular day could justify some delay in obtaining search warrants for all of them, Mr. Asinor has plausibly alleged much more than brief delays that could be conceivably explained by unanticipated volume; instead, MPD retained the phones from the inauguration protests for "at least eight months (and in some cases much longer)." Compl. ¶ 83(i); *see United States v. Smith*, 967 F.3d 198, 203, 207 (2nd Cir. 2020) (observing that a month-long delay in procuring a warrant "well exceeds what is ordinarily reasonable"); *United States v. Pratt*, 915 F.3d 266, 272 (4th Cir. 2019) (31-day delay in securing warrant for seized cell phone unreasonable); *United States v. Burgard*, 675 F.3d 1029, 1034 (6-day delay barely reasonable,

given extenuating circumstances); *United States v. Veillette*, 778 F.2d 899, 903 & n.3 (1st Cir. 1985) (3-day delay barely reasonable, given holiday weekend).

Indeed, the scale of the inauguration protests indicates that "various employees" were involved in the investigation, a fact that tends to support the existence of a custom. *Powe*, 664 F.2d at 651 (single invalid arrest warrant established custom because many employees worked on it and it led to four arrests); *see also Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding municipality liable based on a single car chase involving six officers and the municipality's failure to discipline them).

Not only do Defendants wrongly attempt to exclude seizures arising from the inauguration protest, they also incorrectly assert that Mr. Asinor only identified eight examples of unreasonable retentions besides that one, when in fact he has alleged 41, *see* Compl. ¶ 83(b)–(h), (j), not counting the ones inferable from the large bin of phones in MPD's Evidence Control Branch, *see id.* ¶ 83(i)(i), (ii). Two hundred and forty-one examples more than satisfies the custom standard; indeed, this Court has observed that even "eight incidents might conceivably suffice to get a [municipal liability claim] to a jury," *Robinson*, 130 F. Supp. 3d at 196 (addressing deliberate indifference theory).

As for the District's remaining arguments: D.C. contends that Mr. Asinor improperly relied on conversations with "unidentified attorneys" representing "unidentified clients" MTD at 22, but Mr. Asinor explained that the attorneys represented specific individuals who had their phones seized under specific circumstances. *See* Compl. ¶ 83. The attorneys' description of their clients' experiences provides a plausible basis for inferring the validity of Mr. Asinor's allegations. *Cf. King v. Holder*, 950 F. Supp. 2d 164, 171 (D.D.C. 2013) (complaints can rely on hearsay). And while D.C. asserts that Mr. Asinor has not shown that a sufficient share of arrests led to prolonged

property seizures, MTD 22 n.7, Mr. Asinor has no such burden. *Carter v. District of Columbia*, 795 F.2d 116, 124 (D.C. Cir. 1986) (concluding that no "numerical standard controls the determination of whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy"); *see also Robinson*, 130 F. Supp. 3d at 196–97 (finding municipal liability based on 22 instances of misconduct without considering the denominator); *Alexander v. Government of the District of Columbia*, 2020 WL 3573462, at *1–*3, *7 (D.D.C. July 1, 2020) (applying similar analysis). In any case, demanding that Mr. Asinor analyze the legality of every seizure arising from every MPD arrest in the past year, as the District suggests, MTD 22 n.7, is inappropriate at the pleading stage given that the circumstances surrounding those seizures are "facts . . . peculiarly within the possession and control of the defendant." *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 325 (D.D.C. 2017) (internal citation omitted).

Mr. Asinor has plausibly alleged that MPD has repeatedly retained phones for similar periods of time from people in similar circumstances and has alleged that the same factors made all of these prolonged seizures unreasonable. These allegations far exceed what courts generally require at this stage of the proceedings. *See Owens*, 767 F.3d at 403 (holding that plaintiff stated municipal liability claim by alleging custom of *Brady* violations supported only by allegation of "reported and unreported cases and numerous successful motions" regarding *Brady* abuses, which the plaintiff did not describe at all); *Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011) (denying motion to dismiss on similar grounds). Thus, Mr. Asinor has plausibly alleged that a District custom was the moving force behind his injuries.

### III.   Mr. Asinor Has Stated a Procedural Due Process Claim Under the Fifth Amendment.

"A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C.*

*Off. of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). Mr. Asinor contends that the District fails to provide an adequate process for arrestees to regain seized cell phones when no charges were filed against them and when there is no pending case in which the phones could serve as evidence. Compl. ¶ 88.

