## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OYOMA ASINOR**, *et al.*, <br><br>     **Plaintiffs,** <br><br>     **v.** <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br>     **Defendants.** | **No. 1:21-cv-02158-APM** |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Plaintiffs Oyoma Asinor and Bryan Dozier allege that they attended protests near Black Lives Matter Plaza late at night on August 29, 2020.  Asinor claims that during the protest Defendant Metropolitan Police Department (MPD) Officer Shawn Caldwell directed pepper spray toward another protestor and, in doing so, exposed Asinor to the pepper spray, which he alleges constituted assault and battery as well as a violation of his rights under the District's First Amendment Assemblies Act (FAAA).  Dozier claims that during the same protest Defendant MPD Commander Robert Glover physically forced him to walk through a cloud of chemical irritant, which constituted an assault and battery and a violation of his FAAA rights.

Separately, Asinor alleges he attended a different protest on August 30, 2020.  During the protest, Asinor was arrested and his cellphone was seized incident to the arrest.  Asinor does not dispute that there was probable cause to arrest him and he does not assert any claims relating to force used against him by MPD officers on August 30; rather he alleges that MPD retained his cellphone after it no longer had any evidentiary value despite his repeated requests for its return, which constituted conversion of his property and an unconstitutional seizure under the Fourth

Amendment.  Asinor does not allege that there is any connection between the retention of his cellphone and his exposure to pepper spray on August 29.  The Court should ultimately dismiss all claims against all Defendants.

First, the Court lacks supplemental jurisdiction over Plaintiffs' state law claims relating to MPD officers' use of force, and those claims should be dismissed.  The only federal claim in this case concerns MPD's retention of Asinor's property and whether it held the property longer than was justified despite Asinor's requests for its return.  That claim has, literally, nothing to do with whether MPD officers were justified in deploying less lethal munitions on a different day.

Second, the Court should dismiss Asinor's Fourth Amendment claim because he has failed to adequately allege that any violation of his rights was caused by a municipal policy. Previously, this Court found that Asinor had failed to allege a violation of the Fourth Amendment.  On appeal, the D.C. Circuit held that he had.  Those decisions, however, addressed only whether Asinor had alleged a constitutional violation; they did not address whether Asinor adequately alleged that a District custom or practice caused any violation.  To sufficiently allege a custom or practice, Asinor must identify a "persistent or regular pattern of conduct" that is "pervasive."  He has plainly failed to do so here.  Outside of his own experience and the claims of the plaintiffs in a related case before this Court, Asinor identifies only a single individual (Michael Basillas) who purportedly was denied access to his seized property after he requested its return.  Although Asinor claims, on information and belief, that a handful of others have had similar experiences, those allegations cannot be credited because Asinor acknowledges knowing who those individuals are, which generally precludes him from relying on "information and belief."  Yet, even if the Court did credit the handful of other alleged examples identified by Asinor, when considered in the context of the fact that MPD has handled hundreds of thousands

of pieces of property during the relevant time frame, ten or so examples are insufficient to establish municipal custom. For these reasons, discussed further below, the Court should dismiss Asinor's Fourth Amendment claim and, even assuming the Court finds in the first instance that it has jurisdiction to hear Plaintiffs' state law claims, it should decline to exercise supplemental jurisdiction over the claims that have not been dismissed.

**BACKGROUND**

## I.    <u>MPD Policies and Procedures Concerning Handling of Evidence</u>

MPD has detailed policies and procedures concerning the handling of property seized from arrestees. *See* General Order 601.1, Recording, Handling and Disposition of Property Coming into the Custody of the Department (Apr. 30, 1992) (GO-SPT-601.1) (attached as Ex. A). MPD also has policies directly addressing situations when a cell phone is seized incident to an arrest. *See* Special Order 15-08, Cell Phone Recovery Process (Apr. 14, 2015) (SO-15-08) (attached as Ex. B). SO-15-08 cross-references GO-SPT-601.1.

