**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OYOMA ASINOR, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>*Defendants*. | Civil Action No. 21-cv-02158 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' THIRD MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. The Complaint Plausibly Alleges the District's Liability for the Fourth Amendment Violation. ........ 9

A. Plausibly alleging a custom claim is not a demanding task. ........ 10

B. The Complaint plausibly alleges a custom claim under *Frederick Douglass Foundation* and under *Carter* as well. ........ 12

C. Defendants' Arguments for Dismissal Are Unpersuasive. ........ 17

1. Defendants are wrong that the Complaint failed to allege a discernable custom. ........ 17

2. Defendants err in arguing that the Complaint failed to allege a custom that is widespread and persistent. ........ 23

II. Supplemental Jurisdiction Over the Complaint's D.C. Law Claims Is Proper. ........ 26

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) ... 11

*Animal Legal Def. Fund, Inc. v. Vilsack*,
111 F.4th 1219 (D.C. Cir. 2024) ... 8

*Asinor v. District of Columbia*,
111 F.4th 1249 (D.C. Cir. 2024) ... 8, 9, 13, 14, 16, 19, 21, 22, 23

*Atchinson v. District of Columbia*,
73 F.3d 418 (D.C. Cir. 1996) ... 11

*Baker v. District of Columbia*,
326 F.3d 1302 (D.C. Cir. 2003) ... 9, 10, 12

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ... 9, 20, 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 9

*Bernard v. City of Palo Alto*,
699 F.2d 1023 (9th Cir. 1983) ... 23

*Black Lives Matter D.C. v. Trump*,
541 F. Supp. 2d 15 (D.D.C. 2021) ... 30

*Blumel v. Mylander*,
954 F. Supp. 1547 (M.D. Fla. 1997) ... 23

*Brower v. Cnty. of Inyo*,
489 U.S. 593 (1989) ... 21

*Brown v. Knapp*,
75 F. 4th 638 (6th Cir. 2023) ... 21

*Carter v. District of Columbia*,
795 F.2d 116 (D.C. Cir. 1986) ... 10, 11, 12, 16, 17, 24

*Chelsea Condo. Unit Owners Ass'n v. 1815 A. St., Condo. Grp., LLC*,
468 F. Supp. 2d 136 (D.D.C. 2007) ... 27, 28

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989) ... 10

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ... 10

*Connick v. Thompson*,
563 U.S. 51 (2011) ........................................................ 10

*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991) ........................................................ 21

*Doe by Fein v. District of Columbia*,
93 F.3d 861 (D.C. Cir. 1996) ........................................................ 27, 29

*Egudu v. District of Columbia*,
72 F. Supp. 3d 34 (D.D.C. 2014) ........................................................ 26

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
894 F.3d 339 (D.C. Cir. 2018) ........................................................ 9

*Evangelou v. District of Columbia*,
901 F. Supp. 2d 159 (D.D.C. 2012) ........................................................ 9

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ........................................................ 27

*Feigler v. Tidex Inc.*,
826 F.2d 1435 (5th Cir. 1987) ........................................................ 28

*Frazier v. Wexford Health Sources, Inc.*,
2021 WL 1165094 (N.D. Ill. Mar. 26, 2021) ........................................................ 27

*Frederick Douglass Foundation, Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023) ........................................................ 10, 11, 12, 16, 25

*Goodwin v. District of Columbia*,
2025 WL 637467 (D.D.C. Feb. 27, 2025) ........................................................ 29, 30

*Haley v. City of Bos.*,
657 F.3d 39 (1st Cir. 2011) ........................................................ 18

*Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*,
386 F.3d 1148 (D.C. Cir. 2004) ........................................................ 23

*Henry v. Cnty. of Shasta*,
132 F.3d 512 (9th Cir. 1997) ........................................................ 25

*Henry v. Cnty. of Shasta*,
137 F.3d 1372 (9th Cir.1998) ........................................................ 25

*Holt v. Walsh Grp.*,
316 F. Supp. 3d 274 (D.D.C. 2018) ........................................................ 9, 10

*Hunter v. District of Columbia*,
824 F. Supp. 2d 125 (D.D.C. 2011) ........................................................ 26

*Hurd v. District of Columbia*,
864 F.3d 671 (D.C. Cir. 2017) ........................................................ 8, 9

*Hurd v. District of Columbia*,
997 F.3d 332 (D.C. Cir. 2021) .......... 10, 12, 16

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989) .......... 16

*Johnson v. District of Columbia*,
725 F. Supp. 3d 62 (D.D.C. 2024) .......... 29

*Jones v. Changsila*,
271 F. Supp. 3d 9 (D.D.C. 2017) .......... 29

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) .......... 24

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996) .......... 29

*Leach v. District of Columbia*,
2022 WL 1316436 (D.D.C. May 3, 2022) .......... 11, 12

*Lipman v. Budish*,
974 F.3d 726 (6th Cir. 2020) .......... 25

*Luck v. Rovenstine*,
168 F.3d 323 (7th Cir. 1999) .......... 23

*Mwimanzi v. Wilson*,
590 F. Supp. 3d 231 (D.D.C. 2022) .......... 29

*Nelson v. Myren*,
2014 WL 2946220 (D.S.D. June 30, 2014) .......... 23

*Northington v. Marin*,
102 F.3d 1564 (10th Cir. 1996) .......... 22

*Odom v. District of Columbia*,
248 F. Supp. 3d 260 (D.D.C. 2017) .......... 11

*Owens v. Baltimore City State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014) .......... 11, 17, 18

*Page v. Mancuso*,
999 F. Supp. 2d 269 (D.D.C. 2013) .......... 11, 25

*Parker v. District of Columbia*,
850 F.2d 708 (D.C. Cir. 1988) .......... 11, 22

*Powe v. City of Chicago*,
664 F.2d 639 (7th Cir. 1981) .......... 25

*Robinson v. District of Columbia*,
130 F. Supp. 3d 180 (D.D.C. 2015) .......... 25

*Sandvig v. Sessions*,
315 F. Supp. 3d 1 (D.D.C. 2018)........................................................................................ 8, 9

*Sibert-Dean v. Washington Metro. Area Transit Auth.*,
826 F. Supp. 2d 266 (D.D.C. 2011) ..................................................................................... 29

*Tabb v. District of Columbia*,
605 F. Supp. 2d 89 (D.D.C. 2009)........................................................................................ 25

*United Mine Workers v. Gibbs*,
383 U.S. 715 (1966) ............................................................................................................. 27

*United States ex rel. Conteh v. IKON Off. Sols., Inc.*,
103 F. Supp. 3d 59 (D.D.C. 2015)........................................................................................ 24

*United States v. Mitchell*,
565 F.3d 1347 (11th Cir. 2009) ............................................................................................ 21

*United States v. Place*,
462 U.S. 696 (1983) ............................................................................................................. 21

*Whren v. United States*,
517 U.S. 806 (1996) ............................................................................................................. 21

*Wiley, Co-Trs. for Wiley v. Fleet Farm LLC*,
2025 WL 2601952 (D. Minn. Sept. 9, 2025) ........................................................................ 28

*Wisey's #1 LLC v. Nimellis Pizzeria LLC*,
952 F. Supp. 2d 184 (D.D.C. 2013).................................................................................. 28, 29

*Woods v. District of Columbia*,
2020 WL 6392775 (D.D.C. Nov. 2, 2020) ........................................................................... 12

**Statutes**

28 U.S.C. § 1367(a) ....................................................................................................... 26, 27

28 U.S.C. § 1367(b) ............................................................................................................. 26

28 U.S.C. § 1367(c) ....................................................................................................... 26, 29