Defendants do not dispute that Mr. Asinor has a protected property interest in his phone, *see* MTD 13–20; they contend instead that the District provided due process via Superior Court Rule of Criminal Procedure 41(g), which provides: "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."

Here, however, where no charges against the property's owner were filed, and no criminal case in which the property could serve as evidence was pending, the Superior Court has no jurisdiction to hear a Rule 41(g) motion. The D.C. Court of Appeals has never recognized jurisdiction in such a context, and this Court, construing D.C. law, has rejected it. Moreover, even if there were some novel basis under which the Superior Court could have jurisdiction to hear Mr. Asinor's Rule 41(g) motions, the remedy would be too speculative to satisfy due process. Because Rule 41(g) does not provide individuals in Mr. Asinor's situation with a meaningful process to regain their property, the District has violated the Fifth Amendment.

**A. Superior Court Rule of Criminal Procedure 41(g) Does Not Provide a Meaningful Way For Individuals to Contest Prolonged Seizures of Their Cell Phones When No Charges Were Filed Against Them and When There Is No Criminal Case in Which The Phones Could Serve as Evidence.**

Rule 41(g) was not designed for situations like the one at issue here, where charges were never filed against the property owner and the seized items were not being held as evidence in a pending criminal case against someone else. The purpose of the Rule is to promote judicial efficiency by allowing the same judge who presides over the criminal case to adjudicate the related issue of whether the government must release property seized in relation to that case. *See District*

34

*of Columbia v. Dunmore*, 749 A.2d 740, 743 (D.C. 2000). The D.C. Court of Appeals has construed the Rule narrowly in light of this purpose. For example, the Rule's text—which states that "[a] person aggrieved by . . . the deprivation of property may move for the property's return"— could be read broadly to apply whenever MPD seizes property and the owner wants it back. However, the D.C. Court of Appeals has rejected such an approach, holding, for example, that owners cannot invoke the rule if MPD initiated forfeiture proceedings to acquire the seized item, *id.* at 745, or gave the item to someone else, *Stevens v. United States*, 462 A.2d 1137, 1138 (D.C. 1983). Summarizing its holdings, the court explained that it has recognized jurisdiction under Rule 41(g) only when it both "makes for economy of judicial effort to have the matter disposed of in the criminal proceeding, and where the ancillary nature of the hearing would not be supplanted by an essentially civil action in which the rights of competing claimants are resolved." *Dunmore*, 749 A.2d at 743 (cleaned up).

The first of these conditions is not met here. Charges were never filed against Mr. Asinor and he knows of no pending case in which his cell phone or any material on it could possibly have served as evidence. *See* Compl. ¶ 71. In these circumstances, it cannot promote judicial economy "to have the matter disposed in the criminal proceeding" because there is no criminal proceeding. Thus, the Superior Court would have lacked jurisdiction to hear a Rule 41(g) motion had Mr. Asinor filed one. Recognizing this gap, this Court held in *Avila v. Dailey*, 246 F. Supp. 3d 347 (D.D.C. 2017), that when a property owner is "not a defendant in a criminal proceeding, nor was there any criminal proceeding at all," Rule 41(g) is not a constitutionally adequate remedy. *Id.* at 363.

The cases on which Defendants rely do not establish that Rule 41(g) would have been available to Mr. Asinor. Two of the decisions cited involve motions filed after the movant had pled

guilty, *see Leyland v. Edwards*, 797 F. Supp. 2d 7, 9 (D.D.C. 2011); *Wilson v. United States*, 424 A.2d 130, 131 (D.C. 1980), and are thus inapposite because "the trial judge became familiar with the facts and circumstances of the case," and so assigning the matter to another judge "as a separate civil case would be a needless waste of judicial time and energy," *id.* at 132 (cleaned up).