GO-SPT-601.1 requires MPD officers to complete a PD Form 81 for property seized from arrestees. GO-SPT-601.1, Part I.A.2. "Detailed instructions for the preparation of [the] PD Form 81 are contained in Report Writing Instructions Series 91 Number 1." *Id*., Part I.C.5. Property seized is generally classified in one of 13 categories, including "Evidence." *Id*., Part I.A.6. "When the decision is made not to paper a case, the member shall have the reviewing attorney sign the PD Form 81-C releasing the property." *Id*., Part I.I.9. Similarly, "[i]f a disposition is available in the case, or the property is no longer needed for prosecution, the member shall submit a completed PD Form 81-C containing the signature of the appropriate prosecuting attorney." *Id*., Part I.I.8.b. "After 60 days, if there is no defendant or suspect in a case, and it is evident that the property will not be needed in court, the member who initially

handled the property shall prepare and submit a properly signed PD Form 81-C to their element's property officer." *Id.*, Part I.I.11.

With regard to seized cell phones, Special Order 15-08 provides for three different procedures depending on how the cell phone has been classified. First, if the cell phone has been classified as "Found" property, then "absent any circumstances or evidence indicating the cell phone is linked to a criminal offense, [MPD members] shall handle the cell phones in accordance with GO-SPT-601.1." SO-15-08, Part III.A. Second, "when members recover cell phones from arrestees, and there is no reason to believe the phone has any evidentiary value or is stolen, members shall handle the cell phones as 'Prisoner's Property' in accordance with GO-SPT-601.1." *Id.*, Part III.B.[1] Third, "when members recover cell phones from arrestees who are charged with any felony offenses, theft-related offenses, or any offenses in which there is reason to believe the device has evidentiary value," several steps follow, including "Complete a PD Form 81 and list the phone as 'Evidence' on the Property Book." *Id.*, Part III.C. Once those steps are completed, "the assigned detective shall turn the cell phone over to the District property clerk for handling according to the appropriate category (*e.g.*, 'Found Property,' 'Evidence')." *Id.*, Part III.C.6.

General Order 601.02 is also relevant to MPD's handling of property. *See* General Order 601.02, Preservation of Potentially Discoverable Material (Feb. 3, 2004) (GO-SPT-601.02) (attached as Ex. C). GO-SPT-601.02 provides that:

---

[1]    As to "Prisoner's Property," GO-SPT-601.1 provides that "[w]hen a prisoner is being released from custody and all personal property is returned, the prisoner shall affix his/her signature in the appropriate block on the Property Book." GO-SPT-601.1, Part II.A.4. "Personal property that is not returned shall be retained at the element where the prisoner was booked. The station clerk shall advise the prisoner that he/she or a person designated by him/her must claim the remaining property within 90 days. After 90 days, the property shall be forwarded, with PD Form 81, to the Property Control Branch for disposition." *Id.*, Part II.A.6.

> To ensure the integrity of any criminal investigation, all potentially discoverable material that comes into the possession of the Metropolitan Police Department (MPD) must be properly maintained and preserved, so that the prosecuting authority may disclose such material in a criminal judicial proceeding. D.C. Superior Court Criminal Rule 16 (SCR-Crim. Rule 16) states that the Government must disclose certain material to a defendant in a criminal judicial proceeding upon request.

Relatedly, Plaintiffs allege that PCB Policy Report #19-4: Handling Property (Sept. 30, 2019) (PCB Policy Report) (attached as Ex. D) placed the District on notice of whether there were problems with MPD's handling of evidence.[2] Am. Compl. [24] ¶ 85. In that report, the Police Complaints Board (PCB) explained that "the flexible and extensive nature of general order 601.1, when it is followed properly, ensures that MPD members have comprehensive guidelines to appropriately manage property." PCB Policy Report at 2. The PCB also observed that "these policies adequately set forth effective procedures for handling all varieties of property as it may come into the custody of MPD during the course of official police activities." *Id*. The PCB concluded that "MPD policies currently in place for the handling of property generally conform to best practices standards." *Id*. at 5. Although the PCB did note that it receives "approximately 50 complaints per year categorized as mishandling property," those complaints generally involved either "mistakes made during the course of custody that caused the loss or damage of property" or "property seized or stolen from community members." *Id*. at 3. The PCB did not raise any concerns about MPD officers holding property of no-papered arrestees (or any other individuals) longer than necessary, a lack of available procedures for seeking the return of seized property, or MPD officers refusing to return property when it was available for release.