28 U.S.C. § 1367(c)(3)........................................................................................................... 26

28 U.S.C. § 1367(c)(4)........................................................................................................... 29

D.C. Act 23-336, Comprehensive Policing and Justice Reform Second Emergency Amendment
Act of 2020 § 121 .................................................................................................................. 4

**Other Authorities**

ECF No. 29-1 ....................................................................................................................... 29
(Tr. Status Conf., Horse v. District of Columbia, No. 17-cv-1216 (D.D.C. Sept. 27, 2019))

*Many*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/many (last visited Nov. 19, 2025) ................ 19

Metro Police Dep't, Special Order 15-08,
*Cell Phone Recovery* § III(C)(4)(c) (Apr. 14, 2015) ............................................................. 5

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................................................ 8

# INTRODUCTION

In the late-night hours of August 29 2020, and again late on the night of August 30, MPD officers violently cleared protests near 16th Streets and H Streets NW, what was formerly known as Black Lives Matter Plaza. The officers sprayed liquid chemical irritants, fired smoke bombs, and set off flash-bang grenades—all weapons the D.C. Council had, just over a month earlier, banned officers from using at demonstrations due to similar abuses in the prior weeks. Plaintiff Bryan Dozier, a photojournalist, covered the August 29 incident and suffered significant physical and mental health injuries due to the officers' conduct. Plaintiff Oyoma Asinor, a photojournalist and documentarian, was present at both protests. On the first night, officers sprayed him with chemical irritant and shot off flash grenades in his vicinity; on the second night, officers arrested him, seized his cell phone and other possessions, and, despite releasing him the next day without charges, retained the phone and several other items for over eleven months. These incidents caused Mr. Asinor physical, mental, and economic harm; led him to suspend his attendance and coverage of protests; and resulted in him experiencing anxiety when he goes near the location where the events occurred.

Seeking relief for these injuries, Plaintiffs sued the District and several individual officers under D.C. law for their excessive force at the first protest; Mr. Asinor also brought a Fourth Amendment and conversion claim against the District for the prolonged retention of his property that began at the second protest. Defendants' latest attempt to dismiss these claims comes after their last one stumbled at the D.C. Circuit. There, the court held that Mr. Asinor stated a Fourth Amendment claim on the merits and that this Court should reconsider its denial of supplemental jurisdiction over the D.C. law claims, since the federal claim that was previously dismissed was reinstated. In their new motion, Defendants argue that the Complaint fails to allege that the District,

the sole defendant on the Fourth Amendment claim, bears culpability for it, and that the D.C. law claims falter for want of supplemental jurisdiction. Defendants are wrong on both counts.

On municipal liability, Defendants acknowledge that the District can face liability for constitutional torts that arise from widespread and persistent customs but deny that the Complaint alleged one. They advance this argument even though the Complaint contains detailed allegations describing 200-plus incidents where, as here, MPD held arrestees' cell phones for months without justification. They deem these averments inadequate to plead a District custom of unreasonably retaining phones seized from arrestees, even when combined with allegations discussing MPD's large bin for cell phones seized and not returned, a Police Complaints Board report describing officers' failures to comply with the MPD's written policies on property return, and reports from *The Atlantic* and numerous local attorneys describing the frequency with which MPD engages in conduct like what occurred in this case.

In contending that all this is not enough to plead a custom, Defendants make legal errors and rely on hairsplitting and speculation. They attack the Complaint for failing to allege that a sufficient percentage of MPD's property seizures are unlawful. But they cite no authority holding that proving, let alone pleading, a custom claim requires demonstrating that the constitutional violations occurred at some particular rate of frequency. D.C. Circuit authority strongly suggests no such showing is required. Defendants also contend that the Complaint's examples in support of its custom claim are not pleaded with enough specifics to set out a discernible practice. But the government demands a level of detail about each incident that one might expect if each example were *itself* the subject of the lawsuit. Defendants cite no authority for the proposition that, to plead a custom, each example must survive a mini-12(b)(6) motion, and case law makes clear no such requirement exists. What matters is that the Complaint plausibly alleged that, in a discrete and

specific type of situation, MPD officers retain seized cell phones in a discrete and specific way that violates the Fourth Amendment. These commonalities plausibly demonstrate a custom.

On supplemental jurisdiction, Defendants assert that the Court should dismiss the conversion claim if it dismisses the Fourth Amendment claim. But because the latter survives for the reasons discussed above, so must the former. Defendants are also wrong to assert that the remaining D.C. law claims do not arise from the same nucleus of operative facts as the Fourth Amendment claim. Both the constitutional claim and the claims involving MPD's excessive force arise from MPD's clearing of demonstrations at the same location a day a part. The District's policies, practices, and procedures for addressing protests are likely to bear on both incidents, and the damages inquiry turns on the cumulative effects of these events. That is enough to satisfy the supplemental jurisdiction statute's broad standard.

Because the Complaint has stated a claim for municipal liability, and because supplemental jurisdiction over the common law claims is proper, Defendants' motion to dismiss should be denied.

## BACKGROUND

Taking all the Complaint's well-pleaded allegations as true, on the evening of August 29, and into the early morning of August 30, photojournalist Bryan Dozier, and photojournalist and documentarian Oyoma Asinor covered a racial justice protest (the "August 29 protest") that reached the intersection of 16th and H Streets NW, what was then known as Black Lives Matter Plaza, when MPD violently disbursed it. ECF 24, 2d Am. Compl., ¶¶ 7-8, 18 ("Compl."). Mr. Asinor returned to the same location the next night with the same result. *Id.* ¶¶ 7, 18.

The August 29 protest started around 7:00 pm. *Id.* ¶ 21. Both Mr. Asinor and Mr. Dozier had their photography gear strapped across their bodies and walked alongside the protestors

throughout the District, until the demonstrators gathered around Black Lives Matter Plaza. *Id.* ¶¶ 22, 23. At a nearby intersection, a protestor was shoved and, when the crowd verbally expressed its disapproval, officers deployed smoke-bombs that released chemical irritants. *Id.* ¶¶ 35, 37. The irritant-filled smoke hit Mr. Dozier. *Id.* ¶ 37, 40-42. He started to run. *Id.* ¶ 43. Defendant MPD Commander Robert Glover, apparently not wanting Mr. Dozier to leave the way he was heading, lifted Mr. Dozier off the ground and pushed him through a line of riot officers, giving him no exit except through clouds of irritant. *Id.* 43-45. At another intersection, Defendant Officer Shawn Caldwell sprayed liquid laced with irritant toward a crowd, which hit Mr. Asinor. *Id.* ¶ 57. Officers also deployed stun grenades, producing smoke and loud noises that disoriented and terrified both Plaintiffs. *Id.* ¶¶ 59-65. MPD used these weapons to clear the protest even though, just over a month earlier, and in response to several allegations of abuse, the D.C. Council unanimously passed legislation barring officers from using such devices to clear protests. *Id.* ¶¶ 11-17 (discussing the Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 § 121).