Defendants' remaining cases involve situations in which the government filed charges and then dismissed them. *See Cousart v. Metro Transit Police Chief*, 101 F. Supp. 3d 27, 28 (D.D.C. 2015) (charges were "filed in the Superior Court of the District of Columbia" and then "dismissed without prosecution"), *Alleyne v. United States*, 455 A.2d 887, 888 (D.C. 1983) (stating that defendants were "no papered" but clarifying that this meant they were "charged" with a crime and the charges were dismissed at arraignment). In these cases, there were criminal proceedings to which the Rule 41(g) proceedings could be ancillary. But, here, as in *Avila*, there were not "any criminal proceedings at all." 246 F. Supp. 3d at 363. Defendants' contention that Rule 41(g) applies anyway departs from the D.C. Court of Appeals' careful limitations on the Rule.

Even if the Superior Court could, theoretically, exercise jurisdiction over Rule 41(g) motions in circumstances like those at issue here, the remedy would remain constitutionally insufficient because its availability in practice is entirely uncertain. As the Supreme Court has explained, a speculative remedy is no remedy at all for due process purposes. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) (stating that "lengthy and speculative" state tort remedies were insufficient to satisfy due process); *accord Avila*, 246 F. Supp. 3d at 362 (holding that the potential availability of an action *in detinue* could not provide due process because of "the absence of any examples of its successful use" in the relevant context); *Coley v. Bowser*, 2021 WL 1578295, at *10 (D.D.C. Apr. 22, 2021) (declining to dismiss due process claim based on

availability of state tort remedies in part because "it remains unclear at the motion to dismiss stage whether a state law tort remedy would adequately redress Plaintiff's alleged injuries").

Defendants have cited no cases in which the D.C. Court of Appeals has held that individuals in Mr. Asinor's circumstances can invoke the rule, and Mr. Asinor knows of none. Cases construing the federal equivalent to Rule 41(g) further illustrate the uncertainty of the remedy. Federal courts have held that, in certain circumstances, they possess jurisdiction to consider motions under the federal equivalent to Rule 41(g)—Fed. R. Crim. P. 41(g), previously Fed. R. Crim. P. 41(e)—even when no charges have been filed and no case in which the property could serve as evidence is pending. *See, e.g.*, *In re Singh*, 892 F. Supp. 1, 3 (D.D.C. 1995); *Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993). When courts apply this theory—which rests on a conception of jurisdiction that "has rarely been invoked   . . . and its very existence has been questioned," *In re Grand Jury Proc.*, 115 F.3d 1240, 1246 (5th Cir. 1997)—they treat the motions as "civil equitable proceedings," and "exercise caution and restraint before assuming jurisdiction." *Singh*, 892 F. Supp. 1, 3 (D.D.C. 1995). Moreover, it is the movant's burden to establish jurisdiction. *See Ramsden*, 2 F.3d at 325 (citing with approval cases holding that the "movant must establish" jurisdiction in this context). Thus, the availability of the 41(g) remedy to individuals like Mr. Asinor is at best speculative, and so it cannot constitute due process.

Although this Court has occasionally held that the availability of post-deprivation civil suits can satisfy due process, none of those cases involved such uncertainty over whether the remedy was, in fact, available to the plaintiff. For example, in *Medina v. District of Columbia*, the Court held that a plaintiff alleging that an administrative agency deprived him of a hearing to which he had a right could seek redress through a mandamus or a D.C. Administrative Procedures Act action in the D.C. Court of Appeals, after citing authorities confirming the availability of both

37

remedies for individuals in the plaintiff's circumstances. 517 F. Supp. 2d 272, 283–84 (D.D.C. 2007); *see also Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) (adopting similar analysis); *Dukore v. District of Columbia*, 970 F. Supp. 2d 23, 32 (D.D.C. 2013), *aff'd*, 799 F.3d 1137 (D.C. Cir. 2015) (no due process violation where "adequate post-deprivation state remedies are available"). By contrast, when a post-deprivation civil remedy's capacity to provide the plaintiff full relief was uncertain or even unknown, the Supreme Court and this Court have, as noted, held the remedy constitutionally insufficient. *See Logan*, 455 U.S. at 437; *Avila*, 246 F. Supp. 3d at 362; *Coley*, 2021 WL 1578295, at \*10.[7]

The constitutional inadequacy of Rule 41(g) in these circumstances undercuts Defendants' argument that Mr. Asinor had an obligation to invoke that rule in order to challenge it. The cases they cite for the proposition only compel litigants to test local procedures that "provide adequate process," *Medina*, 517 F. Supp. 2d at 281; MTD 16 (citing cases using similar language), and here, whether because it is entirely foreclosed to Mr. Asinor or too speculative in its availability, Rule