---

[2] The PCB Policy Report was issued by the Police Complaints Board pursuant to D.C. Code § 5-1104(d).

Finally, D.C. Superior Court Rule of Criminal Procedure 41(g) (Rule 41(g)) expressly provides a mechanism for individuals, including no-papered arrestees, to seek the return of property seized by MPD:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

## II.    Plaintiffs' Allegations

Plaintiffs Oyama Asinor and Bryan Dozier identify themselves as photojournalists and allege that they were covering a protest against police brutality in the District of Columbia on August 29, 2020.  Am. Compl. [24] ¶¶ 18, 21–22.  Plaintiffs allege that they followed a group of protestors marching through various neighborhoods of the District for about four hours, eventually arriving at the intersection of 16th Street NW and H Street NW, beginning at approximately 11:00 p.m. that night.  *Id.* ¶¶ 24–25.  Plaintiffs allege that MPD officers stood behind "concrete barriers" going north on 16th Street and east on H Street.  *Id.*  ¶ 25.  At around 11:20 p.m., MPD officers made an arrest near the H Street barrier.  *Id.* ¶ 31.

Dozier traveled east on H Street and continued to "film officers and protestors."  *Id.* ¶ 32.  Protestors stood a "few feet in front of the officers" and, shortly after he arrived, Dozier saw "a protestor shoved near the bike officers stationed between the H Street Barricade and Vermont Avenue."  *Id.* ¶ 35.  It is not clear from Plaintiffs' allegations who shoved this individual or any of the surrounding circumstances.  Dozier "moved closer to film what was occurring."  *Id.*  Plaintiffs allege that one MPD officer released a less-lethal munition near Dozier that spread "some form of gas or smoke which contained chemical irritant."  *Id.* ¶ 37.  Another MPD officer allegedly released another munition, "causing more smoke or gas with chemical irritants."  *Id.*

¶ 40.  Dozier allegedly ran east on H Street and turned onto Vermont Avenue after these less lethal weapons were deployed; a line of riot officers marched past Dozier heading west on H Street.  Am. Compl. ¶ 44.  Defendant Glover purportedly "grabbed" Dozier and "pushed him through the line of riot officers that had just passed by him."  *Id.* ¶ 45.  Dozier would then have been in front of the line of officers, as opposed to immediately behind them.  Dozier contends he was then forced to go west on H Street, through the "clouds of irritants produced by the two munitions."  *Id.* ¶ 46.

Asinor was allegedly taking photographs near the H Street Barricade when he heard the deployment of less lethal munitions.  *Id.* ¶ 47.  Asinor then "moved closer to the intersection of H Street and Vermont Avenue to take photos of the scene and the smoke or gas produced."  *Id.* ¶ 48.  Asinor allegedly then saw riot officers advancing and ordering people to move back.  *Id.* ¶ 49.  Asinor alleges that he and nearby demonstrators and journalists retreated and, at one point, a demonstrator got closer to the officers.  *Id.* ¶ 53.  Officers allegedly grabbed this individual and pushed him to the ground; the individual then attempted to get up and move away from the officers and Defendant Caldwell allegedly then sprayed a "liquid containing chemical irritant toward the demonstrator and the people near him."  *Id.* ¶¶ 55–57.  Plaintiffs allege that around this time, another officer deployed stun grenades near the intersection of 16th and H Streets.  *Id.* ¶ 59.  Asinor and Dozier both left the scene and returned to their apartments.  *Id.* ¶ 66.

The next night, Asinor allegedly attended another, separate protest as a photojournalist.  *Id.* ¶ 67.  Asinor was arrested and an MPD officer removed his property, including his camera, cell phone, and goggles.  *Id.* ¶¶ 67–68.  Asinor was released on August 31, 2020, and informed that he was not being charged (in other words, he was "no papered").  *Id.* ¶ 71.  After he was released, Asinor asked an officer about his camera and cell phone and was informed that they

were being kept as evidence. Am. Compl. ¶ 72. Asinor allegedly contacted MPD officers several times seeking the return of his property and was advised that the property was being held as evidence. *Id.* ¶ 73. On August 31, 2021, Asinor collected his property from MPD. *Id.* ¶ 75.