The next night, Mr. Asinor was present for another racial justice protest (the "August 30 protest"), again it culminated at Black Lives Matter Plaza, and again MPD forcibly disbursed it. *Id.* ¶¶ 67-68. This time, Defendant Glover ordered MPD to arrest several people in the area and Mr. Asinor was swept up in the detentions. *Id.* ¶¶ 68-69. MPD officers seized his property incident to the arrest, detained him overnight, and, despite releasing him without charges the next day, retained several of his items, including his phone. *Id.* ¶¶ 70-72. MPD had no reason to think the phone was stolen given the context of the arrest: the clearing of a protest. *Id.* ¶ 76. And, to the extent officers suspected the phone of containing evidence related to a crime, they could have conducted the investigation relatively quickly. MPD policy requires officers interested in searching

seized cell phones to pursue warrants within 48 hours of the seizure, *id.* ¶ 79 (citing Metro Police Dep't, Special Order 15-08, *Cell Phone Recovery* § III(C)(4)(c) (Apr. 14, 2015)), and MPD has access to Cellebrite Kiosk technology that allows it to extract data from cell phones in about 30 minutes "without damaging the phones and without requiring ongoing retention of the devices to authenticate the data," *id.* ¶ 80. Yet MPD retained Mr. Asinor's phone, along with several other items belonging to him, for over eleven months, despite multiple requests for the property's return. *Id.* ¶¶ 73-75.

MPD's extended retention of Mr. Asinor's phone is part of widespread departmental practice. In 2017, a few years before the events at issue here, MPD arrested 200 people at Inauguration Day protests, seized phones from "all or nearly all" of them and held them "for at least eight months." *Id.* ¶ 83(i). A year later, MPD arrested someone at another protest and held their cell phone and iPad for at least three years after releasing them. *Id.* ¶ 83(j). And just a few weeks before MPD seized Mr. Asinor's phone, it confiscated phones from approximately 40 demonstrators at another protest and held each one for at least nine months. *Id.* ¶ 83(b). (This incident is the subject of the related matter, *Cameron v. District of Columbia*.) In each incident, as in Mr. Asinor's case, the context of the underlying arrest—a seizure arising from a protest—gave MPD no basis to think the device was stolen. *See id.* ¶ 83(b), (i), (j). And MPD's only other plausible law enforcement basis for retaining the phones—lawfully extracting the data—required days, not months. *See id.* ¶ 82.

MPD has engaged in similar conduct outside the protest setting. It retained: one person's phones for over three months after releasing the owner without charges in May 2021, *id.* ¶ 83(g); another person's phone one and a half years after the charges against the individual were dismissed in 2019, *id.* ¶ 83(h); and a third person's phone for about a year after taking it in 2020, despite

"agree[ing] that the cell phone should be released," *id.* ¶ 83(f). Further, between 2019 and 2020, MPD retained a theft suspect's phones even though the phones were "unrelated to the theft charge," *id.* ¶ 83(e); a robbery suspect's phone that lacked "evidentiary value" for 15 months after the individual pleaded guilty, *id.* ¶ 83(c); and another robbery suspect's phone for over a year after a trial "at which the cell phone was not introduced as evidence," *id.* ¶ 83(d). As with the other incidents, MPD retained all these phones after it no longer had a basis to think they were stolen (the seizures continued even though: all charges against the owner were dismissed, the phone was unrelated to theft/robbery allegations, or the phone was not introduced into evidence in a trial on theft/robbery charges). It also kept the phones months longer than necessary to collect any data within the phones, which, based on the Complaint's allegations, was the only other source of evidentiary or investigatory value the phones could have served. *See id.* ¶ 83(a)-(j).

The frequency with which MPD retains arrested persons' phones without reason has led it to obtain a "large plastic bin" that it filled with cell phones seized but not returned. *Id.* ¶ 83(i)(i)-(ii). On one occasion, when a former arrestee sought her phone back and officers referred her to the bin, she could not find the phone she was looking for but did locate one seized from her on another occasion. *Id.* ¶ 83(i)(ii). Officers did not allow her to reclaim it. *Id.*

MPD's mishandling of property has generated local and national attention. The District's Police Complaints Board published a report in 2019 raising concerns that MPD officers failed to return property in violation of the Department's written policies. *Id.* ¶ 85. After interviewing several local criminal defense attorneys, *The Atlantic* published an article concluding that MPD routinely retains phones for long periods of time, amounting to what one attorney described as "legal robbery." *Id*. Moreover, "numerous defense attorneys from the D.C. Public Defender Service and from the panel of attorneys maintained under the Criminal Justice Act in this District

for appointment as defense counsel have reported to undersigned counsel that prolonged retentions of the type complained of in this case and described above occur regularly." *Id.* ¶ 84.

For Mr. Asinor, this practice, along with MPD's forceful clearing of the August 29 protest, has had lasting effects. He had to purchase new equipment, experienced significant physical pain and psychological distress, began feeling anxiety around Black Lies Matter Plaza, and suspended his attendance at and coverage of protests. *Id.* ¶¶ 96-99. Mr. Dozier likewise experienced significant physical and mental health harms due to MPD's protest practices. *Id.* ¶¶ 93-95.

In August 2021, Plaintiffs filed a complaint seeking accountability and compensation for their injuries arising from MPD's handling of the August 29 and 30 protests. The lawsuit brought D.C. law claims against the District and its officers for their actions on August 29, and Mr. Asinor filed Fourth Amendment and conversion claims for the prolonged seizure of his cell phone that began on August 30.[1] The government successfully moved to dismiss. *See* ECF No. 34 (Order on Defs.' Partial Mot. To Dismiss). Plaintiffs then appealed the dismissal of the Fourth Amendment claim as well as the Court's denial of supplemental jurisdiction over the common law claims (which was predicated on the dismissal of the federal claims). *See* ECF No. 35 (Notice of Appeal).

The D.C. Circuit reversed. In an opinion that decided this case in consolidation with *Cameron v. District of Columbia*, a matter raising similar issues, the court held that "[w]hen the government seizes property incident to a lawful arrest, the Fourth Amendment requires that any continued possession of the property must be reasonable." *Asinor v. District of Columbia*, 111 F.4th

[1] Plaintiffs amended their Complaint shortly after filing, amending its claims and naming Doe defendants. *See* ECF No. 10 (Am. Compl.). After Defendants moved to dismiss, ECF No. 18 (Defs.' Partial Mot. To Dismiss), Plaintiffs filed a second amended complaint, adding a Fifth Amendment claim, *see* ECF No. 21 (Mot. To Amend). This Court ultimately dismissed that claim, *see* ECF No. 34 (Order on Defs.' Partial Mot. To Dismiss), and Plaintiffs did not appeal, *see* ECF No. 35 (Notice of Appeal).

1249, 1252 (D.C. Cir. 2024). The court further held that the plaintiffs in both cases stated Fourth Amendment claims for violating this requirement because they "have alleged that the seizures at issue, though lawful at their inception, later came to unreasonably interfere with their protected possessory interests in their own property." *Id.* at 1255, 1261. Additionally, because this Court's rulings on the common law claims derived from its constitutional holding, the Circuit vacated that judgment and remanded. *Id.* at 1261. Defendants now move to dismiss for a second time, raising arguments solely on municipal liability and supplemental jurisdiction. *See* ECF No. 52-1 (Mem. of Points & Authorities in Support of Defs.' Mot. To Dismiss), 2-3 ("MTD").

**LEGAL STANDARD**

As relevant here, a complaint need only provide "a short and plain statement of the grounds for the court's jurisdiction," Fed. R. Civ. P. 8(a)(1), and "a short and plain statement . . . showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). When reviewing a motion to dismiss—whether one contending that the complaint failed to state a claim under Rule 12(b)(6), or one that relies on Rule 12(b)(1) to contest the legal sufficiency of the complaint's invocation of subject matter jurisdiction—the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (reviewing Rule 12(b)(6) motion); *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1227 (D.C. Cir. 2024) (adopting materially identical approach in reviewing a 12(b)(1) motion). The complaint survives a motion under Rule (12)(b)(6) if it alleges facts sufficient to make plausible its claims for relief. *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 11 (D.D.C. 2018). It survives a motion under Rule 12(b)(1) if it alleges facts sufficient to make plausible its basis for jurisdiction. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339,

345 (D.C. Cir. 2018) (reviewing a 12(b)(1) motion under a standard "akin to that applied under Rule 12(b)(6)").