---

[7] *Parratt v. Taylor*, 451 U.S. 527, 543 (1981), and *Hudson v. Palmer*, 468 U.S. 517, 532–33 (1984), which permit states to rely on post-deprivation tort remedies where the deprivation arises from random and unauthorized conduct by state employees, are not to the contrary. In those cases, the availability of the tort suits was not speculative. Additionally, those cases apply "only where the challenged acts of state officials can be characterized as random and unauthorized," *Coleman v. Watt*, 40 F.3d 255, 262 (8th Cir. 1994) (citing *Parratt*, 451 U.S. at 541; *Hudson*, 468 at 53). That is not the case here because the challenged deprivation arises from a practice so pervasive as to qualify as a municipal policy. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (stating that municipalities can face liability based on customs). By contrast, here, because the District can anticipate when its legitimate interests in individuals' cell phones expire, it can provide a hearing before extending the seizure beyond that point. As the Eighth Circuit reasoned in *Walters v. Wolf*, a prolonged seizure entails two deprivations: the initial confiscation and the refusal to return the property after the government's need for the item ends. 660 F.3d 307, 314 (8th Cir. 2011). A hearing is required before the second deprivation begins. *See id.* at 315 (holding that state had obligation to provide arrestee with a hearing for the return of his seized firearm after the charges related to the seizure of the gun were resolved); *see also Zinermon v. Burch*, 494 U.S. 113, 129, 130 (1990) (describing *Parratt* and *Hudson* as "special" applications of the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test where "the value of predeprivation safeguards . . . is negligible in preventing the kind of deprivation at issue").

41(g) does not. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (holding that where the available local procedures "are constitutionally inadequate," a plaintiff's "failure to take advantage of them . . . is irrelevant").

Moreover, Defendants' suggestion (at MTD 16 n.6) that Mr. Asinor did not suffer a particularized injury for standing purposes is obviously wrong: The District's failure to provide him with a constitutionally adequate process forced him to buy a new phone, Compl. ¶ 99, and economic harm is a paradigmatic injury-in-fact, *see Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[A] loss of even a small amount of money is ordinarily an 'injury.'").

In sum, for individuals in Mr. Asinor's situation, Rule 41(g) is likely foreclosed entirely, or at best speculative. Such a procedure does not provide Mr. Asinor with the "meaningful opportunity to be heard" that he was due. *LaChance v. Erickson*, 522 U.S. 262, 266 (1998); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

### B.  The District is Constitutionally Liable for Depriving Mr. Asinor of His Cell Phone Without Due Process.

As noted previously, a plaintiff establishes the District's liability under 42 U.S.C. § 1983 by (a) identifying a predicate constitutional violation and (b) demonstrating that a District policy was the "moving force" behind it. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). In the context of Mr. Asinor's Fifth Amendment claim, Defendants do not offer any argument suggesting that, if Rule 41(g) is inapplicable, the failure to provide a process for individuals in Mr. Asinor's situation is not attributable to the District itself. *See* MTD 21–24 (challenging Mr. Asinor's custom allegations only). Nor could they. *See Smith v. City of Chicago*, 524 F.3d 834, 839 (7th Cir. 2008), *vacated and remanded as moot sub nom.*, *Alvarez v. Smith*, 558 U.S. 87 (2009) (holding that plaintiffs established municipal liability by alleging that city failed to provide prompt hearing for individuals to challenge seized property subject to forfeiture); *see also*

*Brown v. District of Columbia*, 115 F. Supp. 3d 56, 67 (D.D.C. 2015) (concluding that plaintiff stated a claim against the District for the same failure); *see also Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (granting preliminary injunction against the District for the same). To the contrary, the District argues that its due process obligations are satisfied by the availability of Rule 41(g). A municipality that relies on the availability of a certain procedure to show that it has satisfied its Fifth Amendment duties cannot escape liability when that procedure proves unavailable or constitutionally inadequate.