### III.   Procedural History

Plaintiffs filed suit in this Court on August 12, 2021, initially naming as defendants the District as well as eight John and Jane "Doe" law enforcement officers—all MPD employees allegedly involved, in various ways, in the police response downtown on August 29–31, 2020. *See generally* Compl. [1]. About two weeks later, Plaintiffs moved (unopposed) [7] for leave to serve four interrogatories and one request for production of documents on the District, collectively designed to determine the identity of the "Doe" defendants named in the Complaint. The Court granted that request on August 24, 2021 [8]. The day after receiving the District's responses to Plaintiffs' discovery requests, Plaintiffs filed the Amended Complaint [10], substituting Commander Glover and Officer Caldwell for two of their seven "Doe" defendants, dropping Asinor's claims alleging false arrest and/or imprisonment (formerly Claims 4 and 5, Compl. ¶¶ 156–162), and adding a constitutional challenge to the District's retention of Asinor's belongings after his release from MPD custody (Claim 4, Am. Compl. ¶¶ 124-126). All named Defendants were served electronically as of September 17, 2021.

Thereafter, on October 22, 2021, Defendants filed a partial motion to dismiss the amended complaint [18]. Plaintiffs responded on November 19, filing—in lieu of an opposition—an unopposed motion for leave to amend their pleadings a second time [21]. The Second Amended Complaint, which the Court accepted by minute order dated December 1, 2021, is based on substantially the same factual circumstances as the first and second iterations but added a sixth claim (new Claim 5) alleging a procedural due process violation. *See* Am. Compl. ¶¶ 131–133. The District filed a partial motion to dismiss [29] in January 2022. The

Court granted the motion, dismissing Plaintiffs' Fourth and Fifth Amendment claims for failure

to state a claim and declining to exercise supplemental jurisdiction over Plaintiffs' remaining

claims.  Mem. Op. [33].  Because the Court found no predicate constitutional violation, it did not

reach the District's arguments concerning municipal liability under Section 1983.  *See id.*

Plaintiffs appealed the dismissal of the Fourth Amendment and the state law claims.  Notice of

Appeal [35].  The D.C. Circuit reversed the dismissal of the Fourth Amendment claim and

vacated the dismissal of the state law claims.  Judgment [40-1].

## LEGAL STANDARDS

### I.    Federal Rule of Civil Procedure 12(b)(1)—Lack of Subject Matter Jurisdiction

"Federal district courts are courts of limited jurisdiction and 'possess only that power

conferred by the Constitution and by statute.'"  *Logan v. Dep't of Veterans Affairs*, 357 F. Supp.

2d 149, 153 (D.D.C. 2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

377 (1994) (alterations omitted)).  "Plaintiffs bear the burden of establishing subject matter

jurisdiction[.]"  *Dye v. United States*, 516 F. Supp. 2d 61, 67 (D.D.C. 2007) (citations omitted).

When a Court determines that it lacks subjection matter jurisdiction, dismissal is automatic.  Fed.

R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction,

the court must dismiss the action.").

### II.    Federal Rule of Civil Procedure 12(b)(6)—Failure To State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly*, 550 U.S. at 556). Courts need not accept a plaintiff's conclusory allegations and legal conclusions as true. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678–79.

"In deciding a motion under Rule 12(b)(6), a court may consider the complaint's factual allegations, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017). "A court may take judicial notice of facts contained in public records of other proceedings, and of historical, political, or statistical facts, and any other facts that are verifiable with certainty." *Id.* "Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." *Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014); *see, e.g.*, *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013); *Carik v. Dep't Health & Human Svcs.*, 4 F. Supp. 3d 41, 48 n.4 (D.D.C. Nov. 27, 2013); *Hyson v. Architect of Capitol*, 802 F. Supp. 2d 84, 90–91 n.4 (D.D.C. 2011).