"Plausibility does not mean certainty," only that the claim "rises 'above the speculative level.'" *Sandvig*, 315 F. Supp. 3d at 11 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To the extent inferences must be drawn, they must merely be reasonable, *Hurd*, 864 F.3d at 678 (citing *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)), and need not be the only possible inferences. *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). The plausibility standard is a "relatively low bar." *Holt v. Walsh Grp.*, 316 F. Supp. 3d 274, 282 (D.D.C. 2018).

## ARGUMENT

The Complaint plausibly alleges that the District is liable for the prolonged seizure of Mr. Asinor's phone (Part I). Thus, there is no basis to dismiss the Fourth Amendment claim. Further, the Court has jurisdiction over the D.C. law claims because they arise from the same nucleus of operative facts as the Fourth Amendment one. (Part II). Thus, Defendants' motion fails.

### I. The Complaint Plausibly Alleges the District's Liability for the Fourth Amendment Violation.

Stating a claim for District liability under 42 U.S.C. § 1983 requires plausibly alleging, first, a predicate constitutional violation, and second, a District custom or policy that caused it. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). The D.C. Circuit's ruling on appeal resolved the first element. *Asinor*, 111 F.4th at 1255. Thus, Defendants contest only the second. *See* MTD 11.

A plaintiff can plead that element in several ways. *Baker*, 326 F.3d at 1306-07. Here, the Complaint advances a custom theory, alleging that the District adopted "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well

settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (cleaned up). Pleading a custom requires plausibly alleging that the custom comprises incidents that "coalesce into a discernible policy," as opposed to a series of unrelated events, *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986); that the custom is "persistent and widespread," *Hurd v. District of Columbia*, 997 F.3d 332, 338 (D.C. Cir. 2021) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); and that it was the "moving force" behind the predicate constitutional violation, *see Baker*, 326 F.3d at 1306 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). As explained below, plausibly alleging these elements is a "relatively low bar," *Holt*, 316 F. Supp. 3d at 282 (Part A); the Complaint has cleared it (Part B); and Defendants' arguments do not show otherwise (Part C). Thus, the Complaint has plausibly alleged District liability, and the Fourth Amendment claim survives.

**A. Plausibly alleging a custom claim is not a demanding task.**

*Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), the D.C. Circuit's most recent custom case, explained the proper approach for reviewing custom claims at the pleading stage. There, the court held that the plaintiff plausibly alleged a custom theory (along with several other bases for municipal liability) by "alleg[ing] facts *suggesting*" that the violation at issue arose from a "persistent and widespread" practice. *Id.* at 1148-49 (emphasis added). Although the court's custom analysis focused on the "persistent and widespread" inquiry, nothing in the opinion indicates that a different standard applies to the other elements of a custom claim.[2] Indeed, this Court has concluded that, to plead a practice cohesive enough to plausibly reflect a discernible "custom" (as opposed to a scattered set

[2] The court noted in passing that the District's execution of the challenged practice was "unvarying," but, in making this descriptive observation, the court did not indicate that it was articulating a pleading requirement. *See Frederick Douglass Foundation*, 82 F.4th at 1149.

of incidents), the complaint must allege "*facially similar* past wrongdoing." *Leach v. District of Columbia*, 2022 WL 1316436, at *13 (D.D.C. May 3, 2022) (emphasis added). This approach aligns with *Frederick Douglass Foundation*.

Defendants' analysis does not. They argue that pleading a discernible custom requires alleging not merely "facially similar" past acts but rather "concentrated, fully packed, precisely delineated scenarios." MTD 12. This test derives from *Carter v. District of Columbia*, but that decision reviewed a directed verdict, not a motion to dismiss, 795 F.2d at 125, as did the only other D.C. Circuit decision to invoke that standard, *see Parker v. District of Columbia*, 850 F.2d 708, 711-12 (D.C. Cir. 1988). Neither *Frederick Douglass Foundation*, *see* 82 F.4th at 1148-49, nor any other D.C. Circuit motion-to-dismiss decision has ever mentioned *Carter*'s "precisely delineated scenario" test, and the court has never implied that pleading a discernible custom requires alleging past incidents of wrongdoing that meet that standard.

This reluctance to apply the *Carter* standard at the pleading stage comports with the way courts generally assess municipal liability when reviewing motions to dismiss. In discussing the "failure to train" theory of municipal liability, an alternative approach to custom, the D.C. Circuit has explained that "alleging municipal liability under section 1983 for failure to train is to be judged not by the standards that would govern a decision on the merits, but by the liberal standard of Rule 8." *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996); *see also Odom v. District of Columbia*, 248 F. Supp. 3d 260, 267 (D.D.C. 2017) (recognizing *Atchinson*'s vitality post *Iqbal*). Other courts have reached similar conclusions. *Adkins v. City of New York*, 143 F. Supp. 3d 134, 142 (S.D.N.Y. 2015) (declining to rely on *Carter* or other decisions involving summary judgment or directed verdicts because they "applied different standards than those the Court is charged with applying" at the pleading stage); *see also Owens v. Baltimore City State's*

*Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (observing that pleading a municipal liability claim is "by definition, easier" than proving one and that the allegations underlying it "need not be particularly detailed"). And, while this Court had sporadically applied the *Carter* standard to motions to dismiss, *compare Woods v. District of Columbia*, 2020 WL 6392775, at *5 (D.D.C. Nov. 2, 2020) (invoking it in that setting), *with Leach*, 2022 WL 1316436, at *13 (omitting it), *Frederick Douglass Foundation* confirms that doing so is improper. At this stage, that decision's lenient standard for plausibly alleging a custom, and not the *Carter* "concentrated, fully packed, precisely delineated" requirement, controls.

### B. The Complaint plausibly alleges a custom claim under *Frederick Douglass Foundation* and under *Carter* as well.

The Complaint plausibly alleges a District custom of "retaining cell phones seized from arrestees, where officers have no basis to believe the cell phone constitutes physical evidence of a crime or contains contraband, for longer than is reasonably necessary for any legitimate law enforcement purpose." Compl. ¶ 81. The Complaint's allegations plausibly show (1) the conduct composing the custom is sufficiently similar to "coalesce into a discernible policy," *Carter*, 795 U.S. at 123; (2) that the custom is "persistent and widespread," *Hurd*, 997 F.3d at 338; and (3) that the custom was the "moving force," *Baker*, 326 F.3d at 1306, behind the predicate constitutional violation: the prolonged phone seizure.

Starting with the first issue, the Complaint's examples coalesce into a discernable custom. As plausibly alleged in the Complaint, the 200-plus prior incidents of unreasonable seizures all arose in the same context: a seizure of a cell phone (or in one case, an iPad) effectuated incident to an arrest.[3] Additionally, as plausibly alleged, they all involved the same injury (prolonged

[3] Each example in the Complaint either expressly states that the device seizure occurred incident to arrest, *see* Compl. ¶ 83(a), (b), (i), (j), or describes the seizure in terms that clearly imply that it was incident to arrest—for instance, that the device was seized from a "suspect" of a particular

deprivation of a device), offended the same constitutional provision (the Fourth Amendment), violated the same legal principle arising from that constitutional guarantee (the prohibition on retaining seized items when the initial justification expires and no new one emerges), and did so in a similar way: officers held each seized item after any concerns about officer safety expired, after any basis for suspecting it stolen dissipated, and for far longer than needed for any evidentiary purpose (namely extracting its data or introducing it in court). *See* Compl ¶ 83(a)-(j). Further, the Complaint offers no basis to think a new justification arose after those others dissipated. *See id.*

These commonalities not only tie the Complaint's examples to each other but also link the examples to the incidents giving rise to the Fourth Amendment violation at issue here. The Complaint's examples of past misconduct involve the same law enforcement interests that the D.C. Circuit found implicated in the seizure of Mr. Asinor's phone. In the examples, as in Mr. Asinor's experience, MPD's acquisition of devices incident to arrest gave it interests in holding the seized items to "protect the safety of arresting officers and [] prevent any destruction of evidence." *Asinor*, 111 F.4th at 1255.