Turning to the predicate violation, Mr. Asinor's Fifth Amendment claim is governed by the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Although Defendants contend that *Medina v. California*, 505 U.S. 437 (1992), controls, MTD 17, that decision applies only to challenges to "the validity of state procedural rules which . . . are part of the criminal process." 505 U.S. at 443. In *Nelson v. Colorado*, 137 S. Ct. 1249 (2017), the Supreme Court recognized that it had primarily applied *Medina* to cases involving burdens of proof, and therefore invoked *Mathews* rather than *Medina* to assess a challenge to a state procedure governing "the continued deprivation of property after a conviction has been reversed or vacated, with no prospect of reprosecution." *Id.* at 1255. In reaching this holding, the Court expressly adopted the analysis from Chief Justice Roberts' dissent in *Kaley v. United States*, 571 U.S. 320 (2014), where he had concluded that *Mathews*, and not *Medina*, governed a criminal defendant's claims arising from "the collateral issue of the pretrial deprivation of property." *Id.* at 350 n.4; *see also Nelson*, 137 S. Ct. at 1255 (endorsing this analysis). Mr. Asinor's claim is highly similar to the ones in *Kaley* and *Nelson*, and pursuant to those cases, falls squarely under *Mathews*.

Under *Mathews*, defining the process that is due requires analysis of three factors: (1) the private interest at issue; (2) "the risk of erroneous deprivation of such interest through the

procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the governmental interests at stake. 424 U.S. at 335. These factors weigh strongly in favor of requiring the District to provide a prompt opportunity for a hearing after it seizes a cell phone from someone arrested but never charged.

Defendants concede, as they must, that the first factor—Mr. Asinor's interest in his cell phone—favors Mr. Asinor. MTD 19. Cell phones are central to modern life, "offer[ing] a range of tools for managing detailed information about all aspects of a person's life." *Riley v. California*, 573 U.S. 373, 396 (2014). Depriving owners of these tools works considerable hardship. For example, because of MPD's prolonged retention of his cell phone, Mr. Asinor lost access to texts, photographs, and other records. Compl. ¶ 99.

Second, the risk of officers erroneously depriving individuals of phones seized at arrest is high. Although officers may properly seize property "incident to booking," the rationale for such seizures relates largely to safekeeping, *see Illinois v. Lafayette*, 462 U.S. 640, 643 (1983), and therefore generally expires with the owners' release. To lawfully retain property, the police must have some further legitimate justification. *See Smith*, 387 F. Supp. 3d at 25. Yet MPD policy *requires* officers to retain phones seized from arrestees as evidence even where they lack probable cause to believe the phones fit that category. Under MPD Special Order 15-08, officers must "seize cell phones as evidence" and retain the phones to apply for a warrant to search them when an arrestee is "charged with any felony offenses, theft-related offenses, *or* any offenses in which there is reason to believe the device has evidentiary value." MPD Special Order 15-08 § III.C.1.a & III.C.4.c (emphasis added).[8] The policy thus treats arrests for felonies and theft as standalone bases

---

[8] The Special Order's use of the word "charged" appears to refer to the offense for which MPD members made the arrest, as opposed to any offenses listed in any charging documents filed against

to retain an arrestee's phone even where the officers know they cannot establish probable cause to believe that the cell phone was stolen or contains evidence. *See id.* Retaining property on such grounds is unlawful. *See United States v. Place*, 462 U.S. 696, 701, 706 (1983) (property seizures generally require probable cause or at least reasonable suspicion to believe the item is or contains evidence or contraband). And even where officers do have probable cause prior to seizing the phone, there is good reason to fear that the District will unlawfully hold the phone past the point reasonably necessary to obtain and execute a warrant.

In these circumstances, there is significant value in "additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, in the form of a prompt hearing on the legality of the retention before a neutral decisionmaker. Besides Rule 41(g), which is inadequate for the reasons discussed above, the only check Defendants identify is the possibility that "erroneous deprivation will be detected either by the Court or a jury at or immediately after the criminal trial in an adversary proceeding," MTD 19 (quoting *Sunrise Acad. v. United States*, 791 F. Supp. 2d 200, 206 (D.D.C. 2011)). But Mr. Asinor never faced criminal charges, so there was no trial to correct the deprivation, and Defendants offer no analysis suggesting that the federal ancillary post-trial remedies mentioned in the case they cite would be available in the Superior Court to someone in Mr. Asinor's situation. *See id.*