## ARGUMENT

**I.    The Court Should Dismiss Claims 1, 2, and 3 for Lack of Subject Matter Jurisdiction.**

The Court may exercise supplemental jurisdiction over state law claims only if they derive from a common nucleus of operative fact as the claims over which the Court has subject matter jurisdiction. *See* 28 U.S.C. § 1367. "The Court must, accordingly, consider whether [Plaintiffs'] state law and [federal] claims 'derive from a common nucleus of operative fact' such that [they] 'would ordinarily be expected to try them all in one proceeding.'" *Jones v. Changsila*, 271 F. Supp. 3d 9, 22 (D.D.C. 2017). Here, there is no factual or legal overlap between Plaintiffs' negligence per se, FAAA, and assault and battery claims, and Asinor's

Fourth Amendment claim.  These state law claims concern the alleged use of force by MPD officers on August 29, 2020; Asinor's Fourth Amendment claim concerns whether MPD retained his property after it no longer had evidentiary value and he requested its return.  *Compare* Am. Compl. ¶¶ 104–27 *with id.* ¶¶ 128–30.  Although both of these claims involve protests in August 2020, that is not sufficient to provide a basis for supplemental jurisdiction.  "[S]tate law claims do not derive from a common nucleus of operative facts if there is almost no factual or legal overlap between the state and federal claims," *Chelsea Condo. Unit Owners Ass'n v. 1815 A St., Condo Grp., LLC*, 468 F. Supp. 2d 136, 141 (D.D.C. 2007), or if there is "only some background factual overlap," *Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 189 (D.D.C. 2013).  The only common thread between the claims here is Asinor himself.  Whether the force purportedly used by MPD officers on August 29, 2020, against Asinor and Dozier was negligent per se, violated the First Amendment Assemblies Act, or was assault and battery, concerns different legal and factual issues than whether the retention of Asinor's property after his arrest during a different protest on a different day violated the Fourth Amendment.  In other words, Asinor's Fourth Amendment claim offers no basis for the Court to exercise supplemental jurisdiction over Plaintiffs' state law claims.  As such, the Court lacks jurisdiction over Claims 1, 2, and 3, and should dismiss them under Rule 12(b)(1).

## II.  Asinor Fails To Allege That the District Has a Custom or Practice of Retaining Property After It No Longer Has Evidentiary Value Despite Requests for Its Return.

"[U]nder 42 U.S.C. § 1983, municipalities can be held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort.'"  *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978)).  The D.C.

Circuit has identified four ways such an official municipal policy can be shown: (1) the municipality adopts a policy that violates the Constitution; (2) a "policy maker" within the government takes an unconstitutional action; (3) "the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware"; or (4) "deliberate indifference" to the risk of constitutional violations. *Id.* (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306–07 (D.C. Cir. 2003) (alteration omitted)). Under any theory, a municipal liability claim separately requires proof of causation—specifically, an "affirmative link" between the alleged municipal policy and the alleged constitutional violation, "such that [the former] was the moving force behind the [latter]." *Baker*, 326 F.3d at 1306.

Asinor does not allege that the District has an express policy that causes the retention of property after it no longer has evidentiary value despite requests for its return. Nor does he allege that his injuries were caused by the actions of a final municipal policymaker or by a final policymaker's deliberate indifference. Asinor relies only on the custom or practice theory of municipal liability. *See generally* Am. Compl.

To establish municipal policy arising from a custom or practice, Asinor must allege "that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (citation omitted). That conduct must include "concentrated, fully packed, precisely delineated scenarios," *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013), and it must be "pervasive," *Tabb v. District of Columbia*, 605 F. Supp. 2d 89, 96 (D.D.C. 2009). Further, the past events purportedly establishing a custom must be sufficiently similar to the alleged wrongdoing underlying a plaintiff's claim. *Egudu*, 72 F. Supp. 3d at 41 (holding that

report "analyz[ing] data related to disorderly conduct arrests [but] tailored toward exposing racial disparities" could not show policy or custom of "violat[ing] an individual's free speech right or the right to be free from an unlawful seizure"); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133–34 (D.D.C. 2011) (holding report could not evidence municipal custom when "plaintiff was not arrested for the offense examined in the report").  Here, Asinor has failed to allege facts supporting his claim of a "widespread" and "pervasive" MPD custom of holding property after it no longer has evidentiary value despite requests for its return.  Asinor's purported examples fall into three categories.