Additionally, in both the Mr. Asinor's experience and in the Complaint's examples, the seizures outlasted the government's interests in similar ways. The government's safety interest would have expired when MPD either released the owner or had the ability to allow the owner's designee to collect the item. These circumstances would have alleviated the officers' need to store the item for safekeeping while they detained the owner. Yet, in each of the Complaint's examples (and in Mr. Asinor's case), MPD retained the seized item for months or years after releasing the owner without charges or after the owner's case concluded via trial or plea. *See* Compl. ¶ 83(a)-

crime, *see e.g.*, *id.* ¶ 83(c)-(f), from a person who was "no papered," *id.* ¶ 83(g), or from a person who was charged with a crime, *see id.* ¶ 83 (h).

(j). Thus, MPD extended the seizures longer than the officer-safety justification allowed. *See Asinor*, 111 F.4th at 1255 (concluding that in Mr. Asinor's case, MPD's "legitimate interests" in his phone, including its safety concerns, dissipated long before the officers returned the phones).

As for the government's interest in preserving evidence, both for Mr. Asinor himself and in the examples the Complaint describes, any investigatory objective or interest in evidence preservation expired long before the seizures concluded. As common consumer items, the phones and iPads in the Complaint's examples were not contraband, and so MPD could not keep them on that basis. *See id.* at 1260-61 (observing that police can keep contraband but nonetheless holding the seizure of Mr. Asinor's phone unreasonable). The Complaint also plausibly alleges that MPD retained all the devices after it lacked any reasonable basis to believe they were stolen. *See* Compl. ¶¶ 68-70, 76 (alleging that MPD seized Mr. Asinor's phone after arresting him in the context of breaking up a protest, not a setting likely to involve stolen goods); *id.* ¶ 83(b), (i), (j) (discussing other cell phone seizures arising from arrests during protests); *id.* ¶ 83(c), (e), (g), (h) (alleging that the seized device had "no evidentiary value," was "unrelated" to the charges against the owner, or that the seizure continued after the owner was released or had charges dismissed); *id.* ¶ 83(f) (alleging that MPD kept a phone after agreeing that it should be returned); *id.* ¶ 83(d) (alleging that MPD retained a phone more than a year after the owner's trial even though it "was not introduced as evidence").

To the extent any device could have otherwise had law enforcement value, the only conceivable reason, based on the Complaint's allegations, is that police expected its data to contain evidence or information that could assist with an investigation. *See id.* ¶ 83(a)-(j). As to that possibility, the Complaint plausibly alleged that MPD could have obtained a warrant within days and extracted the data within minutes, all without damaging the phone or needing to keep it for

authentication purposes. *See id.* ¶¶ 78-80, 82. Yet, for both Mr. Asinor and the individuals discussed in the Complaint's examples, MPD retained the devices for months and years. *See id.* ¶¶ 78-80, 83(a)-(j). The Complaint offers no basis for concluding that another justification emerged in that time. *See id.* Thus, Mr. Asinor's own case and his examples all violated the Fourth Amendment under *Asinor* for similar reasons. *See* 111 F.4th at 1255-56 (holding that a seizure violates the Fourth Amendment when it continues past its original justification without a new rationale arising).

Turning to the second element of a custom claim, the Complaint plausibly alleges that the pattern or policy underlying these incidents is widespread and persistent. The Complaint identifies over 200 similar incidents where MPD retained an arrestee's cell phone for months or years after the justification for seizing it expired and no new one emerged. Compl. ¶ 83(b)-(j). Plaintiffs have also alleged that MPD had to obtain a "large bin" just to hold the phones it seized but failed to give back, *id.* at ¶ 83(i)(i)-(ii); that the Police Complaints Board documented repeated instances where MPD officers improperly failed to return property in violation of the Department's written policies, *id*. ¶ 85; and that an *Atlantic* article found that MPD frequently engages in prolonged property seizures like the ones that occurred here, *see id.* Further, the Complaint avers that "numerous defense attorneys from the D.C. Public Defender Service and from the panel of attorneys maintained under the Criminal Justice Act in this District for appointment as defense counsel have reported to undersigned counsel that prolonged retentions of the type complained of in this case and described above occur regularly." *Id.* ¶ 84. These allegations make the existence of a widespread and pervasive custom plausible.

Finally, the Complaint has plausibly alleged that the custom was the moving force behind the predicate Fourth Amendment violation. The allegations discussed above plausibly show that, when the District arrests someone and takes their cell phone, its "standard operating procedure,"

*Hurd*, 997 F.3d at 338 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)), is to retain the phone long after its officers have a legitimate reason for doing so. That is precisely what occurred here. *See Asinor*, 111 F.4th at 1255-56 (holding that the Complaint plausibly alleged that MPD's retention of Mr. Asinor's phone violated the Fourth Amendment on such grounds). Given the similarity between the predicate Fourth Amendment claim and the challenged practice, *see* pp. 12-15, *supra*, it is reasonable to infer that MPD retained Mr. Asinor's phone as long as it did because that's just how MPD does business. For these reasons, the Complaint has stated custom claim under *Frederick Douglass Foundation*.

Moreover, even if, contrary to that decision, the burden of showing "concentrated, fully packed, precisely delineated scenarios" applied at the pleading stage, the Complaint has met it. That framework serves to distinguish a set of "scattered" incidents that "do not line up" from ones that "coalesce into a discernible 'policy.'" *Carter*, 795 F.2d at 123-24. The Complaint accomplishes this objective because all its examples involve the same specific "scenario." In each one, officers first conduct an arrest. Then, they seize an electronic device that has law enforcement value, if at all, because (a) the police need to hold it for safekeeping while the owner is detained, (b) it might have been stolen, or (c) its data may have investigatory or evidentiary uses. Finally, the officers retain the device after (a) releasing the owner or having an opportunity to give the phone to a designee so they no longer need to keep it for safekeeping, (b) determining it wasn't stolen, and (c) months or years longer than necessary to lawfully extract that data—all without any new justification emerging. This case, thus, differs from *Carter* itself, where the plaintiff attempted to establish a custom of "excessive force" based on incidents where officers used quite different degrees of force in very different settings, ranging from arrests to custodial detentions. *See id.* Those incidents lacked a common form; here, the Fourth Amendment violations in Plaintiffs'

examples share the same contours. The Complaint's allegations thus satisfy *Carter* by doing what the plaintiff in that case did not: presenting a "pattern or policy [that] a trier could see." *Id.* at 125.

In sum, the Complaint has plausibly alleged that the predicate Fourth Amendment violation was caused by a widespread, pervasive practice of MPD officers retaining cell phones seized from arrested persons long after the rationales for holding the items expired. The Complaint has thus stated a custom claim.