Finally, the governmental interest in denying such a hearing is weak. Defendants' motion identifies no challenges that would arise from providing that remedy. MTD 20.  And, while the District's briefing in the related case, *Cameron v. District of Columbia*, does contend that this type

---

an arrestee by a prosecutor. The Special Order is titled "Cell Phone *Recovery* Process" (emphasis added) and offers guidance for members on what to do in the immediate aftermath of securing a cell phone. *See id.* at § III.C.4.c (requiring detectives to secure warrants for seized phones "no later than 48 hours after the recovery"). Formal charging decisions occur later and therefore cannot be what the order is referring to.

of hearing would create a logistical problem—namely, the risk that the District would need to defend its seizure thorough one procedure *before* criminal proceedings are initiated and again via Rule 41(g) *after* criminal proceedings are initiated, *see* Def.'s Reply Br. 16–17, *Cameron v. District of Columbia*, 1:21-cv-2908 (D.D.C. Feb. 11, 2022)—the burdens it cites do not tip the scales in the government's favor. Only individuals whose property relates to a pending criminal case might receive the two hearings the government mentions, and in most cases, criminal proceedings begin so soon after arrest that there is no realistic possibility that an arrestee will seek the return of his or her property before Rule 41(g) becomes available. The possibility that a few individuals will enjoy two opportunities to be heard does not justify depriving uncharged individuals of any hearing at all. Moreover, if the government's concern is that criminal defendants will prematurely regain items needed as evidence, courts regularly consider that issue in Rule 41(g) hearings, *see In re Smith*, 888 F.2d 167, 168 (D.C. Cir. 1989) (discussing Fed. R. Crim. P. 41(e)), and the decisionmaker in the process sought here could do the same.

Holding that process is required would, moreover, align with this Court's and other circuits' case law. This Court has twice concluded that when MPD seizes a car and retains it for forfeiture, it must hold a prompt hearing to determine whether the car can be returned to the owner while the forfeiture hearing is pending. *Brown v. District of Columbia*, 115 F. Supp. 3d 56, 67 (D.D.C. 2015); *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 104 (D.D.C. 2012). The Second and Seventh Circuits have recognized the same requirement. *Smith v. City of Chicago*, 524 F.3d 834, 838 (7th Cir. 2008), *vacated and remanded as moot sub nom. Alvarez v. Smith*, 558 U.S. 87 (2009); *Krimstock v. Kelly*, 306 F.3d 40, 70 (2d Cir. 2002) (Sotomayor, J.).  These courts ordered hearings even though they implicated the same governmental burden as the one the District raised in *Cameron*: the possibility of two hearings on the same property (one promptly after the seizure

and another when the government actually sought forfeiture). Moreover, the risk of erroneous deprivation in here is higher. Whereas each of the decisions above concluded that the seizures were based on probable cause, *Brown*, 115 F. Supp. 3d at 67, *Simms*, 872 F. Supp. 2d at 93, 104; *Smith*, 524 F.3d at 835; *Krimstock*, 306 F.3d at 49, Mr. Asinor's claim involves seizures that are not necessarily justified by probable cause under MPD's policy. And, because the prior cases involved property retained for forfeiture, the plaintiffs were eventually entitled to a forfeiture hearing which would determine whether the government could keep the property. By contrast, when property is seized incident to arrest, as happened here, it is not necessarily subject to forfeiture and, consequently, there is no guarantee that claimants will receive any hearing at all.

By depriving Mr. Asinor of his cell phone and leaving him to rely on Rule 41(g)—a process he cannot invoke—the District denied him a meaningful opportunity to be heard, failing "the root requirement" of due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

## CONCLUSION

Defendants' Partial Motion to Dismiss should be denied.

Dated: February 25, 2022                   Respectfully submitted,

                                           */s/ Michael Perloff*
                                           Michael Perloff (D.C. Bar No. 1601047)
                                           Scott Michelman (D.C. Bar No. 1006945)
                                           Arthur B. Spitzer (D.C. Bar No. 235960)
                                           American Civil Liberties Union Foundation
                                           of the District of Columbia
                                           915 15th Street, N.W., Second Floor
                                           Washington, D.C. 20005
                                           (202) 601-4278
                                           mperloff@acludc.org

                                           *Counsel for Plaintiff*

---

\* Counsel thank Elaine Stamp and Jada Collins for their assistance cite-checking and proofreading this brief.