First, Asinor alleges that MPD unreasonably retained the cell phones of "all or nearly all" of more than 200 individuals arrested during the 2017 presidential inauguration of President Donald J. Trump.  Am. Compl. ¶ 83(i).  But the vagueness surrounding that allegation renders it useless for establishing a custom, in part, because it provides the Court with no basis to assess whether those unidentified and unnumbered individuals had sufficiently similar experiences to Asinor.  For example, Asinor contends that "many" of those individuals requested the return of their property and that "most" of them were not charged with a crime.  How "many" is "many"?  How many is "most"?  Which of those individuals were charged with a crime?  If requests were made for the return of their property, when were those requests made and to whom?  Had the USAO already determined not to press charges when the requests were made?  Had the USAO already completed a PD Form 81-C at the time of the requests?  Asinor highlights the experiences of two individuals from that group, *see* Am. Compl. ¶¶ 83(i)(i), 83(i)(ii), but those examples undermine Asinor's allegation of a custom, rather than support it.  Asinor's claim in this case is that MPD could have returned his property but *refused* to do so.  *See id.* ¶ 73.  In other words, Asinor's claim involves intentional action on the part of MPD, not mere negligence.

However, Asinor alleges that Michael Basillas and Nicole Ambruster were unable to retrieve their property, not because MPD refused to give it to them, but because their phones had been lost.  Am. Compl. ¶¶ 83(i)(i), 83(i)(ii).  Although the District in no way defends or justifies that apparent loss of property, the loss of property is a different kettle of fish than Asinor alleges.  It cannot support Asinor's custom claim.  *Cf. Egudu*, 72 F. Supp. 3d at 41.  Further, those two examples suggest that, to the extent other individuals were unable to retrieve their phones, the more likely explanation is that the phones were also misplaced, not that MPD was refusing to return them.

Next, Asinor relies again on the experience of Michael Basillas.  Am. Compl. ¶ 83(j).  But the allegations concerning his interactions with MPD are too vague to establish a custom.  According to Asinor, MPD refused to return the property at the time of Basillas's release.  *Id.*  While Asinor asserts that Basillas's property had no evidentiary value, just because an arrestee is released without charges shortly after his arrest does not mean that there is no possibility that charges may be brought at a later time or that the investigation is not ongoing.  And Asinor does not allege that Basillas made any attempt to retrieve his property after his release.  Am. Compl. ¶ 83(j).

Asinor then attempts to rely on the alleged experiences of six other individuals who he does not identify.  *Id.* ¶¶ 83(c)–(h).  As an initial matter, the Court should completely disregard those examples because they are effectively made on information and belief.  Although allegations based on information and belief are permitted "when the necessary information lies within defendants' control," *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021), by Asinor's own admission, the circumstances surrounding these unidentified individuals are not exclusively within the District's control.  *See* Am. Compl. ¶¶ 83(c)–(h).  Therefore, the Court should not

credit them when assessing whether Asinor has alleged a custom. *See, e.g.*, *United States ex rel. Conteh v. IKON Off. Sols., Inc.*, 103 F. Supp. 3d 59, 66 (D.D.C. 2015) (holding that "[the plaintiff] simply cannot credibly assert . . . that the paystubs are solely within the possession and control of [the defendant] as pretext for his necessity to plead his case based on 'information and belief,' while also attaching several of them to the very same amended complaint").

Even if the Court were to consider those claims, Asinor's own allegations reveal those examples to be too dissimilar to plead a custom. For example, five of the six unidentified individuals were actually charged with a crime, unlike Asinor. And Asinor fails to note whether MPD had received a Form PD 81-C when any requests for the return of property had been received. To the extent any delay is attributable to USAO not providing MPD with a Form PD 81-C, MPD cannot be blamed for it. Given these significant differences, the complete lack of details surrounding these "examples" renders them useless for assessing policy or custom. *Cf. Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 93–94 (D.D.C. 2011) (finding plaintiff did not state a claim for municipal liability when plaintiff offered only three examples and did not allege that "some, most, or all" individuals in similar circumstances experienced the alleged constitutional violation). MPD made more than 19,000 arrests in 2020 alone.[3] These handful of purported examples that Asinor identifies over a six-year period fall far short of plausibly alleging that "the employees' unconstitutional actions are so consistent that they have become a custom of which the supervising policymaker must be aware." *Hurd*, 997 F.3d at 337 (quoting *Monell*, 436 U.S. at 691).