**C. Defendants' Arguments for Dismissal Are Unpersuasive.**

The government contends that the Complaint's custom examples are not pleaded with adequate specificity to form a discernible custom and that there are not enough of them to plausibly contend that the challenged practice is widespread and persistent. Neither is correct.

**1. Defendants are wrong that the Complaint failed to allege a discernable custom.**

Defendants' demand for details is flawed for several reasons. For starters, the government bases this argument on the *Carter* standard, *see* MTD 11-12, which, as discussed above, does not apply. More fundamentally, Defendants offer little analysis as to the relevance of the facts it contends Plaintiffs omitted. A complaint could always allege more. The key question is whether it alleged enough.

Here, it has. As explained above, the Complaint recounts past examples with sufficient detail to plausibly allege that, in each one, officers violated the Fourth Amendment in the same discrete and specific manner. Especially at the pleading stage, this suffices to establish a discernible practice. For instance, in *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014), the Fourth Circuit held that the plaintiff plausibly alleged a custom of police officers withholding exculpatory evidence by averring the existence of "reported and unreported cases and numerous successful motions" involving *Brady* violations from around the same time as the *Brady* violations in his own criminal case. The plaintiff did not describe the circumstances of the other

cases and motions; he did not specify whether they involved officers withholding evidence intentionally or negligently, whether the officers acted on orders from the prosecutors, or whether the type of evidence withheld in the other cases was similar to the type of evidence withheld in his own. *See id.* at 403-04. Nonetheless, the court deemed his allegations sufficient to plead a custom claim. *Id.* The First Circuit recognized a custom claim in similar circumstances. *See Haley v. City of Bos.*, 657 F.3d 39, 53 (1st Cir. 2011); *see also Owens*, 767 F.3d at 403-04 (discussing *Haley*). The Complaint here has gone further, alleging a set of incidents that not only violate the same constitutional rule but also do so in the same way. No further details are necessary.

This conclusion is bolstered by examining the four types of facts that Defendants assert that the Complaint omitted. Each type is either plausibly alleged by the Complaint, irrelevant, or both. First, Defendants suggest that the Complaint's past examples should count only if they involve individuals who, like Mr. Asinor, were released without charges. MTD at 13-14. Defendants provide no reason for demanding this overlap, and the constitutionality of the Complaint's examples do not depend on it. Even if some of the Complaint's examples involved people facing active investigations, the Complaint's allegations, and reasonable inferences therefrom, plausibly show that the seizures of those individuals' phones lasted longer than any such investigation would have justified and did so for similar reasons. Specifically, the Complaint plausibly alleges that, in each example, the seizure persisted after its original rationales concluded and without any new one emerging: officers retained the devices after they no longer needed to hold it for safekeeping, after the officers dispelled suspicions that the phone was stolen, and longer than reasonably necessary to lawfully extract any data (which, in each example, was the only source of investigative or evidentiary value the device could conceivably have had). *See* Compl. ¶ 83(a)-(j). Thus, to the extent some examples involve people facing charges, the length of the phone

seizure still violated the Fourth Amendment in the same fundamental way as in Mr. Asinor's experience and in the other examples.

Second, Defendants suggest that the examples fail to consistently state that owners asked for the return of their phones. MTD 12-13. Yet the Complaint's examples repeatedly describe how the seizures persisted after owners "requested" their device back (or that MPD "refused" to return the device, which in turn implies that there was a request to be declined). Compl. ¶ 83(a)-(j). Defendants' only counterpoint is that the allegations about the 2017 Inauguration Day protests state that "many" protestors asked for their phones back without supplying a specific number. MTD 13. This objection is trivial. Many means a "large but indefinite number,"[4] and even a "large" share of the 200 extended phone seizures arising from the Inauguration Day protests would exceed the number of examples courts generally require to establish a custom, which may be under 10, as discussed in the cases cited in Part I.C.2, below.

More fundamentally, the duration of a property seizure can be unreasonable even if owners do not request the return of their items. Officers have an affirmative duty to release property when the justification for holding it terminates. The D.C. Circuit made this clear: "If the rationales that justified the initial retention of the plaintiffs' effects dissipated, and if no new justification for retaining the effects arose, *then the Fourth Amendment obliged the MPD to return the plaintiffs' effects*." *Asinor*, 111 F.4th at 1256 (emphasis added); *see also id.* at 1255, 1261 (holding that the Complaint stated a prolonged seizure claim without mentioning Mr. Asinor's requests for the return of his phone). Thus, it is ultimately irrelevant whether the individuals in the Complaint's

[4] *Many*, Merriam-Webster, https://www.merriam-webster.com/dictionary/many (last visited Nov. 19, 2025).

examples asked for their items back. MPD officers had an obligation to return them when the rationale for the seizure terminated, which the Complaint plausibly alleges they did not do.

Third, Defendants err in contending that the Court must ignore examples because they fail to state that officers refused to return individuals' property. MTD 13-14. Defendants insist on this detail in part because they assume the Complaint defined the custom as one of where "MPD could have returned [individuals'] property but *refused*" to do so. *Id.* In fact, the Complaint defines the custom as one of officers "retaining cell phones seized from arrestees . . . longer than reasonably necessary," whether a refusal was involved or not. Compl. ¶ 81. Thus, the Complaint's articulation of the custom does not inherently require officers to refuse to return seized items.

Defendants' emphasis on "refusals" also appears to reflect a view that a seizure's duration violates the Fourth Amendment only if police extended it through affirmative, intentional conduct. *See* MTD 13-14. Even if such a requirement existed (which, as discussed below, it does not), the Complaint's examples meet it. Those incidents, as noted, generally involve MPD retaining phones after requests for the item's return. *See* Compl. ¶ 83(a)-(j). Reading the Complaint with reasonable inferences, these allegations make it plausible that MPD officers affirmatively and intentionally caused the seizure to persist. Defendants make much of the fact that two of the Complaint's examples involve MPD losing individuals' phones, MTD 13-14, but their assertion that the rest of the examples could have arisen from similar circumstances is pure speculation, at best reflecting an alternative plausible account that does not justify dismissal given that the Complaint's explanation is plausible too, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("A complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." (cleaned up)).

More fundamentally, Defendants are wrong to suggest that the Fourth Amendment bars prolonged seizures only when the extension arises from officers' affirmative, intentional acts. Affirmative conduct is not required to make property retention unlawful: omissions (like failing to facilitate the return of an item) can be just as unconstitutional as actions (like refusing to give the phone back). *See United States v. Place*, 462 U.S. 696, 709-10 (1983) (holding that officers' failure to "diligently pursue their investigation" made property seizure unreasonable). Nor is intentionality required to make a seizure unreasonable. While officers must act intentionally to *initiate* a seizure, *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989), the reasonableness of their conduct is an objective inquiry, *see Whren v. United States*, 517 U.S. 806, 813-14 (1996). Basic Fourth Amendment doctrine thus makes clear that, although officers cannot seize a person or an item unintentionally, the seizure can be unreasonable even absent intent to violate the Fourth Amendment.

Cases from the Supreme Court and federal appeals courts regularly apply this principle. Courts have held seizures of property unlawful based on their duration even when the officer did not intend to prolong it or did not do so based on affirmative conduct. *See Place*, 462 U.S. at 710; *United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009) (holding that officers unreasonably extended seizure where they prolonged it because they "simply believed that there was no rush" to secure a warrant). Courts likewise do not consider intent in evaluating person seizures, a related setting, *see Asinor*, 111 F. 4th at 1256-57. Officers who detain arrested persons for more than 48 hours without a hearing, thereby violating *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), cannot avoid liability by saying "I forgot." *See Brown v. Knapp*, 75 F. 4th 638, 651-52 (6th Cir. 2023) (rejecting argument that establishing *Riverside* violations requires intentional conduct).