---

[3]    MPD 2020 Annual Report at 28. Available at: https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf. The Court may take judicial notice of MPD's annual report. *Pharm. Research*, 43 F. Supp. 3d at 33.

Finally, Asinor contends that a 2019 Police Complaints Board (PCB) Policy Report (attached as Exhibit D) evidences the custom he alleges.  Am. Compl. ¶ 85.  To the contrary, the PCB Policy Report contradicts Asinor's argument that there is a custom of retaining property when it no longer has evidentiary value despite requests for its return.  In the report, the PCB explained that "the flexible and extensive nature of general order 601.1, when it is followed properly, ensures that MPD members have comprehensive guidelines to appropriately manage property."  PCB Policy Report at 2.  The PCB also observed that "these policies adequately set forth effective procedures for handling all varieties of property as it may come into the custody of MPD during the course of official police activities."  *Id*.  The PCB concluded that "MPD policies currently in place for the handling of property generally conform to best practices standards."  *Id*. at 5.  Although the PCB did note that it receives "approximately 50 complaints per year categorized as mishandling property," those complaints generally involved either "mistakes made during the course of custody that caused the loss or damage of property" or "property seized or stolen from community members."  *Id*. at 3.  The PCB Policy Report identified no issues surrounding the *refusal* of MPD to return property after it had received a Form PD 81-C from the prosecutor.  *Id.* at 3–4.

In sum, MPD handles over 100,000 pieces of property a year, which means that during the time period of Asinor's alleged custom, that number would be in the hundreds of thousands.[4] Asinor has alleged, at most, a dozen or so examples of MPD purportedly refusing to return property despite the property no longer having evidentiary value.  Even if one assumes— generously, giving Asinor the benefit of reasonable inferences and rounding—that Asinor is able

---

[4]    https://mpdc.dc.gov/page/evidence-control-divsion.  The Court may take judicial notice of information on MPD's website.  *Pharm. Research*, 43 F. Supp. 3d at 33.

to identify 50 examples and MPD handled only 200,000 pieces of property during the same period, that would mean that 0.025 percent, or less than one tenth of one percent, of all seized property was impacted by Plaintiffs' alleged "custom."  Such an extremely small number is not "pervasive" or otherwise indicative of a "persistent or regular pattern."  *See Egudu*, 72 F. Supp. 3d at 41.  Therefore, Claim 1 should be dismissed.

### III.    If the Fourth Amendment Claim Is Dismissed, the Court Should Not Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.

If the Court dismisses Plaintiffs' Fourth Amendment claim, it should decline to exercise supplemental jurisdiction over the remaining claims (if it otherwise believes they derive from a common nucleus of operative fact).  *See* Section I above.  When a district court dismisses all claims over which it has original jurisdiction, it "may (and indeed ordinarily should)" decline to exercise supplemental jurisdiction over the remaining state law claims.  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025); *see also* 28 U.S.C. § 1367(c)(3).  When determining whether to exercise supplemental jurisdiction, courts balance judicial economy, convenience, fairness, and comity; usually these factors "point towards declining to exercise jurisdiction over the remaining state-law claims" once federal law claims are dismissed.  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (internal quotation omitted).  Here, the litigation is in a preliminary stage and, if only Plaintiffs' state law claims remain, these factors weigh in favor of allowing local District of Columbia courts to rule on the merits of those claims.

### CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Date: October 20, 2025.                         Respectfully submitted,

                                                BRIAN L. SCHWALB
                                                Attorney General for the District of Columbia

                                                CHAD COPELAND

17

Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTION [1019878]
Assistant Chief, Equity Section

*/s/ Richard P. Sobiecki*
RICHARD P. SOBIECKI [500163]
HELEN M. RAVE [90003876]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 805-7512
Email: richard.sobiecki@dc.gov

*Counsel for Defendant*