These cases refute Defendants' contention that the Complaint must allege prolonged seizures arising from affirmative, intentional actions (though, in any case, Plaintiffs largely did so).

Fourth and finally, Defendants err in asserting that the Complaint's examples can inculpate the District only if they rule out the possibility that "any delay" in the device's return was "attributable to USAO" holds on the seized items. MTD 15. In discussing its examples, the Complaint consistently alleges it was MPD that did not return the phones (or, sometimes, "the government," which when read in context, can reasonably be inferred to mean the same). Compl. ¶ 83(a)-(j). This makes it plausible that MPD acted at least partially on its own. In any case, nothing in the Complaint suggests that USAO holds were the sole or even partial cause of the prolonged retention in the examples. Defendants' speculation that those holds might have extended the seizure, at best, provides an alternative, plausible account, which, as discussed previously, offers no basis for dismissal given that the Complaint's version of events is plausible as well. *See Banneker Ventures*, 798 F.3d at 1129.

Moreover, as a legal matter, Defendant is wrong to assert that the USAO's possible role in the duration of the seizures insulates the District from liability. The District had physical custody of the devices in all the examples the Complaint identifies. When the initial rationale for retaining the devices dissipated and no new justification arose, as the Complaint plausibly alleges was the case in each incident, then then the Fourth Amendment "obliged *the MPD* to return" the devices. *Asinor*, 111 F.4th at 1256 (emphasis added). Even if the USAO instructed MPD to retain the items, the officers' decision to obey that unlawful order, and shirk their affirmative Fourth Amendment duties, was a "substantial factor," and therefore a "moving force" behind the custom that led to Mr. Asinor's injuries. *Parker v. District of Columbia*, 850 F.2d 708, 714 (D.C. Cir. 1988); *see Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996) (observing that joint and several

liability is permissible under § 1983 and collecting circuit cases to that effect); *accord Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1153 (D.C. Cir. 2004) (Roberts, J.).

In the context of prolonged person seizures, which as noted is a related setting, *see Asinor*, 111 F. 4th at 1256-57, courts have rejected arguments similar to the one Defendants advance. For example, the Seventh Circuit held that a county sheriff's office violated the Fourth Amendment through a policy of refusing to release individuals brought to its jail by other law enforcement agencies unless "directed to do so by a judge or prosecutor." *Luck v. Rovenstine*, 168 F.3d 323, 325, 327 (7th Cir. 1999). "In the final analysis," the court reasoned, "the sheriff is the custodian of the persons incarcerated in the jail, and as such, it is he who is answerable for the legality of their custody." *Id.* at 326. Other courts have reached similar conclusions. *See, e.g.*, *Bernard v. City of Palo Alto*, 699 F.2d 1023, 1027 (9th Cir. 1983) (holding that county, as the entity "responsible for operating the jail [that] has custody over arrestees," could not pass the buck for prolonged detentions to other agencies); *Nelson v. Myren*, 2014 WL 2946220, at *6 (D.S.D. June 30, 2014) ("Even if the sheriff is not responsible for the delay in bringing an arrestee before a magistrate, he must release an arrestee who has been held longer than is reasonable." (citation omitted)); *Blumel v. Mylander*, 954 F. Supp. 1547, 1557 (M.D. Fla. 1997) (reaching similar conclusion). Thus, because the Complaint alleges that the District physically held the devices at issue in its examples, any speculation that the USAO extended the seizures is immaterial. This argument, like Defendants' others, fails to undercut the Complaint's plausible allegations of a discernible custom.

**2. Defendants err in arguing that the Complaint failed to allege a custom that is widespread and persistent.**

The government's second major argument, that the Complaint has not pleaded a widespread and persistent custom, is similarly deficient. Defendants are wrong to assert that

several of the Complaint's examples should be discounted because they are "effectively" pleaded on information on belief. MTD 14-15. The phrase "information and belief" never appears in the Complaint, and the government never defines what it means for allegations to invoke that standard "effectively" rather than actually. Nor do the cases it cites, which make no mention of this distinction. *See Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021); *United States ex rel. Conteh v. IKON Off. Sols., Inc.*, 103 F. Supp. 3d 59, 66 (D.D.C. 2015). Indeed, the examples the government assails are pleaded not on "information and belief" but rather on information obtained from the device owners' attorneys, *see* Compl. ¶ 83(c)-(h), a plainly plausible foundation.

Defendants also offer no persuasive reason to disregard the Complaint's other allegations of the custom's pervasiveness. Defendants emphasize that the Police Complaints Board report covers different types of property abuses than the ones at issue here, MTD 16; however, the report's relevance is in showing that officers repeatedly violate MPD's property policies, a fact that supports the plausibility of Plaintiffs' custom allegations generally. As for *The Atlantic* article and the representations from "numerous defense attorneys" about MPD "regularly" engaging in conduct like that at issue here, Compl. ¶¶ 84, 85, Defendants say nothing at all.

Defendants' most sweeping argument—that the Complaint's examples constitute too small a percentage of the total number of MPD seizures to plausibly allege a custom, MTD 16-17—is wrong as well. The D.C. Circuit has strongly suggested that this line of argument fails, explaining that proving (let alone pleading) a custom does not require meeting a specific statistical target and therefore no "numerical standard" controls. *Carter*, 795 F.2d at 124. A contrary rule would impose massive discovery and investigative burdens on plaintiffs, making the possibility of custom claims illusory. At the pleading stage, these considerations are even more salient: There has been no opportunity to assess the total number of property seizures the District effected.

Perhaps for these reasons, cases evaluating custom claims, both at the pleading stage and at later phases, do so based on an absolute number of examples, not percentages. The 200-plus instances of misconduct the Complaint identifies far exceed the number of examples courts have required. Indeed, even if the Complaint had alleged only "a dozen or so examples," the sum Defendants contend arguably survive its (misguided) culling efforts, MTD 16, the Complaint would still have pleaded many more incidents than courts generally demand. *See, e.g.*, *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122, 1148-49 (D.C. Cir. 2023) (holding that plaintiff alleged a custom of selective enforcement by identifying one instance where MPD acted on a law that it had generally overlooked); *Lipman v. Budish*, 974 F.3d 726, 748 (6th Cir. 2020) (holding six examples of the custom sufficient); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518 (9th Cir. 1997), *op. amended on denial of reh'g*, 137 F.3d 1372 (9th Cir.1998) (four instances sufficient to survive summary judgment); *Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir. 1981) (holding that plaintiff adequately alleged municipal custom arising from four arrests "based upon the same, allegedly invalid, warrant" which "was prepared, promulgated, and executed by various employees"); *cf. Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 196 (D.D.C. 2015) (holding that plaintiff established "sufficiently widespread" practice to survive summary judgment on deliberate indifference claim—another theory of municipal liability—based on 22 past examples of misconduct, and noting that eight incidents might have sufficed).

Defendants offer no case holding that a plaintiff must meet a particular statistical cutoff. The authorities it cites merely reject custom claims that relied on two or fewer examples that were close in time to the events at issue, *see Page v. Mancuso*, 999 F. Supp. 2d 269, 284-86 (D.D.C. 2013) (two incidents plus several seven-year-old examples insufficient); *Tabb v. District of Columbia*, 605 F. Supp. 2d 89, 96 (D.D.C. 2009) (one prior incident), or rejected claims that

invoked evidence having nothing to do with the harms the plaintiffs alleged, *see Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 42 (D.D.C. 2014) (report raising concerns about racial disparities in arrests did not support custom of First Amendment violations); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011) (seven-year-old report alleging "higher than average," though not necessarily wrongful, arrests for disorderly conduct did not support custom leading to plaintiff's allegedly unlawful detention on a different charge).

In sum, the Complaint has plausibly alleged that the predicate Fourth Amendment violation arose from a District custom of retaining arrestees' cell phones longer than reasonably necessary for any law enforcement purpose. Defendants' arguments to the contrary are baseless.

## II. Supplemental Jurisdiction Over the Complaint's D.C. Law Claims Is Proper.

The supplemental jurisdiction statute states:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Subsection 1367(b) applies only to actions where the sole basis for jurisdiction is diversity of citizenship; thus, that exception is irrelevant in this federal question case. Subsection 1367(c) lists four discretionary grounds on which the Court may decline supplemental jurisdiction that it otherwise possesses.

Defendants advance two distinct arguments on supplemental jurisdiction. One concerns only the conversion claim arising from MPD's prolonged retention of Mr. Asinor's phone. There, Defendants contend that "[i]f the Court dismisses Plaintiffs' Fourth Amendment claim," MTD 17, it should also dismiss the conversion claim by invoking one of the discretionary factors—specifically § 1367(c)(3), which permits courts to decline jurisdiction over state law claims when

it has "dismissed all claims over which it has original jurisdiction." Because the Court should not dismiss the Fourth Amendment claim, the premise of this argument fails, and the conversion cannot be dismissed on this ground.

Defendants fare no better in their second argument, which asserts that the D.C. law claims arising from the August 29 protests fall outside § 1367(a) altogether. *See* MTD 10-11. Section 1367(a) authorizes courts to hear state claims that arise from the same "nucleus of operative facts" as a federal one. *Doe by Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996) (per curiam) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). "A common nucleus of operative facts exists when there is a link or overlap between the facts of the state and federal claims." *Chelsea Condo. Unit Owners Ass'n v. 1815 A. St., Condo. Grp., LLC*, 468 F. Supp. 2d 136, 141 (D.D.C. 2007). This is a "broad jurisdictional grant." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005); *see also Frazier v. Wexford Health Sources, Inc.*, 2021 WL 1165094, at *6-7 (N.D. Ill. Mar. 26, 2021) (exercising jurisdiction over claim arising from dispute over a different clause of a different contract than the claim that conferred jurisdiction).

Here, a link or overlap exists between the D.C. law claims arising from the August 29 protest and the Fourth Amendment claim. Both sets of claims arise from MPD's forcible dispersing of protests at the same location a day a part. Both sets of claims, therefore, involve facts about MPD's policies and practices for dispersing protests and for investigating them. Moreover, facts about the August 29 incident may have shaped MPD's response to the August 30 incident and help explain what crimes, if any, it was investigating when it refused to return Mr. Asinor's phone.

In addition to overlapping on liability, the claims overlap on damages, as Mr. Asinor's injuries implicate facts from each incident. Specifically, Mr. Asinor seeks compensation for, among other harms, his inability to attend and cover protests. Compl. ¶¶ 96-99. The Complaint makes

clear (or at minimum plausible) that these injuries did not arise solely from the August 29 incident (which is the context where the Complaint first discusses them) but also from the seizure of his property and attendant economic harms that began on August 30. *See id.* ¶ 98 (noting that the August 29 incident "contributed to [Mr. Asinor's] decision to stop attending and covering protests" but that he did not make that choice until a "few months later," after the prolonged deprivation of his items began). Claims that share operative facts about damages fall within § 1367(a)'s wide berth. *See Feigler v. Tidex Inc.*, 826 F.2d 1435, 1436 (5th Cir. 1987) (holding that court had pendant jurisdiction over federal claim occurring on the high seas and state claim arising from an automobile accident because both incidents contributed to plaintiff's back injuries); *Wiley, Co-Trs. for Wiley v. Fleet Farm LLC*, 2025 WL 2601952, at *9 (D. Minn. Sept. 9, 2025) (discussing *Feigler* and other cases that stand for the same principle). And, because Mr. Asinor's claims from August 29 are indisputably related both factually and legally to Mr. Dozier's (they assert the same legal theories and seek relief from the same course of conduct), the latter claims fall within the Court's jurisdiction as well.

The cases Defendants cite do not prove otherwise. The D.C. law claims in this case do not merely provide "general background" information for the federal ones but directly inform aspects of those claims. None of the Defendants' authorities, for instance, assessed whether the claims overlapped in terms of damages. *See Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 189 (D.D.C. 2013); *Chelsea Condo. Unit Owners Ass'n*, 468 F. Supp. at 142; *Jones v. Changsila*, 271 F. Supp. 3d 9, 23 (D.D.C. 2017). That consideration alone distinguishes this case from ones where the overlapping facts provided nothing more than "general background." *Wisey's #1*, 952 F. Supp. 2d at 189.

Further, none of § 1367(c)'s discretionary factors counsel in favor of the Court declining to hear the claims arising from the August 29 protest. Defendants do not assert that any of those factors applies. MTD 10-11. And because the factors are not jurisdictional, *LaShawn A. v. Barry*, 87 F.3d 1389, 1396 (D.C. Cir. 1996) (en banc), Defendants have waived any argument based on them, *Doe by Fein*, 93 F.3d at 871.

In any event, such arguments would fail. Regarding § 1367(c)'s first factor, the D.C. law claims are not particularly "novel or complex." This Court regularly considers assault, battery, and negligence per se claims. *See, e.g.*, *Johnson v. District of Columbia*, 725 F. Supp. 3d 62, 69 (D.D.C. 2024) (assault and battery); *Mwimanzi v. Wilson*, 590 F. Supp. 3d 231, 260 (D.D.C. 2022) (battery); *Sibert-Dean v. Washington Metro. Area Transit Auth.*, 826 F. Supp. 2d 266, 272 (D.D.C. 2011), *aff'd*, 721 F.3d 699 (D.C. Cir. 2013) (negligence per se). And it has also assessed liability for violations of the First Amendment Assemblies Act on several occasions. *See, e.g.*, ECF No. 29-1 (Tr. Status Conf., Horse v. District of Columbia, No. 17-cv-1216 (D.D.C. Sept. 27, 2019)) 26:24–28:5; 31:22–32:2 (assessing whether the statute provides a private right of action and whether its provisions could serve as a basis for negligence per se liability ); *Goodwin v. District of Columbia*, 2025 WL 637467, at *21 (D.D.C. Feb. 27, 2025) (considering negligence per se theory under the statute). Regarding § 1367(c)'s second factor, the D.C. law claims are unlikely to "substantially predominate[]" over the Fourth Amendment claim, which requires examining a widespread and persistent practice. Section 1367(c)'s third factor is inapposite because it applies only if no federal claims remain, and here, the Fourth Amendment claim should survive. Nor does this case involve any "exceptional circumstances," § 1367(c)(4), as the D.C. law claims and the underlying circumstances are similar to many cases in this Court arising from MPD responses to protests. *See,*

*e.g.*, *Goodwin v. District of Columbia*, 2025 WL 637467, at *21; *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 26 (D.D.C. 2021).

In sum, the Court can and should exercise supplemental jurisdiction over all Plaintiffs' D.C. law claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: November 20, 2025

Respectfully Submitted,
*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
Art Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
Foundation of the District of Columbia
529 14th Street NW, Ste. 722
Washington, D.C. 20045
mperloff@acludc.org
(202) 457-0800

*Counsel for Plaintiffs**

*Counsel wish to acknowledge paralegal Ameerah Adetoro for her assistance in the preparation of this brief.